IN THE SUPREME COURT OF NORTH CAROLINA

No. 425A21-3

Filed 2 April 2026

HOKE COUNTY BOARD OF EDUCATION, et al., plaintiffs

and

CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, plaintiff-intervenor

and

RAFAEL PENN, et al., plaintiff-intervenors

v.

STATE OF NORTH CAROLINA and the STATE BOARD OF EDUCATION, defendants

and

CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, realigned defendant

and

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, and TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, intervenor-defendants


Appeal pursuant to N.C.G.S. § 7A-27(b) from an order entered on 17 April 2023 by Judge James Floyd Ammons Jr. in Superior Court, Wake County. On 20 October 2023, pursuant to N.C.G.S. § 7A-31(a)–(b), the Supreme Court allowed defendant-intervenors' petition for discretionary review prior to determination by the Court of Appeals. Heard in the Supreme Court on 22 February 2024.

*Melanie Black Dubis, Scott E. Bayzle, Catherine G. Clodfelter, and H. Lawrence Armstrong Jr. for plaintiff-appellees Hoke County Board of Education, et al.*

*Tharrington Smith, LLP, by Neal A. Ramee and David B. Noland, for plaintiff-intervenor/realigned-defendant-appellee Charlotte-Mecklenburg Board of Education.*

*Lawyers' Committee for Civil Rights Under Law, by Christopher A. Brook, Maya Brodziak, pro hac vice; Chavis Jones, pro hac vice; and Michael P. Robotti, pro hac vice, for plaintiff-intervenor-appellees Rafael Penn, et al.*

*Jeff Jackson, Attorney General, by Lindsay Vance Smith, Deputy Solicitor General, and Daniel P. Mosteller, Associate Deputy Attorney General, for defendant-appellee State of North Carolina.*

*No brief for defendant-appellee State Board of Education.*

*Matthew F. Tilley, W. Clark Goodman, and Michael A. Ingersoll for intervenor-defendant-appellants Philip E. Berger Sr. and Destin Hall.**

*Jane R. Wettach for Professors Dereck Black, Joseph Blocher, John Charles Boger, et al., amici curiae.*

NEWBY, Chief Justice.

In this case we resolve whether the trial court lacked subject matter jurisdiction to enter its order of 17 April 2023. To do so, we must consider what happens to a case when the original claims have been transformed into claims very different than those in the pleadings. In other words, can a party completely change

---

\* Pursuant to Rule 38(c) of the Rules of Appellate Procedure, "When a person is a party to an appeal in an official or representative capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the person's successor is automatically substituted as a party." N.C. R. App. P. 38(c). Timothy Moore is no longer the Speaker of the North Carolina House of Representatives; accordingly, his successor, Destin Hall, has been automatically substituted as a party in this appeal.

the subject matter of its action without following the proper procedure for invoking the trial court's subject matter jurisdiction over a new, very different claim? We conclude that the answer is no. Rather, litigants are required to properly invoke the trial court's subject matter jurisdiction over claims they want resolved. If litigants do not do so, the trial court lacks subject matter jurisdiction to adjudicate the claims.

In 1994, students from five low-wealth school districts, joined by their parents or guardians and their respective local school boards (plaintiffs), sued the State of North Carolina and State Board of Education (defendants), claiming that they had deprived the students in plaintiffs' school districts of their education rights enshrined in the North Carolina Constitution. Plaintiffs were subsequently joined by students from six urban school districts, who were also joined by their parents or guardians and their respective local school boards (plaintiff-intervenors). Like plaintiffs, plaintiff-intervenors alleged that defendants were not providing students in plaintiff-intervenors' school districts a constitutionally compliant education.[1]

Thus, in 1994 plaintiff parties' complaints presented challenges to the

---

[1] When plaintiff-intervenors filed their intervening complaint in this action, they called the six intervening school boards "the urban school boards" and the school districts they administered "the urban school districts." This opinion adopts those identifiers. Because the five school boards identified in plaintiffs' complaint operated in self-described low-wealth counties, this opinion refers to those school boards as "the low-wealth school boards" and the school districts they administered as "the low-wealth school districts." Throughout this opinion, references to the urban school boards, the urban school districts, the low-wealth school boards, and the low-wealth school districts are only to those school boards and school districts specifically named in plaintiffs' and plaintiff-intervenors' respective complaints; these identifiers do not broadly refer to any school board or school district that one could conceivably classify as "urban" or "low-wealth."

constitutionality of the way state education funds were allocated in the named students' school districts at that time—i.e., as-applied challenges.[2] There were no claims saying there was a statewide constitutional problem with the existing education system—i.e., there was not a facial challenge.

When this case was first considered by this Court, we had to determine the extent of the education rights in the constitution. Namely, did the State satisfy its constitutional duty merely by providing a free public education system for the children who live within its boundaries, or does the constitution also guarantee a certain quality of education for the public school students of this state? In *Leandro v. State*, 346 N.C. 336, 488 S.E.2d 249 (1997), this Court held that the constitution's education provisions, taken together, have a qualitative component—specifically, the requirement for the State to provide schoolchildren with the "opportunity for a sound basic education."

This Court recognized that there are numerous facets to the successful provision of the opportunity for a sound basic education. Such facets include, but are not limited to, the quality of the system's curricula, the level of the State's education expenditures, and the performance of the public education bureaucracy

---

[2] Throughout this litigation, plaintiffs and plaintiff-intervenors have been collectively denominated the "plaintiff parties." *E.g.*, *Hoke Cnty. Bd. of Educ. v. State* (*Hoke County I*), 358 N.C. 605, 611, 599 S.E.2d 365, 374 (2004); *cf. Leandro v. State*, 346 N.C. 336, 342, 488 S.E.2d 249, 252 (1997) ("plaintiff-parties"). Any references to plaintiffs, plaintiff-intervenors, or plaintiff parties do not include the "Penn Intervenors," who intervened over a decade after this litigation began and whose claims are discussed below.

administering the school system at the state and local levels.

Although this Court ultimately rejected most of the claims raised in the 1994 complaints, we remanded some of the claims for resolution. Most pertinently to the case today, this Court remanded the case to the trial court to determine whether school children in each named school district were being denied their opportunity for a sound basic education and, if so, why. At the same time, this Court recognized the judiciary's general lack of expertise in matters of education policy; observed that such policy determinations properly resided in the legislative and executive branches; and conceded that courts should give proper deference to those branches.

Once the case had returned to the trial court in 1997, the judge assigned to the case directed plaintiff parties to amend their complaints to encompass claims concerning prekindergarten services. The judge then decided to begin with a trial on the as-applied claims of the Hoke County students, recognizing that there needed to be a district-by-district assessment of the plaintiff parties' school districts. As a result of this year-long trial, the trial court acknowledged that the State's education system was generally constitutionally compliant, including its curriculum and funding. It determined, however, that the State's education system was unconstitutional as applied to at-risk students in the Hoke County school district because resource allocation issues at both the state and local levels were preventing those students from receiving an opportunity for a sound basic education.

In *Hoke County Board of Education v. State* (*Hoke County I*), 358 N.C. 605, 599

S.E.2d 365 (2004), this Court affirmed the trial court's decision while further clarifying that the constitutional education rights belonged only to students. We remanded the case so that plaintiff parties' other as-applied claims concerning the other named school districts could proceed to trial.

Several procedural developments then occurred. In 2005, a group known as the "Penn Intervenors," who were represented by current Justice Anita Earls, sued defendants and the Charlotte-Mecklenburg Board of Education and sought intervention in this lawsuit. The Penn Intervenors were students from the Charlotte-Mecklenburg school district; their parents or guardians; and, eventually, the Charlotte-Mecklenburg Branch of the National Association for the Advancement of Colored People (NAACP), which was added in an amended complaint. The trial court allowed the intervention only as to the issues raised in the Penn Intervenors' complaint similar to those already before the court—i.e., as-applied claims. In 2006, five local school boards that had originally joined plaintiff-intervenors' complaint voluntarily dismissed their claims.

Over the next eleven years, none of the remaining as-applied claims were tried. The judge who presided over this case made numerous observations about his continuing belief that state and local education officials were not properly administering the school system. Then that judge retired, resulting in the appointment of a new judge.

On 24 July 2017, the then-Attorney General of North Carolina filed a motion

for relief from the Hoke County trial judgment on the State Board's behalf.[3] In the motion and supporting documents, the Attorney General highlighted that the original claims, which were stated in the pleadings and refined by this Court's decisions, were no longer the focus of this case. The subject of the original complaints—the education system of the 1990s and early 2000s—no longer existed. The litigation had instead become a statewide challenge to a "future school system," exceeding the jurisdiction of the original pleadings. Therefore, the Attorney General argued that the trial court did not have jurisdiction to address this question.

In this appeal, the General Assembly made similar arguments in support of its position that the trial court lacked subject matter jurisdiction to entertain a new, statewide claim. For example, the General Assembly argued that "[t]he trial court . . . exceeded its jurisdiction" by "purport[ing] to grant relief on a supposed 'statewide' claim that no party has ever asserted."

We agree. By 24 July 2017, the remaining participants in the litigation and the trial court officially transformed this case into one addressing matters never pled. Specifically, the trial court worked with the remaining parties in this case—while excluding the General Assembly—to enforce a statewide plan that overhauled the legislatively enacted educational system. What began as modest, as-applied challenges to the allocation of educational resources in the named school districts became a full-scale, facial assault on the entire educational system enacted by the

---

[3] Former Attorney General Josh Stein is now Governor of North Carolina.

General Assembly. When this case ceased to be about the as-applied claims raised in the complaints and refined by this Court's decisions, the trial court's authority to hear the case likewise ceased. No facial constitutional challenge was ever pled. What is more, this unpled facial challenge was not directed to the one tribunal empowered to address it: a three-judge panel of the Superior Court, Wake County. As a result, the trial court was without subject matter jurisdiction to consider that claim in the current case.[4]

---

[4] Two of our dissenting colleagues clearly read the pleadings, this Court's opinions, and Justice Earls's recusal orders differently than we do. *See* Earls dissent *infra*; Riggs dissent *infra*. In disagreeing with our recitation of the pleadings, these dissenting colleagues take allegations out of context or misunderstand their significance. Indeed, they even rely heavily on allegations made in and supporting claims that were dismissed by this Court in *Leandro*. Instead of responding to each misused quotation by these dissents, we encourage the readers to review the pleadings, this Court's opinions, and Justice Earls's recusal orders for themselves. After all, "sunlight is the best disinfectant." *See* Louis Brandeis, *What Publicity Can Do*, *in Other People's Money and How the Bankers Use It* 92, 92 (1914) ("Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.").

Here we will limit ourselves to a few examples that illustrate how these dissenting colleagues have mischaracterized allegations in the complaints. First, one dissenting colleague selectively quotes plaintiffs' Count I to suggest that plaintiffs asserted a statewide claim. *See* Earls dissent *infra* Section I.A.3. n.8. She quotes the following from paragraph 84 in plaintiffs' Count I: "[p]laintiff [students] ha[d] not received the [adequate] educational opportunities guaranteed by the . . . [c]onstitution[ ] because the State ha[d] failed to provide the necessary funds." *Id.* (alterations in original). She omits, however, crucial language from the same paragraph. The full paragraph demonstrates that plaintiffs asserted as-applied claims: "*Plaintiff school children* have not received the educational opportunities guaranteed by the state [c]onstitution, because the State has failed to provide the necessary funds. *The funding system substantially ignores the poverty of plaintiff districts*." (Emphases added.)

Our dissenting colleague likewise omits important language when quoting an allegation contained in plaintiff-intervenors' Count II. She quotes from paragraph 82 in plaintiff-intervenors' complaint: "[t]he State's public education system, including its educational funding system . . . [was] inadequate, inequitable, irrational, arbitrary and capricious, and not general and uniform, in violation of the . . . [c]onstitution." *Id.* (alterations in original). The following paragraph in plaintiff-intervenors' complaint, paragraph 83, demonstrates the as-applied nature of plaintiff-intervenors' claims: "As a result of

defendants' violations of their constitutional duty, *the individual intervenors have been denied access to a general and uniform system of public education in which equal opportunities are provided.*" (Emphasis added.)

Another dissenting colleague asserts: "From the beginning, plaintiffs' allegations alleged a statewide injury." *See* Riggs dissent *infra* Section II.B. To support this statement, she cites the first factual allegation (paragraph 40) contained in plaintiffs' complaint:

> [The State Board of Education and the State of North Carolina] have failed in numerous respects to satisfy their constitutional and statutory obligations regarding education. These failures stem from the State's system for funding its schools, which does not take sufficient account of the substantial disparities in wealth among school districts. The result of inadequate funding is an education system with inadequate and unequal educational opportunities.

*Id.* (alteration in original).

When paragraph 40 is read in context with paragraphs 41 through 81 of the complaint, it becomes abundantly clear that plaintiffs were not asserting a facial attack of statewide funding. Rather, they were providing background for their allegations that the funding system left plaintiffs—i.e., low-wealth school districts—at a disadvantage relative to wealthier school districts.

For instance, in paragraph 71 plaintiffs alleged that

> the average salary supplement in 1993–94 for teachers in Chapel Hill School District was $3,310, while that in Halifax was $208. Such disparities make it difficult for *plaintiff districts to compete with wealthy districts* for the most qualified teachers, and ultimately reduce the quality of the education available to children *in plaintiff districts*.

(Emphasis added.) Then in paragraph 72 plaintiffs alleged that "in 1992–93, Robeson [County] (with approximately 22,535 students) was only able to hire 2 teachers entirely with local funds, while Chapel Hill (with approximately 6,733 students) hired 86. This relative inability to hire teachers restricts the ability of *plaintiff districts* to provide varied courses for schoolchildren." (Emphasis added.)

Obviously, plaintiffs intended the allegations in paragraphs 71 and 72 to highlight the alleged lack of resources in their counties as compared to other school districts. The allegations certainly cannot be rightly understood to allege that the statewide funding system deprived all of North Carolina's children—*including Chapel Hill students*—of their constitutional education rights. Indeed, if plaintiffs had intended to assert a facial challenge to the statewide funding system, why did they delineate themselves as "low-wealth school districts"? If plaintiffs had asserted a facial constitutional challenge regarding statewide funding, such a delineation would have been entirely unnecessary. Further, the allegations alluded to by our dissenting colleague were made to support plaintiffs' equal opportunity

Consequently, we hold that any court decision entered in this matter after 24 July 2017 was entered without subject matter jurisdiction and is void ab initio, meaning it is "a nullity anywhere, at any time, for any purpose." *High v. Pearce*, 220 N.C. 266, 271, 17 S.E.2d 108, 112 (1941) (first citing *Clark v. Carolina Homes, Inc.*, 189 N.C. 703, 128 S.E. 20 (1925); and then citing *Carter v. Rountree*, 109 N.C. 29, 13 S.E. 716 (1891)). This includes this Court's opinion in *Hoke County Board of Education v. State* (*Hoke County III*), 382 N.C. 386, 879 S.E.2d 193 (2022), and the 17 April 2023 Order. The trial court order of 17 April 2023 is vacated, and this matter is dismissed with prejudice.[5]

## I.  Background & Procedural History

This litigation is one chapter in the long, ever-developing history of public education in this state. Indeed, as discussed below, several of this Court's decisions throughout this litigation have established important principles concerning the education rights in the constitution. *Leandro v. State*, 346 N.C. 336, 488 S.E.2d 249 (1997); *Hoke Cnty. Bd. of Educ. v. State* (*Hoke County I*), 358 N.C. 605, 599 S.E.2d 365 (2004). To comprehensively explain every twist and turn of this case's background and procedural history would require gallons of ink spilled across many pages. The

---

claim—plaintiffs' Count III. The Court of Appeals dismissed Count III, and this Court affirmed the dismissal in *Leandro*.

    [5] Dismissal with prejudice is appropriate because the various complaints and amended complaints presented as-applied constitutional challenges to the education system of 1994, which no longer exists.

following recitation of the facts and procedural history focuses on those aspects necessary to analyze the trial court's subject matter jurisdiction as it existed on 17 April 2023.

## A. Backdrop to the Pleadings

Before diving into this case's long procedural history, a brief survey of the context in which plaintiffs filed their complaint is in order.

### 1. 1971 Constitution

The history of North Carolina reveals the State's continually expanding commitment to providing children a free, beneficial public education. There have been setbacks to be sure, but undeniably, the long arc of history reveals this State's commitment to enhancing the public education provided to the children within its borders. *See* William W. Peek, N.C. Dep't of Pub. Instruction, *The History of Education in North Carolina* 5 (1993), https://digital.ncdcr.gov/Documents/Detail/history-of-education-in-north-carolina/2533439?item=2555702 [hereinafter NCDPI, *The History of Education*]. Notably, a constant throughout this history has been "the precedent of school support from a combination of state and local funds." *Id.* at 9.

In 1971, the people ratified our current constitution, which carried over most of the education provisions first included in the constitution of 1868. Unlike the two versions that preceded it, the 1971 constitution "was not . . . a product of haste and social turmoil. It was instead a good-government measure, long matured and carefully crafted . . . to consolidate and conserve the best features of the past, not to

break with it." John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 32 (2d ed. 2013) [hereinafter *State Constitution*]; *see also, e.g.*, *McKinney v. Goins*, 387 N.C. 35, 45 n.5, 911 S.E.2d 1, 10 n.5 (2025) ("The primary goal of the 1971 constitution was 'editorial pruning, rearranging, rephrasing, and modest amendments,' and 'the great majority of the changes embraced in the 1971 constitution took the form of non-substantive deletions or contractions in language.' " (citation modified) (quoting *State ex rel. McCrory v. Berger*, 368 N.C. 633, 643, 781 S.E.2d 248, 254–55 (2016)); *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 617, 264 S.E.2d 106, 112 (1980) (concluding that the 1971 constitution's "reference . . . to 'a general and uniform system of free public schools' requires no substantive change in the [S]tate's long standing policy of providing its citizens with a basic tuition[-]free education" (quoting N.C. Const. art. IX, § 2, cl. 1) (emphasis omitted)).

Like the 1868 constitution before it, the current constitution declares, "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. It echoes, "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged." *Id.* art. IX, § 1. "These provisions . . . evince our State's resolve to foster an upright, capable citizenry—even from youth." *State v. Tirado*, 387 N.C. 104, 128 n.17, 911 S.E.2d 51, 69 n.17 (2025); *see also State Constitution* 62 ("Not a restriction on what the state may do, [Article I, Section 15] requires a commitment to social betterment. The

details are spelled out in Article IX, wholly devoted to education."); *id.* at 177 ("Article IX . . . lead[s] off with a general statement on the utility of knowledge (as well as religion and morality) . . . .").

The constitution's General and Uniform System Clause specifically obligates the General Assembly to "provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students." N.C. Const. art. IX, § 2, cl. 1; *see also id.* art. IX, § 3 (requiring the General Assembly to enact a compulsory school attendance law for "every child of appropriate age and of sufficient mental and physical ability . . . unless educated by other means"). Concomitantly, the constitution establishes a "state school fund," requiring certain income streams to "be paid into the State Treasury and, together with so much of the revenue of the State as may be set apart for that purpose, . . . faithfully appropriated and used exclusively for establishing and maintaining a uniform system of free public schools." *Id.* art. IX, § 6; *see also State Constitution* 181 ("The state school fund, the subject of Section 6, is funded principally from appropriations . . . .").

Nevertheless, consistent with the history of both state and local funding of education, the constitution allows for the General Assembly to "assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate." N.C. Const. art. IX, § 2, cl. 2. In addition, local governments may "use local revenues to add to or supplement any public school or post-secondary

school program." *Id.* Furthermore, the constitution establishes "county school funds." *Id.* art. IX, § 7, cl. a. The provision allowing county school funds stipulates that "[a]ll moneys, stocks, bonds, and other property belonging to a county school fund," as well as "the clear proceeds of all penalties and forfeitures and of all fines collected in" a county "for any breach of the penal laws . . . , shall belong to and remain in" that county to be "faithfully appropriated and used exclusively for maintaining free public schools." *Id.*[6]

The State Board is yet another aspect of the 1868 constitution carried over to the modern document, albeit with some modifications. *See id.* art. IX, § 4, cl. 1. The constitution charges the State Board with "supervising and administering the free public school system and the educational funds provided for its support," including the power to "make all needed rules and regulations in relation thereto, subject to laws enacted by the General Assembly." *Id.* art. IX, § 5. *See generally State*

---

[6] In 2003, nearly a decade after this litigation began, the constitution was amended to add Article IX, Section 7's second clause. An Act to Amend the North Carolina Constitution to Provide that the General Assembly May Place the Clear Proceeds of Civil Penalties, Civil Forfeitures, and Civil Fines Collected by a State Agency in a State Fund to Be Used Exclusively for Maintaining Free Public Schools, S.L. 2003-423, § 1, 2003 N.C. Sess. Laws 1284, 1284. The added clause provides,

> The General Assembly may place in a State fund the clear proceeds of all civil penalties, forfeitures, and fines which are collected by State agencies and which belong to the public schools pursuant to subsection (a) of this section. Moneys in such State fund shall be faithfully appropriated by the General Assembly, on a per pupil basis, to the counties, to be used exclusively for maintaining free public schools.

N.C. Const. art. IX, § 7, cl. b.

*Constitution* 180 ("The State Board . . . administers the state school fund but not the county school fund . . . ."). The Superintendent of Public Instruction, an executive branch official, N.C. Const. art. III, § 7, cl. 1, serves as the State Board's secretary and chief administrative officer, *id.* art. IX, § 4, cl. 2.

### 2. *Chapter 115C and the State Education System in 1994*

With the historical and constitutional framework set, we next address the school policy and funding in place when the complaints in this litigation were filed. Long before plaintiffs filed their complaint in May of 1994, the General Assembly had fulfilled its constitutional obligation to provide a system of elementary and secondary public education, both as to educational policy and funding. *See* NCDPI, *The History of Education* at 14. As of 1994, Chapter 115C governed elementary and secondary education (as it does today). N.C.G.S. §§ 115C-1 to -546.2 (1991 & 1993 Supp.).

Consistent with the history recounted above, North Carolina's education system operated on two levels: state and local. At the state level, the General Assembly, in accordance with the constitution, created an education system that set education policies and funded a public school system. The legislature vested the State Board, an executive agency, with "[t]he general supervision and administration of the free public school system." N.C.G.S. § 115C-12 (1993 Supp.) (current version at N.C.G.S. § 115C-12 (2025)). Accordingly, the State Board was required to "establish policy for the system of free public schools, subject to laws enacted by the General Assembly." *Id.* In turn, the Superintendent of Public Instruction and the Department

of Public Instruction were charged with administering the policies the State Board adopted. *See* N.C.G.S. § 115C-19 (1991) (current version at N.C.G.S. § 115C-19 (2025)); N.C.G.S. § 115C-21(a)(1) (1993 Supp.) (current version at N.C.G.S. § 115C-21(a)(1) (2025)); *id.* § 115C-21(b)(1) (repealed 2017).

The lion's share of public-school administration, however, happened at the local level. Indeed, "[a]ll powers and duties conferred and imposed by law respecting public schools, which [were] not expressly conferred and imposed upon some other official, [were] conferred and imposed upon local boards of education." N.C.G.S. § 115C-36 (1991). "Said boards of education . . . ha[d] general control and supervision of all matters pertaining to the public schools in their respective administrative units," and they were to "enforce the school law in their respective units." *Id.* The General Assembly endowed the local school boards with specific powers and duties as well, N.C.G.S. § 115C-47 (1993 Supp.) (current version at N.C.G.S. § 115C-47 (2025)), not the least of which was the duty to "provide adequate school systems within their respective local school administrative units, as directed by law," *id.* § 115C-47(1) (current version at N.C.G.S. § 115C-47(1) (2025)).

Chapter 115C was (and still is) a comprehensive and detailed statutory scheme covering education policy. Three aspects of public education are relevant to this litigation: (1) curriculum, (2) accountability systems, and (3) funding.

*a. Curriculum*

First, consider curriculum. The State Board's duties included developing the

curriculum for the instruction of public schoolchildren. Historically, the General Assembly had directed the State Board to design "Standard Courses of Study" for each grade. *See, e.g.*, N.C.G.S. § 115C-81(a) (1981 Supp.) (repealed 2017); Elementary and Secondary School Reform Act of 1984, ch. 1103, § 2, 1984 N.C. Sess Laws 286, 286. The Standard Courses of Study "set forth what subjects [were to] be taught in each grade, and outline[d] the basal and supplementary books on each subject to be used in each grade." N.C.G.S. § 115C-81(a) (1981 Supp.) (repealed 2017). The courses also provided "directions as to the best methods of teaching [subjects] as guidance for the teachers." *Id.* "North Carolina ha[d] maintained a Standard Course of Study since the 1890[s]. . . . Every five to seven years since that time, the Standard Course of Study ha[d] been revised to reflect the needs of North Carolina students." N.C. Dep't of Pub. Instruction, *North Carolina Standard Course of Study* 7 (1999), https://files.eric.ed.gov/fulltext/ED431211.pdf. Starting in 1985, however, the General Assembly required the State Board to "adopt a Basic Education Program [(BEP)] for the public schools of the State." The Current Operations Appropriations Act of 1985, ch. 479, § 55, 1985 N.C. Sess. Laws 412, 448–57.

The General Assembly intended the BEP to accomplish "the mission of the public school community"—namely, "to challenge with high expectations each child to learn, to achieve, and to fulfill his or her potential." N.C.G.S. § 115C-81(a) (1993 Supp.) (repealed 2017). Therefore, the BEP's basic purpose was to "describe the education program to be offered to every child in the public schools." *Id.*

§ 115C-81(a1). The BEP offered "[i]nstruction . . . in the areas of arts, communications skills, physical education and personal health and safety, mathematics, media and computer skills, science, second languages, social studies, and vocational education." *Id.*; *see also id.* § 115C-81(g) (requiring instruction on "Civic Literacy," focusing on "the [N]ation's founding and related documents"). In Chapter 115C, the General Assembly required the BEP to "include course requirements and descriptions similar in format to materials previously contained in the [existing] [S]tandard [C]ourse of [S]tudy."[7] N.C.G.S. § 115C-81(b) (1993 Supp.)

---

[7] More specifically, subsection 115C-81(b) required the BEP to include:

(1)     A core curriculum for all students that takes into account the special needs of children and includes appropriate modifications for the learning disabled, the academically gifted, and the students with discipline and emotional problems;

(2)     A set of competencies, by grade level, for each curriculum area;

(3)     A list of textbooks for use in providing the curriculum;

(4)     Standards for student performance and promotion based on the mastery of competencies, including standards for graduation, that take into account children with special needs and, in particular, include appropriate modifications;

(5)     A program of remedial education;

(6)     Required support programs;

(7)     A definition of the instructional day;

(8)     Class size recommendations and requirements;

(9)     Prescribed staffing allotment ratios;

(10)    Material and equipment allotment ratios;

(11)    Facilities standards; and

(repealed 2017). "The [S]tandard [C]ourse of [S]tudy as it exist[ed] on [1 January] 1985, and as subsequently revised by the State Board, [was to] remain in effect until its components ha[d] been fully incorporated and implemented as part of the [BEP]." *Id.* § 115C-81(d).

In Chapter 115C, the General Assembly contemplated the involvement of both the State Board and local school boards in the BEP's implementation. In addition to developing the BEP itself, the State Board was "[t]o adopt rules requiring all local boards of education to implement the [BEP] on an incremental basis within funds appropriated for that purpose by the General Assembly and by units of local government." *Id.* § 115C-12(9)(c) (repealed 2017). Such rules were to

> require each local school administrative unit to implement fully the [S]tandard [C]ourse of [S]tudy in every school in the [s]tate in accordance with the [BEP] so that every student in the [s]tate [would] have equal access to the curriculum as provided in the [BEP] and the [S]tandard [C]ourse of [S]tudy.

*Id.* Chapter 115C directed the local school boards to "implement the [BEP] in

---

(12) Any other information the [State] Board considers appropriate and necessary.

N.C.G.S. § 115C-81(b) (1993 Supp.) (repealed 2017).

Notably, the General Assembly also instructed the BEP to require "[l]ocal boards of education [to] provide for their respective local school administrative unit kindergartens as a part of the public school system . . . provided that funds are available from State, local, federal or other sources." *Id.* § 115C-81(f)(1). The General Assembly further directed the State Board to adopt standards requiring "the Board [to] allocate funds for the purpose of operating and administering kindergartens to each school administrative unit in the State." *Id.*

accordance with rules adopted by the State Board." *Id.* § 115C-47(12) (repealed 2017).

The General Assembly specifically explained how the BEP would be funded:

> The State Board shall implement the [BEP] *within funds appropriated for that purpose by the General Assembly and by units of local government.* It is the intent of the General Assembly that until the [BEP] is fully funded, the implementation of the [BEP] shall be the focus of State educational funding. It is the goal of the General Assembly that the [BEP] be fully funded and completely operational in each local school administrative unit by [1 July] 1995.[8]

*Id.* § 115C-81(a) (emphasis added). To ensure the BEP was funded in all school districts, the General Assembly also created a supplemental funding program for low-wealth counties. *Id.* ("It is further a goal of the General Assembly to provide supplemental funds to low-wealth counties to allow those counties to enhance the instructional program and student achievement.").

The State Board complied with Chapter 115C's directives and adopted a BEP. In 1994, however, the General Assembly was not on pace to fully fund the BEP by the extended 1 July 1995 deadline.

*b. Accountability Systems*

Next, consider the accountability systems embedded in the education system in 1994. The General Assembly, desiring a way to assess educational achievement, required the State Board to implement testing programs

> (i) to assure that all high school graduates possess those minimum skills and that knowledge thought necessary to

---

[8] The General Assembly's original deadline to fund the BEP was in 1993. The Current Operations Appropriations Act of 1985, 1985 N.C. Sess. Laws at 456.

> function as a member of society; (ii) to provide a means of identifying strengths and weaknesses in the education process; and (iii) to establish additional means for making the education system accountable to the public.

N.C.G.S. § 115C-174.10 (1991) (current version at N.C.G.S. § 115C-174.10 (2025)). The testing program's first component, the "Annual Testing Program," called for "developmentally appropriate individualized assessment instruments consistent with the [BEP] for the first and second grades, rather than standardized tests." *Id.* § 115C-174.11(a) (current version at N.C.G.S. § 115C-174.11(a) (2025)).[9] The second component, the "Competency Testing Program," required the evaluation of tenth graders "to assure that graduates of the public high schools . . . possess[ed] the skills and knowledge necessary to function independently and successfully in assuming the responsibilities of citizenship." *Id.* § 115C-174.11(b) (repealed 2009). The third testing component was "End-of-course and End-of-grade Tests," which were required for "grades three through [twelve]" and "designed to measure progress toward selected competencies, especially core academic competencies, described in the Standard Course of Study for appropriate grade levels." *Id.* § 115C-174.11(c) (current version at N.C.G.S. § 115C-11(c) (2025)). The statutes also provided a method for identifying "low performing school units" for state intervention and assistance. *See id.* §§ 115C-64.1 to -64.5 (repealed 1996).

In addition to these generally applicable accountability programs, in Chapter

---

[9] The current version makes no references to the BEP.

115C the General Assembly tasked the State Board with developing and implementing a "Performance-based Accountability Program," which was aimed primarily at improving student performance. N.C.G.S. §§ 115C-238.1 to -238.8 (1994) (repealed 1996 and recodified, as amended, at N.C.G.S. §§ 115C-105.20 to -105.35 (1997) (current version at N.C.G.S. §§ 115C-105.20 to -105.35 (2025))). Although participation in this program was optional, *id.* § 115C-238.2(a), participating local school boards received benefits, such as "increased flexibility in the expenditure of [s]tate funds," *id.* § 115C-238.2(b)(4). In exchange, participants were required to develop "local plans" that, among other things, set out a roadmap for improving their local school administrative units and strategies for achieving "specific, measurable" student performance goals. *Id.* § 115C-238.3(a)–(b1).

    *c.  Funding*

    Finally, consider funding. In Chapter 115C, the General Assembly provided, "It [was] the policy of the State of North Carolina to create a public school system that graduate[d] good citizens with the skills demanded in the marketplace, and the skills necessary to cope with contemporary society, *using [s]tate, local and other funds in the most cost-effective manner*." N.C.G.S. § 115C-408(a) (1991) (emphasis added) (current version at N.C.G.S. § 115C-408(a) (2025)). Accordingly, "[t]o insure a quality education for every child in North Carolina, and to assure that the necessary resources are provided, . . . the State of North Carolina [was] to provide *from [s]tate revenue sources the instructional expenses* for [then-]current operations of the public

school system." *Id.* § 115C-408(b) (emphasis added) (current version at N.C.G.S. § 115C-408(b) (2025)). To that end, the State Board possessed "general supervision and administration of the education funds provided by the [s]tate and federal governments, except those mentioned in Section 7 of Article IX . . . , and also excepting such local funds as may be provided by a county, city, or district." *Id.* § 115C-408(a).

As had traditionally been the case, local governments played a supplemental financial role. For instance, in Chapter 115C the General Assembly provided that "*the facilities requirements* for a public education system [were to] be met by county governments." *Id.* § 115C-408(b) (emphasis added). The General Assembly also created a "Critical School Facility Needs Fund," *id.* § 115C-489.1(a) (repealed 1996), which was administered by the State Board and allowed local governments to apply for grants "to meet . . . particular critical need[s] in the local school administrative unit[s]," *id.* § 115C-489.2(a) (repealed 1996).

With this overview of the education system as it existed in 1994, we turn to the pleadings that commenced this litigation more than three decades ago. As we relay the procedural history of this case, we will note relevant changes to the public education system.

**B. The Pleadings**

This case commenced nearly thirty-two years ago on 25 May 1994 when plaintiffs filed their complaint in the Superior Court, Halifax County. The named

plaintiffs were "students and their parents or guardians from the relatively [low-wealth] school systems in Cumberland, Halifax, Hoke, Robeson, and Vance Counties [(plaintiff students)] and the boards of education for those counties" (the low-wealth school boards). *Leandro*, 346 N.C. at 342, 488 S.E.2d at 252.

Plaintiffs' amended complaint complained of the State's alleged failure to timely fund the BEP by the 1995 deadline and its "reli[ance] upon local governments to fill the gaps" in funding instructional expenses. Plaintiffs claimed this amounted to "an irrational, unfair, and unconstitutional funding system" resulting in adequate and equitable educational "opportunities . . . [being] denied to children in some of the poorest school districts in this State."

Plaintiffs' factual allegations focused specifically on challenges unique to their low-wealth school districts. For example, "[b]ecause of their limited capacities to raise funds for education" due to circumstances like lower tax bases and low per capita income, plaintiffs asserted that "the county governments of [the low-wealth school] districts c[ould not] and d[id] not provide as much local funding per student for . . . schools as . . . counties with substantially greater tax bases per pupil." Plaintiffs further alleged that the supplemental funding program for low-wealth counties did not provide sufficient resources to the low-wealth school boards to cover the deficiencies in the BEP's funding. According to plaintiffs, these shortcomings led to many troubling results in the low-wealth school districts: the inability to provide certain courses and programs; insufficient facilities; lack of essential equipment; the

inability to hire and retain high quality teachers; the identification as "low performing" districts or placement on warning status; the inability to satisfy the Performance-based Accountability Program's standards; and poor standardized test performances, to name a few.

Based on their allegations, plaintiffs presented five claims for relief. In Count I, plaintiffs claimed "[p]laintiff [students] ha[d] not received the [adequate] educational opportunities guaranteed by the . . . [c]onstitution[ ] because the State ha[d] failed to provide the necessary funds" and "substantially ignore[d] the poverty of [the low-wealth school] districts." In Count II, plaintiffs alleged that "the State's system of funding education, which allocate[d] substantially less money for the education of schoolchildren in [the low-wealth school] districts than it d[id] for schoolchildren in wealthy school districts," was arbitrary and irrational in violation of the constitution's Equal Protection Clause. In Count III, plaintiffs asserted that "wide disparities in educational opportunities available to the schoolchildren in [the low-wealth school] districts and those available to the schoolchildren in wealthy districts" meant that "[d]efendants ha[d] violated plaintiffs' rights" to a general and uniform system of public schools under Article IX, Section 2. Count IV claimed that "[d]efendants ha[d] violated the law of the land under the . . . [c]onstitution by failing to provide adequate educational opportunities." And in Count V, plaintiffs submitted that defendants had violated Chapter 115C "by failing to provide plaintiff [students] with equal access to the [BEP], and by failing to assure that plaintiffs receive

necessary resources for instructional purposes on an equitable basis." In their prayer for relief, plaintiffs sought declaratory judgments consistent with their claims.

On 18 October 1994, plaintiff-intervenors, another group animated by the State's delay in fully funding the BEP, filed their own complaint. Plaintiff-intervenors were "students and their parents or guardians from the relatively large and wealthy school systems of the City of Asheville and of Buncombe, Wake, Forsyth, Mecklenburg, and Durham Counties [(plaintiff-intervenor students)] and the boards of education for those systems" (the urban school boards). *Leandro*, 346 N.C. at 342, 488 S.E.2d at 252.

In their complaint, plaintiff-intervenors acknowledged that state law charged the urban school boards, like all local school boards, with a "responsibility to maintain adequate school systems within their districts," citing subsection 115C-47(1) of the General Statutes. But like plaintiffs, plaintiff-intervenors alleged that "[t]he [then-]current [s]tate educational funding system d[id] not sufficiently take into consideration the burdens faced by urban school districts that must educate large numbers of students with extraordinary educational needs." These included circumstances like students "living in or near poverty" or "requiring special education, English-as-a-second-language, or academically gifted services." Plaintiff-intervenors also claimed the State's educational funding system ignored "the high costs and 'municipal overburden' that characterize[d] the urban school districts." According to plaintiff-intervenors, in 1994 the State's educational funding system

"shifted virtually the entire burden of capital funding to local authorities that [were] unable to meet the urban school districts' capital needs." Thus, given the "disproportionately high" cost of educating students in their districts, plaintiff-intervenors alleged "[m]any of the urban school boards . . . lack[ed] sufficient [s]tate funding to provide all of their students with appropriate educational materials and supplies."

Based on these allegations, plaintiff-intervenors also advanced five claims for relief. In Count I, plaintiff-intervenors claimed they were entitled to relief because defendants failed to (1) "provide an adequate education to all students in the urban school districts," and (2) "provide the urban school boards with the resources necessary to provide all of their students with an adequate education." This second failure, said plaintiff-intervenors, prevented the urban school boards from accomplishing "the[ir] responsibility to provide all of their students with a constitutionally adequate education." In Count II, plaintiff-intervenors contended "[t]he State's public education system, including its educational funding system [(particularly the BEP's supplemental funding program)] [was] inadequate, inequitable, irrational, arbitrary and capricious, and not general and uniform, in violation of the . . . [c]onstitution." This meant that "[plaintiff-intervenor students] ha[d] been denied access to a general and uniform system of public education in which equal opportunities are provided" and that the urban school boards could not fulfill their responsibility to provide "equal educational opportunities."

Count III subsumed two grievances. More generally, plaintiff-intervenors complained that "whether a student receive[d] an adequate education depend[ed] on capricious circumstances, including where the student live[d]." More particularly, plaintiff-intervenors alleged that "[t]he State's supplemental funding scheme irrationally discriminate[d] against school districts not defined as 'low wealth' or 'small' and against the students and communities served by those districts." For these reasons, plaintiff-intervenors argued that the State's funding of education "denied equal protection of the laws to [plaintiff-intervenor students]" because it "d[id] not provide, and d[id] not ensure that the urban school boards c[ould] provide, an adequate education to all students in the urban school districts." For the same reasons, in Count IV, plaintiff-intervenors claimed that "[t]he State ha[d] denied due process of law to [plaintiff-intervenor students]."

And in Count V, plaintiff-intervenors presented two theories of how defendants had violated Chapter 115C's requirements: First, defendants had not provided the "resources necessary to allow [plaintiff-intervenor students] to have access to 'adequate school systems' that provide[d] them with a '[BEP]' and 'equal educational opportunities.' " Second, defendants had not provided resources sufficient to enable the urban school boards to provide an education that met the requirements of the BEP and other state standards. In their prayer for relief, plaintiff-intervenors sought declaratory judgments consistent with these claims.

In *Leandro*, we summarized the nature of plaintiff parties' allegations as

follows:

> Both plaintiff and plaintiff-intervenors (hereinafter "plaintiff[ ]parties" when referred to collectively) allege in their complaints in the case resulting in this appeal that they have a right to adequate educational opportunities which is being denied *them* by defendants under *the current* school funding system. Plaintiff[ ]parties also allege that the North Carolina Constitution not only creates a fundamental right to an education, but it also guarantees that every child, no matter where he or she resides, is entitled to equal educational opportunities. Plaintiff[ ]parties allege that defendants have denied *them* this right.

> Plaintiffs allege that children *in their poor school districts* are not receiving a sufficient education to meet the minimal standard for a constitutionally adequate education. Plaintiffs further allege that children *in their districts* are denied an equal education because there is a great disparity between the educational opportunities available to children *in their districts* and those offered in more wealthy districts of our state. Plaintiffs allege that *their districts* lack the necessary resources to provide fundamental educational opportunities for *their children* due to the nature of the [S]tate's system of financing education and the burden it places on local governments. They allege that the [S]tate leaves the funding of capital expenses, as well as twenty-five percent of current school expenses, to local governments. They further allege that although *their poor districts* are the beneficiaries of higher local tax rates than many wealthy school districts, those higher rates cannot make up for *their* lack of resources or for the disparities between systems. Plaintiffs also allege that students *in their poor school districts* are not receiving the education called for by the [BEP], part of the statutory framework for providing education to the children of this state.

> Plaintiffs complain of inadequate school facilities with insufficient space, poor lighting, leaking roofs, erratic heating and air conditioning, peeling paint, cracked

plaster, and rusting exposed pipes. They allege that *their poor districts'* [then-current] media centers have sparse and outdated book collections and lack the technology present in the wealthier school districts. They complain that *they* are unable to compete for high quality teachers because local salary supplements in their poor districts are well below those provided in wealthy districts. Plaintiffs allege that this relative inability to hire teachers causes the number of students per teacher to be higher *in their poor districts* than in wealthy districts.

Plaintiffs allege that college admission test scores and yearly aptitude test scores reflect both the inadequacy and the disparity in education received by children *in their poor districts*. Plaintiffs allege that end-of-grade tests show that the great majority of students *in plaintiffs' districts* are failing in basic subjects.

Plaintiff-intervenors allege that *the current* state educational funding system does not sufficiently take into consideration the burdens faced *by their urban school districts*, which must educate a large number of students with extraordinary educational needs. In particular, plaintiff-intervenors claim that *their school districts* have a large number of students who require special education services, special English instruction, and academically gifted programs. They allege that providing these services requires [*the urban*] *school boards* to divert substantial resources from their regular education programs.

Plaintiff-intervenors contend that defendants . . . have violated the North Carolina Constitution and Chapter 115C . . . by failing to ensure that *their relatively wealthy school districts* have sufficient resources to provide all of *their students* with adequate and equal educational opportunities. In addition, plaintiff-intervenors claim that the [S]tate's singling out of certain poor rural districts to receive supplemental state funds, while failing to recognize comparable if not greater needs in [the urban school] districts, is arbitrary and capricious . . . . Plaintiff-intervenors allege that deficiencies in physical facilities and educational materials are particularly

> significant *in their systems* because most of the growth in North Carolina's student population is taking place in urban areas *such as those served by [the urban] school boards*. They claim that *their urban districts* must serve a disproportionate number of children who due to poverty, language barriers, or other handicaps, require special resources. They allege that because urban counties have high levels of poverty, homelessness, crime, unmet health care needs, and unemployment which drain their fiscal resources, *they* cannot allocate as large a portion of their local tax revenues to public education as can the more rural poor districts.

346 N.C. at 342–44, 488 S.E.2d at 252–53 (emphases added).

The pleadings (and this Court's summary thereof) paint a clear picture of plaintiff parties' original theory of the case—namely, that the State had distributed funding for the BEP in such a manner that the *named* students, in the *named* school districts, had not been given an opportunity to receive a constitutionally compliant education under the education system as it existed in 1994. Significantly, plaintiff parties did not allege that all children in all school districts across all one hundred counties were facing similar challenges, or that there was no way for the State's funding system to operate constitutionally. In fact, by raising an alleged statutory violation, plaintiff parties seemed to concede that if the State had complied with the statutory requirements, then it would have provided a constitutionally compliant education system.

Thus, the complaints did *not* allege that the State's education policy was facially unconstitutional; rather, they challenged only the implementation of the education system in their respective districts. In other words, the complaints raised

as-applied challenges. *See generally N.C. Dep't of Revenue v. Philip Morris USA, Inc.*, 388 N.C. 181, 189, 919 S.E.2d 175, 181 (2025) ("The chief distinction [between facial and as-applied challenges] is found in the differing degrees to which the two kinds of challenges can call a statute's constitutionality into question. Whereas a facial challenge alleges that a statute can never be applied constitutionally, an as-applied challenge makes a significantly more modest claim. It merely asserts that a statute cannot be constitutionally applied to the party disputing its validity, 'even if the statute is otherwise generally enforceable.' " (quoting *State v. Packingham*, 368 N.C. 380, 383, 777 S.E.2d 738, 743 (2015), *rev'd on other grounds*, 582 U.S. 98, 137 S. Ct. 1730 (2017))).

On 2 November 1994, the Attorney General appeared on defendants' behalf and moved to dismiss plaintiff parties' complaints on several grounds. On 19 January 1995, the trial court transferred venue to the Superior Court, Wake County. On 1 February 1995, the trial court denied defendants' motion to dismiss without explanation.[10] Defendants appealed.

## C. *Leandro v. State*

### 1. *Court of Appeals Decides* Leandro v. State

When this case was first appealed, a unanimous panel of the Court of Appeals immediately acknowledged that the judicial branch is not the appropriate forum to

---

[10] Because these orders were entered before the case was designated as exceptional, they were entered by a resident judge of the superior court.

wrestle with education policy: "As a preliminary matter, we recognize that education is primarily the responsibility of parents, teachers, and state and local officials, and not of state judges. Judicial intervention in educational services is appropriate only when a constitutional right is 'directly and sharply implicate[d].' " *Leandro v. State*, 122 N.C. App. 1, 6–7, 468 S.E.2d 543, 548 (1996) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S. Ct. 562, 571 (1988)). The Court of Appeals then reversed the trial court's order denying defendants' motion to dismiss, reasoning that plaintiff parties' complaints had failed to state claims upon which relief could be granted. *Id.* at 14, 468 S.E.2d at 552.

Ultimately, the decision rendered by the Court of Appeals had two primary holdings: First, it held that the General and Uniform System Clause "ensure[s] [only] a system of public education that [is] administered uniformly across the state"; it does not require "spending or programming uniformity" or "provide[ ] [a] fundamental right to equal educational opportunities." *Id.* at 8–9, 468 S.E.2d at 548–49. Second, the Court of Appeals held that "the fundamental educational right under the . . . [c]onstitution is limited to one of equal access to education, and it does not embrace a qualitative standard." *Id.* at 11, 468 S.E.2d at 550. Put more bluntly, the court concluded "that a constitutional fundamental right to adequate educational opportunities does not exist." *Id.* at 12, 468 S.E.2d at 551.

In light of these holdings, the Court of Appeals reasoned that the trial court should have dismissed plaintiff parties' lawsuits in their entireties. *See id.* at 8–14,

468 S.E.2d at 548–52. The Court of Appeals further explained that plaintiff parties'

statutory claims alternatively failed because "the specific statutory provisions

themselves provide[d] no basis for relief." *Id.* at 14, 468 S.E.2d at 552. Following the

Court of Appeals' decision, plaintiff parties sought this Court's discretionary review.

### 2.  *General Assembly Enacts the ABCs Accountability System*

While plaintiff parties' petitions were pending before this Court, the General

Assembly modified its accountability model for public schools in 1996.[11] *See* An Act

to Implement the Recommendation of the Joint Legislative Education Oversight

Committee to Implement the State Board of Education's ABC's Plan in Order to

Establish an Accountability Model for the Public Schools to Improve Student

Performance and Increase Local Flexibility and Control, and to Make Conforming

Changes, ch. 716, § 3, 1996 N.C. Sess. Laws 352, 354 (codified as amended at N.C.G.S.

§§ 115C-105.20 to -105.21, -105.25 to -105.27, -105.30 to -105.32, -105.35 to -105.39

(1996 Supp.) (current versions at N.C.G.S. §§ 115C-105.20 to -105.23, -105.25 to

-105.27, -105.30, -105.32, -105.35, -105.37, -105.38, -105.39 (2025)). The General

Assembly directed the State Board to "develop a School-Based Management and

Accountability Program" with "[t]he primary goal of . . . improv[ing] student

performance." N.C.G.S. § 115C-105.20(a) (1996 Supp.). More specifically, the

---

[11] As one might expect, the General Assembly has frequently modified the public education system over the past three decades. It would be virtually impossible to track each change in this opinion. It was not uncommon for the education system to have undergone several changes in between the various orders and opinions in this case. Only a few examples are provided here, but many more changes occurred.

program was to

> (i) focus on student performance in the basics of reading, mathematics, and communications skills in elementary and middle schools, (ii) focus on student performance in courses required for graduation and on other measures required by the State Board in the high schools, and (iii) hold schools accountable for the educational growth of their students.

*Id.* § 115C-105.35.

The General Assembly instructed the State Board to "set[ ] annual performance standards for each school in the [s]tate in order to measure the growth in performance of the students in each individual school." *Id.* To this end, the State Board was to create "rigorous student academic achievement performance standards for kindergarten through eighth grade and student academic performance standards for courses in grades 9–12" that "align[ed], whenever possible, with the National Assessment of Educational Progress (NAEP)." The Excellent Schools Act, ch. 221, § 3(e), 1997 N.C. Sess. Laws 427, 431 (codified at N.C.G.S. § 115C-105.40 (1999)).

Following these directives, the State Board developed "the ABCs (Accountability, Basics, and Local Control) Accountability System," which it first employed in the 1996–1997 school year. The details of this complex program are largely beyond the scope of this opinion. But in broad strokes,

> [h]igh standards [were] at the center of the ABCs. The aim [was] to ensure that all students [were] learning and showing continuous improvement. . . . The plan look[ed] at the progress of individual schools, rather than at whole school systems. . . . The plan compare[d] the school with itself and measure[d] the progress of its own students by

> comparing pretest and posttest scores on the North
> Carolina End-of-Grade Tests . . . .

N.C. Dep't of Pub. Instruction, *ABCs of Public Education in North Carolina: A Journey Toward Excellence* 3 (1999) [hereinafter NCDPI, *ABCs of Public Education*], https://files.eric.ed.gov/fulltext/ED469452.pdf.

To foster "accountability," the ABCs Accountability System offered incentive awards to schools and their administrators and teachers. *Id.*; *see also* N.C.G.S. § 115C-105.36 (1998 Supp.). It also provided procedures for identifying and assisting low-performing schools, N.C.G.S. §§ 115C-105.38 to -105.38A (1998 Supp.), as well as grounds for the removal or dismissal of school personnel in low-performing schools, *id.* § 115C-105.39. As for the "basics" prong, the system required schools "to focus on reading, writing, and mathematics," but gave schools "more freedom to integrate [other] subjects" like science, history, geography, and the arts. NCDPI, *ABCs of Public Education* at 3; *see also* N.C.G.S. § 115C-105.35(i)–(ii) (1996 Supp.). Regarding "control," the program provided local administrators and teachers "more control over the schools in which they work and the flexibility to make their own decisions" when determining how to achieve their student performance goals. NCDPI, *ABCs of Public Education* at 3; *see also* N.C.G.S. § 115C-105.21(b) (1996 Supp.).

Most pertinent to this opinion, under the ABCs Accountability System, there were four performance/proficiency levels to measure student performance. "Level I" meant the student did "not have sufficient mastery of knowledge and skills in th[e] subject area to be successful at the next grade level." NCDPI, *ABCs of Public*

*Education* at 47. "Level II" meant the student "demonstrate[d] inconsistent mastery of knowledge and skills in th[e] subject area and [was] minimally prepared to be successful at the next grade level." *Id.* "Level III" meant the student "consistently demonstrate[d] mastery of grade level subject matter and skills and [was] well prepared for the next grade level." *Id.* To be considered "proficient" or "at grade level," students needed to score at least at Level III on their end-of-course/end-of-grade tests. Finally, "Level IV" meant the student "consistently perform[ed] in a superior manner clearly beyond that required to be proficient at grade level work." *Id.*

### 3. *Supreme Court of North Carolina Decides* Leandro v. State

Returning to the court system, this Court allowed plaintiff parties' petition for discretionary review. We then affirmed in part and reversed in part the Court of Appeals' decision to dismiss all of plaintiff parties' claims. *Leandro*, 346 N.C. at 358, 488 S.E.2d at 261.

This Court affirmed the Court of Appeals' decision to dismiss plaintiff parties' claims predicated on the notion that the constitution "mandate[d] equality in the educational programs and resources offered the children in all school districts in North Carolina" (i.e., plaintiffs' Count III and plaintiff-intervenors' Count II).[12] *Id.* at

---

[12] To the extent that plaintiff-intervenors' Count II overlapped with their arguments under Count I, this Court treated Count II as subsumed by Count I. *See Leandro*, 346 N.C. at 351–52, 488 S.E.2d at 257; *cf. Hoke County I*, 358 N.C. at 612, 599 S.E.2d at 374–75 (listing the "surviving claims for trial" after *Leandro* and not including claims related to equality in the educational programs and resources offered to children in all school districts (citing *Leandro*, 346 N.C. at 353–54, 358, 599 S.E.2d at 255, 258–59)). This Court's resolution of plaintiff-intervenors' Count I is discussed below.

348, 488 S.E.2d at 255. This Court did so because the General and Uniform System Clause "does not require that equal educational opportunities be afforded students in all of the school districts of the state." *Id.* at 351, 488 S.E.2d at 257.

In this analysis, this Court—guided by the constitution's text, the historical context in which the people adopted it, and this Court's caselaw—acknowledged the facial constitutionality of the State's educational funding system multiple times. *See id.* at 349–50, 353, 488 S.E.2d at 256, 258. This Court observed further that equality across school districts would be practically impossible, resulting in a "steady stream of litigation [that] would constantly interfere with the running of the schools of the state and unnecessarily deplete their human and fiscal resources as well as the resources of the courts." *Id.* at 350, 488 S.E.2d at 257; *see also id.* at 350–51, 488 S.E.2d at 256–57 (observing that other state courts had experienced "substantial problems" when dealing just with the right to a sound basic education, and concluding that the constitution's framers did not intend for the General Assembly to strain to achieve the "impractical or unattainable goal" of absolute equality in educational offerings across school districts, noting "even greater problems of protracted litigation resulting in unworkable remedies" would follow) (first citing *Horton v. Meskill*, 486 A.2d 1099 (Conn. 1985); then citing *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717 (Tex. 1995); then citing *State ex rel. Bds. of Educ. v. Chafin*, 376 S.E.2d 113 (W. Va. 1988); then citing William E. Thro, *The Third Wave: The Impact of the Montana, Kentucky, and Texas Decisions on the Future of Public School Finance*

*Reform Litigation,* 19 J.L. & Legal Educ. 219 (1990); then citing James S. Liebman, *Implementing* Brown *in the Nineties: Political Reconstruction, Liberal Recollection, and Litigatively Enforced Legislative Reform,* 76 Va. L. Rev. 349, 392–93 (1990); then citing Note, *Unfulfilled Promises: School Finance Remedies and State Courts,* 104 Harv. L. Rev. 1072, 1075–78 (1991); and then citing *Abbott v. Burke*, 693 A.2d 417 (N.J. 1997))).

In addition to the claims predicated on equality in educational opportunities, this Court affirmed the Court of Appeals' decision to dismiss plaintiffs' equal protection claims (i.e., plaintiffs' Count II). *Id.* at 352, 488 S.E.2d at 258. We observed, "Any disparity in school funding among the districts resulting from local subsidies is directly attributable to Article IX, Section 2(2) itself. Plaintiffs are essentially reduced to arguing that one section of the North Carolina Constitution violates another. . . . This argument is without merit." *Id.*

This Court did not address plaintiff parties' claims predicated on the Law of the Land Clause or due process principles (i.e., plaintiffs' Count IV and plaintiff-intervenors' Count IV). Accordingly, the Court of Appeals' decision to dismiss those claims was the final ruling on those claims and became the law of the case. *See generally Hayes v. City of Wilmington*, 243 N.C. 525, 536, 91 S.E.2d 673, 681–82 (1956) ("[W]hen an appellate court passes on a question and remands the cause for further proceedings, the questions there settled become the law of the case, both in subsequent proceedings in the trial court and on subsequent appeal, provided the

same facts and the same questions which were determined in the previous appeal are involved in the second appeal.").

This Court agreed with plaintiff parties, however, that a "right to a qualitatively adequate education arises under the . . . [c]onstitution." *Id.* at 345, 488 S.E.2d at 254. Specifically, this Court acknowledged that "Article I, Section 15 and Article IX, Section 2 . . . combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools." *Id.* at 347, 488 S.E.2d at 255. We then defined some core qualitative components for a "sound basic education." *Id.* (first citing *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989); and then citing *Pauley v. Kelly*, 255 S.E.2d 859, 877 (W. Va. 1979)). Accordingly, this Court reversed the Court of Appeals' decision to dismiss plaintiff parties' claims premised on the adequacy of educational opportunities (i.e., plaintiffs' Count I and plaintiff-intervenors' Count I), allowing those claims to proceed to determine "whether the State ha[d] failed to meet its constitutional obligation to provide an opportunity for a sound basic education *to plaintiff parties*." *Hoke County I*, 358 N.C. at 612, 599 S.E.2d at 374 (emphasis added) (citing *Leandro*, 346 N.C. at 348, 488 S.E.2d at 255).

This Court also reversed the Court of Appeals' decision to dismiss plaintiff parties' claims predicated on the 1994 statutes (i.e., plaintiffs' Count V and plaintiff-intervenors' Count V). *Leandro*, 346 N.C. at 353–54, 488 S.E.2d at 258–59. We did so because "most of the sections of the statutes [plaintiff parties] rel[ied] upon

d[id] little more than codify a fundamental right guaranteed by our [c]onstitution." *Id.* at 353, 488 S.E.2d at 258. Indeed, this Court observed, "The General Assembly . . . seem[ed] to have recognized the constitutional right to a sound basic education and to have embraced that right in Chapter 115C." *Id.* at 347, 488 S.E.2d at 254. The statutes cited in plaintiff parties' complaints "reiterate[d] the constitutional requirement that every child in the state have equal access to a sound basic education." *Id.* at 354, 488 S.E.2d at 259. And "[t]o the extent that plaintiff[ ]parties c[ould] produce evidence tending to show that defendants ha[d] committed the violations of Chapter 115C alleged in the complaints and that those violations ha[d] deprived children of some districts of the opportunity to receive a sound basic education, [they were] entitled to do so."[13] *Id.* Thus, this Court acknowledged that the statutory framework established by the General Assembly provided for a constitutionally compliant statewide public education system.

Finally, this Court reversed the Court of Appeals' decision to dismiss plaintiff-intervenors' equal protection claim to the extent it challenged the BEP's supplemental funding program for low-wealth counties (plaintiff-intervenors' Count III). *Id.* at 352–53, 488 S.E.2d at 258. This Court stated that the General Assembly could create a supplemental funding program so long as it did not "distribute[ ] state

---

[13] This Court clarified that "none of the statutes relied upon by plaintiff[ ]parties require[d] that substantially equal educational opportunities be offered in each of the school districts of the state." *Leandro*, 346 N.C. at 354, 488 S.E.2d at 259.

funds to the districts in an arbitrary and capricious manner unrelated to . . . educational objectives." *Id.* at 353, 488 S.E.2d at 258. This Court continued, "Plaintiff-intervenors ha[d] made sufficient allegations in their complaint to entitle them to proceed to attempt to prove that the state supplemental funding system in question [was] unrelated to legitimate education objectives and, therefore, . . . arbitrary and capricious." *Id.*

In sum, this Court affirmed the Court of Appeals' decision to dismiss three of plaintiffs' five claims and two of plaintiff-intervenors' claims. We reversed the Court of Appeals' decision as to the rest of plaintiff parties' claims. Accordingly, there were three "surviving claims for trial":

> (1) whether the State ha[d] failed to meet its constitutional obligation to provide an opportunity for a sound basic education *to plaintiff parties*, (2) whether the State ha[d] failed to meet its statutory obligation, pursuant to Chapter 115C of the General Statutes, to provide the opportunity for a sound basic education *to plaintiff parties*, and (3) whether the State's supplemental school funding system [was] unrelated to legitimate education objectives and, as a consequence, [was] arbitrary and capricious, resulting in a denial of equal protection of the laws *for plaintiff-intervenors*.

*Hoke County I*, 358 N.C. at 612, 599 S.E.2d at 374–75 (emphasis omitted and emphases added) (citations omitted) (citing *Leandro*, 346 N.C. at 348, 353–54, 488 S.E.2d at 255, 258–59). Importantly, these surviving claims for trial were the as-applied challenges as pled, which related to specific students in specific school districts operating under a specific education system that existed in 1994.

This Court remanded those surviving as-applied claims to the trial court for resolution. *Leandro*, 346 N.C. at 348, 353–54, 488 S.E.2d at 255, 258–59. We did so, however, with a keen awareness of the constitutionally assigned roles for the different branches of government in education policy. This Court accordingly acted "with some trepidation," understanding that "judges are not experts in education and are not particularly able to identify in detail those curricula best designed to ensure that a child receives a sound basic education." *Id.* at 354, 488 S.E.2d at 259. Instead, this Court "acknowledge[d] that the legislative process provides a better forum than the courts for discussing and determining what educational programs and resources" should be provided. *Id.* This Court pointed out that legislators, unlike judges, "are popularly elected to represent the public for the purpose of making just such decisions." *Id.* at 355, 488 S.E.2d at 259. We also emphasized that the legislature, unlike the courts, is "not limited to addressing only cases and controversies brought . . . by litigants" and may "conduct public hearings and committee meetings" to "hear and consider the views of the general public as well as educational experts," thereby "permit[ting] the full expression of all points of view." *Id.*

Elsewhere, this Court expressed other concerns. For example, the Court acknowledged that education policy is an area where "there will be more than one constitutionally permissible method of solving" problems, that "[o]n even the most basic questions . . . the scholars and educational experts are divided," and that funding increases were not a guaranteed cure-all to perceived problems plaguing

public education. *Id.* at 356, 488 S.E.2d at 260 (emphasis omitted) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42–43, 93 S. Ct. 1278, 1301–02 (1973)). Additionally, as noted above, this Court appeared concerned about "protracted litigation resulting in unworkable remedies," observing that "[s]ubstantial problems have been experienced in those states in which the courts have held that the state constitution guaranteed the right to a sound basic education." *Id.* at 350–51, 488 S.E.2d at 257.

Thus, when remanding the case, this Court took care to non-exhaustively enumerate some factors to guide the trial court as it considered whether defendants had provided plaintiff students and plaintiff-intervenor students with an opportunity for a sound basic education. *See id.* at 355–57, 488 S.E.2d at 259–60. Specifically, this Court instructed the trial court to consider "[e]ducational goals and standards adopted by the legislature," "the level of performance of the children of the state and its various districts on standard achievement tests," and "the level of the [S]tate's general educational expenditures and per-pupil expenditures." *Id.* at 355, 488 S.E.2d at 259–60. This Court was clear, however, that no single factor alone was to be dispositive. *See id.* at 355–57, 488 S.E.2d at 259–60.

Acutely aware that judges would be tempted to insert themselves into a province more appropriately handled by the legislative and executive branches, this Court expressed grave concern about the potential for judicial interference with the constitutional powers and duties of the other two branches. To that end, this Court

provided the following guidance to future courts:

> In conclusion, we reemphasize our recognition of the fact that the administration of the public schools of the state is best left to the legislative and executive branches of government. Therefore, the courts of the state must grant every reasonable deference to the legislative and executive branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education. A clear showing to the contrary must be made before the courts conclude that they have not. Only such a clear showing will justify a judicial intrusion into an area so clearly the province, initially at least, of the legislative and executive branches as the determination of what course of action will lead to a sound basic education.

*Id.* at 357, 488 S.E.2d at 261. With those sentiments, this Court remanded the case to the trial court.

### D. Post-*Leandro* Developments in the Education System

Approximately a month after this Court's *Leandro* opinion in 1997, the education system underwent another relevant change—one addressing the substantive component of education. The General Assembly passed an amendment to section 115C-12 requiring the State Board to "develop a comprehensive plan to revise content standards and the [S]tandard [C]ourse of [S]tudy in the core academic areas of reading, writing, mathematics, science, history, geography, and civics." *See* The Current Operations and Capital Improvements Appropriations Act of 1997, ch. 443, § 8.27(a), 1997 N.C. Sess. Laws 1344, 1396–97 (codified as amended at N.C.G.S. § 115C-12(9a) (1998 Supp.) (recodified as amended at N.C.G.S. § 115C-12(9c) (2025)).

The revised content standards developed in the core

> academic areas [were to] (i) reflect high expectations for students and an in-depth mastery of the content; (ii) be clearly grounded in the content of each academic area; (iii) be defined grade-by-grade and course-by-course; (iv) be understandable to parents and teachers; (v) be developed in full recognition of the time available to teach the core academic areas at each grade level; and (vi) be measurable, whenever possible, in a reliable, valid, and efficient manner for accountability purposes.

N.C.G.S. § 115C-12(9a) (1998 Supp.). The State Board dutifully revised the Standard Course of Study following this statutory amendment.

**E. The Hoke County Trial**

On 10 October 1997, the Attorney General moved on defendants' behalf "to dismiss all claims by [the low-wealth] school boards and [the urban] school boards" for lack of standing. The Attorney General maintained that "[t]he constitutional right to the opportunity for 'a sound basic education' . . . belongs solely to the children attending the public schools[,] . . . not . . . to the [low-wealth and urban] school boards. Indeed, those boards have the duty to protect that right for all students enrolled in their local schools."

On 30 October 1997, before the trial court could rule on defendants' motion, the then-Chief Justice designated the case as exceptional pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts and reassigned it to a special judge of the superior court (the first replacement judge). On 24 November 1997, the trial court denied defendants' motion to dismiss without explanation. The case therefore proceeded with the low-wealth and urban school boards participating

in the litigation.

Nearly a year later, on 15 October 1998, "plaintiffs[,] at the behest of the trial court," amended their complaint to present allegations regarding prekindergarten services. *Hoke County I*, 358 N.C. at 618, 599 S.E.2d at 378. Specifically, plaintiffs alleged that "[t]he [low-wealth school] districts d[id] not have sufficient resources to provide the prekindergarten and other programs and services needed for a sound basic education." Plaintiff-intervenors also amended their complaint the same day, making similar allegations about the urban school districts' inability to provide sufficient prekindergarten services. Defendants, through the Attorney General, denied these allegations.

Because plaintiff parties had asserted different allegations about how the State's educational funding system affected each of them, the trial court "bifurcated [this case] into two separate actions"—one for plaintiffs' remaining claims, one for plaintiff-intervenors'. *Hoke County I*, 358 N.C. at 613, 599 S.E.2d at 375. The trial court held a trial on plaintiffs' claims first. *Id.* Due to the "sheer size and complexity of dealing with evidence" from each unique school district, the trial court decided to hold separate trials for each plaintiff school district—one at a time, *see Hoke County I*, 358 N.C. at 613, 599 S.E.2d at 375. The trial court and the parties agreed that the first trial would address only the Hoke County school district. *Id.*

The claims pertaining to the Hoke County school district came on for trial in September of 1999. The trial court allowed the introduction of evidence that

"reache[d] a broader constituency" than the students in the case's caption; indeed, "a far greater proportion of the evidence pertain[ed] to the circumstances of Hoke County's student population in general than it d[id] to the named plaintiffs in particular." *Id.* at 615, 599 S.E.2d at 376. Also, "the trial court heard evidence concerning the plight of those children who were about to enter the school system"— i.e., "prospective enrollees" of the Hoke County school system. *Id.* at 640–41, 599 S.E.2d at 392–93. Moreover, "the trial court took evidence on, and made conclusions about, student performance across the state." *Id.* at 633 n.14, 599 S.E.2d at 387 n.14; *see also id.* at 625, 599 S.E.2d at 382–83. The reference to student performance in school districts around the state necessarily rested on an assumption that there were *Leandro*-compliant school districts to which comparisons could be drawn. Nevertheless, all the "evidence in the case w[as] restricted to its effect on Hoke County." *Id.* at 613, 599 S.E.2d at 375. The trial on the Hoke County claims "lasted approximately fourteen months and resulted in over fifty boxes of exhibits and transcripts, an eight-volume record on appeal, and a [M]emorandum of [D]ecision that exceeds 400 pages." *Id.* at 610, 599 S.E.2d at 373; *cf. id.* at 621, 599 S.E.2d at 380 (highlighting the Memorandum of Decision's "free-wheeling nature").

Throughout the trial, defendants "consistently t[ook] the position" that the State's educational funding system generally "me[t] the constitutional mandate." Indeed, defendants "fought 'tooth and nail' to prevent any finding that (1) the State. . . [was] not providing the equal opportunity for each child to obtain a sound basic

education," or (2) "the State . . . [was] not providing sufficient funding to its school districts to provide each and every child with the equal opportunity to obtain a sound basic education." According to defendants, any constitutional violations occurring in the Hoke County school district were due to how "the individual school district . . . spen[t] the money the State provide[d]." *Accord Hoke County I*, 358 N.C. at 631, 599 S.E.2d at 386.

The trial court largely agreed with defendants. *See id.* at 634–35, 599 S.E.2d at 388–89. The trial court reviewed five aspects of the State's education system to ensure compliance with *Leandro*: (1) its curriculum (namely, the BEP and the Standard Course of Study developed pursuant to N.C.G.S. § 115C-12(9a)), (2) its teacher licensing/certification system, (3) its funding delivery system, (4) the ABCs Accountability System, and (5) its student performance standards. Notably, the trial court observed that "plaintiffs ha[d] stated that they have no complaint about the content of the [s]tate curriculum"; rather, "plaintiffs . . . confessed that their *only* complaint about the Standard Course of Study is how it 'is brought into practice' or 'implemented.' " (Emphasis added.) In the end, the trial court affirmed that each component was constitutionally sound.

The trial court stated that the State's educational funding system was "structurally sufficient to enable school systems to distribute and allocate funds for every child to have an equal opportunity to obtain a sound basic education." Significantly, the trial court explicitly stated, "The evidence clearly and convincingly

show[ed] that the majority of North Carolina children [were] not at-risk of educational failure and [were] obtaining a sound basic education as required by *Leandro*." As summarized by this Court,

> the trial court found that the State's general curriculum, teacher certifying standards, funding allocation systems, and education accountability standards met the basic requirements for providing students with an opportunity to receive a sound basic education. As a consequence, the trial court concluded that "the bulk of the core" of the State's "Educational Delivery System . . . is sound, valid, and meets the constitutional standards enumerated by *Leandro*."

*Hoke County I*, 358 N.C. at 632, 599 S.E.2d at 387 (alteration in original); *see also id.* at 634, 599 S.E.2d at 388 (noting that the trial court found, "as a general proposition," that "the State's Funding Delivery System for education was adequate" and observing "that the trial court went to great lengths in its efforts to convey its view that the evidence offered no definitive showing that the State's overall funding, resources, and programs scheme lacked the essentials necessary to provide a sound basic education"). In other words, the trial court acknowledged that the State's provision and funding of education were facially constitutional, meaning any viable constitutional challenge to the education system would therefore have to be an as-applied challenge.

But after reviewing data produced under the ABCs Accountability System and comparing Hoke County students to other students across the state, the trial court determined that "at-risk" students in Hoke County were not receiving a sound basic

education.[14] According to the trial court, this was because neither defendants nor the Hoke County school board had "strategically allocat[ed] the available resources to see that *at-risk* children have the equal opportunity to obtain a sound basic education." (Emphasis added.) *Accord Hoke County I*, 358 N.C. at 637, 599 S.E.2d at 390. The trial court therefore "ordered the State to reassess both its financial allocations and its other resource provisions *earmarked for Hoke County schools* . . . to ensure that *'at-risk' children in Hoke County* are afforded a chance to take advantage of their constitutionally-guaranteed opportunity to obtain a sound basic education." *Id.* (emphases added); *see also id.* at 608–09, 599 S.E.2d at 373. It left the " 'nuts and bolts' of the educational resource [allocation] assessment in Hoke County to the other branches of government" and provided only general guidelines. *Id.* at 636, 599 S.E.2d at 389; *see also id.* at 637–38, 599 S.E.2d at 390.

> In short, the trial court: (1) informed the State what was wrong with Hoke County schools; (2) directed the State to reassess its educational priorities for Hoke County; and (3) ordered the State to correct any and all education-related deficiencies that contribute to a student's inability to take advantage of his right to the opportunity to obtain a sound basic education.

*Id.* at 638, 599 S.E.2d at 390.

---

[14] *See generally Hoke County I*, 358 N.C. at 632 n.13, 599 S.E.2d at 387 n.13 ("[A] particular and identifiable subgroup of students has been singled out by experts in the education field and described as 'at-risk' students. In a general sense, such students are those who, due to circumstances such as an unstable home life, poor socio-economic background, and other factors, either enter or continue in school from a disadvantaged standpoint, at least in relation to other students who are not burdened under such circumstances.").

"In addition to ordering the State to reassess its resource allocations to Hoke County schools in an effort to improve them for students currently in attendance," *id.* at 640, 599 S.E.2d at 392, the trial court also found that, in the Hoke County school district, "the evidence showed that the State was providing inadequate resources for . . . 'at-risk' prospective enrollees, and that the State's failings were contributing to the 'at-risk' prospective enrollees' subsequent failure[s] to avail themselves of the opportunity to obtain a sound basic education," *id.* at 641, 599 S.E.2d at 392–93. "The trial court concluded that [s]tate efforts towards providing remedial aid to 'at-risk' prospective enrollees were inadequate," and it ordered the State to provide pre-kindergarten classes for that group. *Id.* at 642, 599 S.E.2d at 393.

## F. Supreme Court of North Carolina Decides *Hoke County Board of Education v. State* (*Hoke County I*)

Following the Hoke County trial, the parties cross-appealed and petitioned this Court for discretionary review prior to a determination by the Court of Appeals. This Court allowed their petitions.

At the outset of the opinion in *Hoke County I*, this Court acknowledged that although "[t]his litigation started primarily as a challenge to the educational funding mechanism imposed by the General Assembly[,] . . . [w]ith the *Leandro* decision, . . . the thrust of this litigation [had] turned from a funding issue to one requiring the analysis of the qualitative educational services provided *to the respective plaintiffs and plaintiff-intervenors*." *Hoke County I*, 358 N.C. at 609, 599 S.E.2d at 373 (emphasis added). Moreover, the statutory question that remained after *Leandro*

"ha[d] been subsumed, for all practical purposes, by the constitutional question." *Id.* at 612 n.1, 599 S.E.2d at 374 n.1. In other words, because the education policy established by the statutes provided a constitutionally compliant sound basic education, compliance with the statutes would equate to constitutional compliance. Plaintiff-intervenors' equal protection claim concerning the BEP's supplemental funding program for low-wealth counties was not yet ripe because it had not yet been addressed in a separate action. *Id.* at 612 n.2, 599 S.E.2d at 375 n.2. Thus, in *Hoke County I* this Court considered whether "the evidence show[ed] that the State ha[d] failed to provide *Hoke County school children* with the opportunity to receive a sound basic education, as defined in *Leandro.*" *Id.* at 610, 599 S.E.2d at 373 (emphasis added).

After addressing some procedural matters, this Court affirmed the trial court's conclusion that statewide educational policy and funding were generally constitutionally sound. *See id.* at 632–38, 599 S.E.2d at 387–91. In its analysis, this Court pointed out that "the question of whether students are obtaining a sound basic education" is different than "the question of whether they were afforded their opportunity to obtain one." *Id.* at 625 n.11, 599 S.E.2d at 383 n.11. Indeed, we recognized that "[t]he failure to obtain such an education may be due to any number of reasons beyond the defendant State's control, not the least of which may be the student's lack of individual effort and a failure on the part of parents and other caregivers to meet their responsibilities." *Id.* As such, this Court stated, "In order to

prevail, plaintiffs must show more than a failure on the part of Hoke County students to obtain a sound basic education." *Id.* Rather, "in order to show Hoke County students [were] being wrongfully denied their rightful opportunity for a sound basic education, plaintiffs [were required to] show that their failure to obtain such an education was due to the State's failure to provide them with the opportunity to obtain one." *Id.* Ultimately, this Court agreed that at-risk students in Hoke County were being deprived of their constitutional opportunity for a sound basic education and affirmed the trial court's directive for defendants to correct those shortcomings in that county. *See id.* at 638, 599 S.E.2d at 391.

Nonetheless, this Court reversed the portions of the Memorandum of Decision that had required the State to provide prekindergarten services for all at-risk children in Hoke County. *Id.* at 645, 599 S.E.2d at 395. We began by explaining that the General Assembly's establishment of "the proper age parameters for starting and completing school" were nonjusticiable political questions. *Id.* at 638–39, 599 S.E.2d at 391. Finally, although this Court agreed that the State was not adequately providing resources for at-risk prospective enrollees in the Hoke County school district, *id.* at 642, 599 S.E.2d at 393, we concluded that the trial court's ordered remedy was, "at best," "a premature judicial encroachment on a core function of our [S]tate's legislative and executive branches" given the evidence the parties had presented at trial, *id.* at 644–45, 648, 599 S.E.2d at 394–97.

Notably, *Hoke County I* was replete with reminders of its holding's narrowness.

This Court continually expressed its understanding that plaintiff parties' claims were as-applied challenges.[15] This Court also disclaimed "any opinion as to whether *non 'at-risk' students in Hoke County* [were] either obtaining a sound basic education or being afforded their rightful opportunity by the State to obtain such an education." *Id.* at 634, 599 S.E.2d at 388 (emphasis added). We clarified that "non 'at risk' students [in Hoke County] [were] *not*: (1) held or presumed to be obtaining a sound basic education, or (2) precluded from pursuing *future claims* that they [were] not being afforded the opportunity to obtain a sound basic education." *Id.* at 633 n.15, 599 S.E.2d at 387 n.15 (second emphasis added).

_____

[15] *See, e.g.*, *Hoke County I*, 358 N.C. at 609, 599 S.E.2d at 373 ("This litigation started primarily as a challenge to the educational funding mechanism imposed by the General Assembly that resulted in disparate funding outlays *among low wealth counties and their more affluent counterparts*. With the *Leandro* decision, however, the thrust of this litigation turned from a funding issue to one requiring the analysis of the qualitative educational services provided *to the respective plaintiffs and plaintiff-intervenors*." (emphases added)); *id.* at 610, 599 S.E.2d at 373 ("The *Leandro* decision and the ensuing trial have resulted in the thrust of the instant case breaking down into the following contingencies: (1) Does the evidence show that the State has failed to provide *Hoke County school children* with the opportunity to receive a sound basic education . . . ." (emphasis added)); *id.* at 612, 599 S.E.2d at 374–75 ("The surviving claims for trial [after *Leandro*] included the following: (1) whether the State has failed to meet its constitutional obligation to provide an opportunity for a sound basic education *to plaintiff parties*, . . . and (3) whether the *State*'s supplemental school funding system is . . . arbitrary and capricious, resulting in a denial of equal protection of the laws *for plaintiff-intervenors*." (first and third emphases added) (citations omitted)); *id.* at 623, 599 S.E.2d at 381 ("We begin our examination under the umbrella of the State's first argument—namely, whether there was a clear showing of evidence supporting the trial court's conclusion that 'the constitutional mandate of *Leandro* has been violated [*in the Hoke County School System*] . . . .' " (alteration in original) (emphasis added)); *id.* at 625 n.11, 599 S.E.2d at 383 n.11 ("Thus, in order to show *Hoke County students* are being wrongfully denied their rightful opportunity for a sound basic education, *plaintiffs* must show that *their* failure to obtain such an education was due to the State's failure to provide *them* with the opportunity to obtain one." (emphases added)).

Additionally, this Court emphasized its "consideration of the case [was] properly limited to the issues relating solely to Hoke County" because only those issues were "raised at trial." *Id.* at 613, 599 S.E.2d at 375. And "because this Court's examination of the case [was] premised on evidence *as it pertain*[*ed*] *to Hoke County in particular*," its "holding mandates [*could not*] *be construed to extend* to the other four [low-wealth school] districts named in the complaint." *Id.* at 613 n.5, 599 S.E.2d at 375 n.5 (emphases added). This Court instructed the trial court to move forward with proceedings for each of the other low-wealth and urban school districts because their individual claims had not yet been adjudicated. *Id.* at 648, 599 S.E.2d at 397.

In summary, by this stage of the case, many of the original claims had been dismissed. After *Hoke County I*, this Court had reiterated the trial court's observations that the structure and funding of the State's education system as they existed in 1994 were facially constitutional, settling that matter for purposes of this action. In Hoke County specifically, however, there had been a showing that at-risk students were being deprived of their opportunity to receive a sound basic education, and this Court affirmed the trial court's directive for defendants to work with the Hoke County school board to remedy the resource allocation problem identified in the Hoke County trial. Otherwise, this Court remanded to the trial court for further proceedings on the remaining plaintiff parties' as-applied claims.

## G. Post-*Hoke County I*

In the years following *Hoke County I*,

> [t]he State . . . established the Disadvantaged Student Supplemental Fund . . . to assist at-risk children, and . . . funded the Low Wealth Schools Fund . . . . Additionally, the State . . . allocated funds to (1) expand the More-at-Four program which provide[d] education to at-risk four-year-olds; (2) reduce class size; (3) increase resources to the Hoke County school system, including increased teacher salaries and creation of Learn to Earn High Schools; and (4) create new programs to adequately train school superintendents and administrators.

*Hoke Cnty. Bd. of Educ. v. State*, 198 N.C. App. 274, 276, 679 S.E.2d 512, 515 (2009). Importantly, however, the rest of plaintiff parties' claims remained untried. Indeed, the parties engaged in protracted, non-trial proceedings for several more years. Throughout this period, the trial court made no findings of fact or conclusions of law amounting to an appealable order. Instead, the original claims were neglected, steadily abandoned, and seemingly forgotten.

The scope of this action contemporaneously began to exceed the boundaries set by the complaints and refined by *Leandro* and *Hoke County I*. By no later than 2017, the litigation went off in a different direction, focusing on public education statewide. All the while, the very education system upon which plaintiff parties' complaints were based was steadily changed and then replaced.

### 1. *2004–2011*

#### a. *The Penn Intervenors Intervene*

On 9 February 2005, over a decade after this case commenced, several "public school students in the Charlotte-Mecklenburg school district" and their parents or guardians (Penn Intervenors) sought to intervene in the action against both

defendants and the Charlotte-Mecklenburg school board "to enforce their constitutional rights to a sound basic education." Their complaint also raised equal protection claims. Notably, the Penn Intervenors were represented by current Justice Anita Earls, who would eventually cast the deciding vote in *Hoke County III* (discussed below).[16]

On 19 August 2005, the trial court allowed permissive intervention to consider the Penn Intervenors' claims concerning "the failure of the [Charlotte-Mecklenburg school] district to provide sufficient human, fiscal, and educational resources to its central city and high poverty schools."[17] It denied intervention concerning any equal protection claims and expressly disallowed "evidence or argument on the [Penn Intervenors'] . . . conten[tion] that the [Charlotte-Mecklenburg school board's] student assignment system violate[d] their right to a sound basic education under *Leandro*." The trial court then "sever[ed] the [Penn Intervenors'] claim so as to permit

---

[16] Justice Earls also signed two amicus briefs at various points in this case's saga: one on behalf of the University of North Carolina School of Law Center for Civil Rights, Mem. of Law as *Amici Curiae* at 15, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158 (N.C. Super. Ct. Dec. 3, 2004), and one on behalf of the Southern Coalition for Social Justice, New Br. of *Amicus Curiae* at 32, *Hoke Cnty. Bd. of Education v. State* (*Hoke County II*), 367 N.C. 156, 749 S.E.2d 451 (2013) (per curiam) (No. 5PA12-2); *Hoke County II*, 367 N.C. at 157, 749 S.E.2d at 453 ("Anita S. Earls . . . for Southern Coalition for Social Justice . . . , amici curiae."), which she founded, *Anita Earls*, N.C. Jud. Branch, https:// www.nccourts.gov/judicial-directory/anita-earls (last visited Apr. 11, 2025).

[17] Accordingly, the Charlotte-Mecklenburg school board was involved in this case both as a participant with plaintiff-intervenors and as a defendant named by the Penn Intervenors.

a separate trial of [their] claims."[18]

On 30 September 2005, the Penn Intervenors filed an amended complaint, which Justice Earls also signed, that further developed the claim allowed by the trial court and added several more students and the Charlotte-Mecklenburg Branch of the NAACP as plaintiffs.[19] The Penn Intervenors' amended complaint alleged the Charlotte-Mecklenburg school board's then-current student assignment plan created "many 'high poverty' and low-performing schools" in its district, which enrolled and "locked in[ ]" many at-risk students. Ultimately, the Penn Intervenors claimed that "the [Charlotte-Mecklenburg school board], the State . . . , and the State Board . . . each . . . violated their duty to provide sufficient human, fiscal and educational resources to [the Charlotte-Mecklenburg school district's] high poverty and low-performing high schools in order to assure that all students in those schools receive a sound basic education." They therefore sought "[a]n order enjoining [the Charlotte-Mecklenburg school board, the State, and the State Board] to provide sufficient human, fiscal, and educational resources to every [Charlotte-Mecklenburg] high school, including every high poverty and low-performing school, to assure that all students in the [Charlotte-Mecklenburg] high schools [were] being consistently

---

[18] This was an example of the proper method to alter an existing action. The aspiring intervenors made a request of the trial court, and the trial court denied the request as to claims unrelated to the existing litigation but allowed intervention as to what it considered to be related claims.

[19] The Penn Intervenors filed an amended complaint to ensure this claim would be addressed. This procedure was notably not practiced later in this litigation.

provided with a sound basic education."

b. *Most Urban School Boards Voluntarily Dismiss Their Claims*

On 4 May 2006, plaintiff-intervenors Asheville City Board of Education, Buncombe County Board of Education, Durham Public Schools Board of Education, Wake County Board of Education, and Winston-Salem/Forsyth County Board of Education voluntarily dismissed their claims.[20] Thus, the Charlotte-Mecklenburg school board was the only urban school board remaining in the litigation. Even had the Charlotte-Mecklenburg school board voluntarily dismissed its claims, however, it would still have been a participant in this litigation by virtue of being named a defendant by the Penn Intervenors.

Following those urban school boards' voluntary dismissals, this litigation involved only the established violations of at-risk Hoke County students' rights, plaintiff parties' yet-to-be-tried claims concerning the other low-wealth and urban school districts, and the Penn Intervenors' new claims concerning the Charlotte-Mecklenburg school district.

c. *Notices of Hearing and Orders Regarding Hearings*

As the case languished into its second and third decades, the proceedings strayed beyond the issues raised in the original complaints even further. Indeed, at times in the various so-called "Notice[s] of Hearings and Order[s] [Regarding]

---

[20] Accordingly, from here on out, references to "plaintiff parties" do not include those urban school boards that voluntarily dismissed their claims.

Hearings," the first replacement judge considered evidence concerning school districts not named in the complaints, and he made statements concerning the general state of education in North Carolina. Yet, in line with the law of the case, the first replacement judge repeatedly reiterated that the problem was not education policy or funding; rather, he found that the problem was a failure of the educational establishment and classroom instruction—i.e., implementation and delivery.

One such example can be found in the trial court's 16 March 2009 "Notice of Hearing and Order Re[garding] Hearing." In this document, the trial court recounted an "academic disaster" in Halifax County despite not having held a trial on claims related to that school district:

> The bottom line is that Halifax County Public School children are suffering from a breakdown in system leadership, school leadership and a breakdown in classroom instruction by and large from elementary school through high school.
>
> . . . .
>
> . . . Financial data furnished by [the Department of Public Instruction] shows that the cost to the taxpayers to provide school level expenditures, the majority of which are salaries and benefits for employees, has exceeded $75,000,000.00 for the past three years.
>
> . . . .
>
> With all of this expense being paid to the adults whose responsibility it is to provide an equal opportunity to obtain a sound basic education to each and every child in the Halifax County Public School system, there seems to be little trickle down benefit to the children entrusted to the adults in these schools.

. . . .

> . . . [I]t is time for the State to exert itself and exercise command and control over the Halifax County Public Schools beginning in the school year 2009–2010, nothing more and nothing less.
>
> By this Notice of Hearing and Order, the [trial] [c]ourt is providing the [e]xecutive [b]ranch the opportunity, initially at least, to exercise its constitutional authority over the Halifax County School system to remedy the academic disaster which is occurring there on behalf of the children who have no other place to turn to for a sound basic education.
>
> . . . .
>
> The [trial] [c]ourt will entertain no excuses or whining by the adults in the educational establishment in Halifax County about how it's the children's fault, not theirs, for failing to provide the academic environment where children can obtain a sound basic education. If these children had *Leandro* compliant school leadership and teachers, they can learn and obtain a sound basic education rather than fail and drop out of school doomed to a lifetime of poverty and its multiple damages.

(Emphasis omitted & added.) Thereafter, the trial court scheduled a "non-adversarial hearing" where "the State . . . , acting through its [e]xecutive [b]ranch," would be given "the opportunity to report to the [trial] [c]ourt concerning the actions that the [e]xecutive [b]ranch w[ould] take with regard to the Halifax County Public School system in response to the [trial] [c]ourt's serious concerns . . . regarding the failure of the Halifax County Public School system."

As another example, in a memorandum addressed to his replacement and the General Assembly, Governor, Attorney General, and Superintendent of Public

Instruction, the first replacement judge explained:

> *Leandro* requires that the children, not the educational establishment, have the [c]onstitutional right to the . . . opportunity to obtain a sound, basic education. This has not and is not happening now as the little children are not being taught to read and write *because of a failure in classroom instruction* as required by *Leandro*. . . .
>
> This is not happening now.
>
> Our children that cannot read by the third grade are by and large doomed not to succeed by the time they get to high school. *As shown by the record in this case, that is a failure of classroom instruction*. . . .
>
> Reduced to essentials, in my opinion the children are not being provided the opportunity because after all the millions spent, 90% of school costs are for adult salaries and benefits, and the data show as it did years ago and up to now the educational establishment has not produced results.

Memorandum from Judge Howard Manning Jr., Retired, to the North Carolina General Assembly, Governor, Attorney General, and Superintendent of Public Instruction (Nov. 9, 2021) (emphases added), https://s3.documentcloud.org/documents/21102063/manning-memo.pdf.

These excerpts are emblematic of the trial court's view that there was not a general problem with education funding or education policy. Instead, the problem lay with the education establishment responsible for implementing and administering the education system.

d. *The Speaker of North Carolina House of Representatives and the President Pro Tempore of North Carolina Senate Attempt to Intervene and* Hoke County Board of Education v. State *(*Hoke County II*)*

After the 2010 midterm elections, members of a political party different from the Governor, Superintendent of Public Instruction, and Attorney General's political party became the majority in both the House of Representatives and Senate.[21] Thereafter, in 2011 a disagreement arose between the Governor and State Board (executive branch defendants) and the Speaker of the North Carolina House of Representatives and President Pro Tempore of the North Carolina Senate (the General Assembly). Specifically, "the General Assembly [had] instituted changes to North Carolina's prekindergarten program in the 2011 biennial budget law." *Hoke Cnty. Bd. of Educ. v. State* (*Hoke County II*), 367 N.C. 156, 158, 749 S.E.2d 451, 454 (2013) (per curiam) (citing Current Operations and Capital Improvements Appropriations Act of 2011, S.L. 2011-145, § 10.7, 2011 N.C. Sess. Laws 253, 354–56). In response, plaintiff parties sought "a judicial determination that the 2011 legislative changes failed to comply with the State's constitutional obligations recognized in *Leandro* and *Hoke County* [*I*]." *Id.*

The trial court then entered a "Memorandum of Decision and Order Regarding Pre-Kindergarten Services for At-Risk Four Year Olds," wherein it determined that

---

[21] This marked the first time during this litigation that the Governor, Superintendent of Public Instruction, Attorney General, and the majorities of the House and Senate were not of the same political party other than 1995 to 1998 and 2003 to 2004, when that political party lost the majority in the House.

certain aspects of the 2011 amendments were unconstitutional. The Governor then issued an executive order that, in the General Assembly's view, was an "attempt[ ] to interpret the [trial court's] [o]rder as establishing a new constitutional obligation upon the State to provide free, universal Pre-K services to each and every at-risk four year old in North Carolina beyond the levels of service funded by the General Assembly."

Disagreeing with the Governor's executive order, the General Assembly asked the Attorney General to seek clarification from the trial court about the scope of its order. The Attorney General refused to do so because of "an inability to obtain a conflict waiver from the Governor or the Department of Public Instruction." The Attorney General no longer "adequately represented" the General Assembly's interests, so the General Assembly moved to intervene in the trial court proceedings to represent "the interests of the legislative branch."

The trial court denied the General Assembly's motion to intervene, reasoning "[t]he . . . obligation[ ] to establish and maintain public schools is the 'shared province of the executive and legislative branches,' " and declining to "put[ ] itself, or the judiciary, in the middle of th[e] political dispute" between the General Assembly and Governor. Thus, from 2011 forward, the General Assembly ceased to be a party to this action. *See generally* N.C.G.S. § 1-72.2 (2025) (stating that "when the State of North Carolina is named as a defendant . . . , both the General Assembly and the Governor constitute the State," but recognizing that the legislative and executive

branches are distinct entities for purposes of litigation and that the General Assembly may sometimes need to independently represent its own interests as its own party in an action); *Berger v. State Conf. of NAACP*, 142 S. Ct. 2191, 2197 (2022) (observing North Carolina is a State that "ha[s] chosen to authorize multiple officials to defend their practical interests in cases").

The validity of the General Assembly's 2011 amendments was the subject of another appeal. Amendments enacted in 2012, however, rendered the appeal moot. *Hoke County II*, 367 N.C. at 159–60, 749 S.E.2d at 455.

### 2. *2011–2022*

#### a. *Changes to the Education System*

Unsurprisingly, as the volumes of the General Assembly's session laws demonstrate, the education system experienced major revisions and many innovations since this case's commencement in 1994. *See, e.g.*, An Act to Implement Various Education Reforms, S.L. 2012-77, §§ 1–8, 2012 N.C. Sess. Laws 272, 272–77; The Current Operations and Capital Improvements Appropriations Act of 2012, S.L. 2012-142, § 7A.1(b), 2012 N.C. Sess. Laws 484, 527–31 (creating the "Read to Achieve" program with the goal of "ensur[ing] that every student read[s] at or above grade level by the end of third grade and continue[s] to progress in reading proficiency"); Current Operations and Capital Improvements Appropriations Act of 2013, S.L. 2013-360, § 9.3(b)–(c), 2013 N.C. Sess. Laws 995, 1084–88 (modifying teacher licensing standards). A few illustrations will suffice.

For example, on the heels of the so-called Great Recession of 2008 and the enactment of the American Recovery and Reinvestment Act of 2009, the State submitted a proposal for a federal grant pursuant to the "Race to the Top" program. U.S. Dep't of Educ., *Race to the Top: North Carolina Report, Year 2: School Year 2011–2012*, at 2 (2013), https://files.eric.ed.gov/fulltext/ED539241.pdf. The Race to the Top program funded "comprehensive statewide reform grants . . . to encourage and reward States that [were] creating the conditions for education innovation and reform." *Id.* North Carolina was one of twelve recipients of Race to the Top grants. *Id.*

The funding under the grant enabled the State to "remodel [its] state system as part of an ambitious plan to increase student achievement, close achievement gaps and continue to increase the number of career- and college-ready graduates." N.C. Dep't of Pub. Instruction, *N.C. Race to the Top*, http://www.dpi.state.nc.us/rttt/ [https://web.archive.org/web/20170802072032/http://www.dpi.state.nc.us/rttt/] (last visited Mar. 25, 2026). The State updated the Standard Course of Study to include Common Core State Standards. *See, e.g.*, U.S. Dep't of Educ., *Race to the Top: North Carolina Report, Year 3: School Year 2012–2013*, at 3 (2014), https://files.eric.ed.gov/fulltext/ED580337.pdf. It also adopted a new accountability model: the READY Accountability Model. *See* Off. of Accountability & Testing Analysis & Reporting Section, N.C. Dep't of Pub. Instruction, *Technical Guide for School Accountability and Testing Results* v–vi (2022), https://www.dpi.nc.gov/ncdpi-school-

grade-technical-guide/open. These changes went into effect for the 2012–2013 school year. N.C. Dep't of Pub. Instruction, *Report to the North Carolina General Assembly: State Board of Education Progress Toward Implementing the Race to the Top Initiative* 4 (2012), https://webservices.ncleg.gov/ViewDocSiteFile/16625.

Like the ABCs Accountability System, the inner workings of the READY Accountability Model are complex and largely beyond the scope of this opinion. *See generally* N.C.G.S. § 115C-83.15(a) (2013) (establishing standards for measuring and grading "[s]chool achievement, growth, and performance scores"). But according to the State Board, the shift to the READY Accountability Model increased academic rigor for all grade levels and placed focus on college and career readiness as opposed to just end-of-course/end-of-grade testing. Moreover, it changed the proficiency/performance levels for measuring student performance, opting to use "achievement levels" to measure a student's career/college readiness. "Achievement Level 1" meant a student demonstrated "limited command" of a topic, and "Achievement Level 2" meant a student demonstrated "partial command." N.C. Dep't of Pub. Instruction, *2016 READY Accountability Background Brief* 1 (2016). "Achievement Level 3" meant a student demonstrated "sufficient command" of a topic. *Id.* This level indicated the student demonstrated grade-level proficiency, meaning he or she could advance to the next grade but may require additional support to be ready for college or a career. *Id.* "Achievement Level 4" meant a student demonstrated "solid command" of a topic, and "Achievement Level 5" meant a student

demonstrated "superior command." *Id.* Students achieving Levels 4 and 5 were considered "on track to be career and college ready by the time they graduate[d] high school." *Id.*

Per the State Board (the entity charged with administering the State's public education system), test results under the READY Accountability Model did not correspond to test results under the ABCs Accountability System, meaning there was no way to statistically link results between the systems. Notably, the implementation of the READY Accountability Model's higher, more-stringent academic standards initially "resulted in a lowering of academic proficiency rates statewide." N.C. Dep't of Pub. Instruction, *Report to the North Carolina General Assembly: An Act to Improve Public Education SL 2012-77 (SB 274), Sec. 7(b)*, at 26 (2014). This decline in proficiency rates did not necessarily signal a sudden drop in statewide student aptitude. Rather, it was a result of more rigorous standards, and the State Board anticipated that scores would steadily rise in the years following the READY Accountability Model's initial implementation.

Other pertinent changes to the education system occurred as well. In 2015, the General Assembly codified the duty of local school boards to also provide public schoolchildren with the opportunity to receive a sound basic education. Current Operations and Capital Improvements Appropriations Act of 2015, S.L. 2015-241, § 8A.1(b), 2015 N.C. Sess. Laws 641, 748 (codified as amended at N.C.G.S. § 115C-47(1) (2025)). It did so after finding that "some local boards of education ha[d]

failed to comply with the requirements of the judiciary's decision in *Leandro* to provide all public school students the opportunity to receive a sound basic education." *Id.* § 8A.1(a), 2015 N.C. Sess. Laws at 747.

In 2017, the General Assembly repealed section 115C-81. An Act to Make Organizational and Technical Changes to the Courses of Study Statutes, S.L. 2017-126, § 1, 2017 N.C. Sess. Laws 913, 913. When it did so, it formally eliminated the BEP—the focus of the lawsuit as originally pled.

Thus, the education system in 2017 was materially different from the education system that had existed in 1994, when plaintiff parties filed their complaints and amended complaints, and 2005, when the Penn Intervenors intervened and filed their amended complaint. Nobody amended or supplemented the pleadings to refine their claims in light of these major changes—including the outright repeal of the BEP, which had been the focus of the complaints.

*b. State Board's Motion for Relief from Hoke County Judgment*

As significant changes took shape in the education system, this lawsuit trudged along. The first replacement judge retired and withdrew from the case, and on 7 October 2016, the then-Chief Justice reassigned the case to an emergency judge of the superior court (the second replacement judge).[22]

---

[22] By this time, over a decade had passed since any student had joined the litigation, and so far as the record indicates, none of the students named in the various complaints and amended complaints remained enrolled in public school. The remaining participants in the lawsuit were therefore the original five low-wealth school boards, the Charlotte-Mecklenburg school board, the Charlotte-Mecklenburg Branch of the NAACP, and executive branch

On 24 July 2017, the Attorney General, on behalf of the State Board, moved under Rules 12(b) and 60(b) of the Rules of Civil Procedure for relief from the Hoke County trial judgment "and any other applicable remedial Superior Court Orders." In that motion, the Attorney General, on the State Board's behalf, highlighted that "[f]or over a decade [since *Hoke County I*], the [trial court] ha[d] retained and exercised jurisdiction in this case" but "ha[d] not . . . held a trial *as to any other plaintiff school board.*" (Emphasis added.) The Attorney General, on the State Board's behalf, further maintained that "legislative," "legal," "factual," "educational," and political changes "divorced" the original claims "from the current laws and circumstances" and rendered them "stale."

Critically, the Attorney General, on the State Board's behalf, contended that "[c]ontinued status hearings on the present system, which to date have *primarily included constitutional attacks based on statewide test scores, exceed the jurisdiction established by the original pleadings* in this action." (Emphasis added.) Indeed, the Attorney General, on the State Board's behalf, maintained that "[t]he cumulative effect of these changes is that the State's current educational system is so far removed from the factual landscape giving rise to the complaint, trial, and [Hoke County] [j]udgment that the [trial court] is now retaining jurisdiction over a 'future school

_____

defendants (i.e., the Governor and State Board) represented by the Attorney General. Thus, none of the remaining participants had the constitutional education rights at issue. The General Assembly was not a party to the proceedings.

system' which was not the subject of the original action."

In other words, the Attorney General, on the State Board's behalf, maintained that the trial court's subject matter jurisdiction over claims then under consideration had never been properly invoked. Thus, in its supporting brief, the State Board, through the Attorney General, argued that "a new lawsuit would be needed to challenge [legislative changes to the education system], both on their face and as-applied."

### c. *"WestEd Phase"*

With the appointment of the second replacement judge, the litigation's nature was officially and palpably altered. Indeed, on 1 February 2018, the trial court entered a "Case Management and Scheduling Order" noting that the remaining participants (except the State Board) "ha[d] jointly nominated, for the [trial] [c]ourt's consideration and appointment, an independent, non-party consultant to develop detailed, comprehensive, written recommendations for specific actions necessary to achieve sustained compliance with the constitutional mandates articulated in this case." This private actor

> w[ould] be charged with recommending specific actions the State should take:
>
> a. To provide a competent, well-trained teacher in *every* classroom in *every* public school in North Carolina;
>
> b. To provide a well-trained, competent principal for *every* public school in North Carolina; and

> c. To identify the resources necessary to ensure that *all* children in public school, including those at risk, have an equal opportunity to obtain a sound basic education, as defined in *Leandro* . . . .

(Emphases added.) In short, the case was headed in a completely new direction. At the trial court's direction, and with the remaining participants' acquiescence, the action was officially focused on statewide education policy and funding rather than the problems with the implementation and delivery of education in the school districts named in the complaints as amended.

On 13 March 2018, the trial court entered two important orders. First, it entered a consent order appointing San Francisco-based WestEd, whom the remaining participants (except the State Board) jointly nominated, as the "independent, non-party consultant" to assist with the case.

Second, and in conjunction with the consent order, the trial court denied the State Board's motion for relief. In the trial court's view, it had jurisdiction in the case, so it denied the State Board's motion to the extent it relied on Rules 12(b)(1) and (b)(2). The trial court then denied the State Board's 12(b)(6) motion because the trial court had denied defendants' 12(b)(6) motion in 1995. Finally, it denied the State Board's Rule 60(b) motion as untimely.

In this order, the trial court stated the case had "statewide implications and applications," and that "[t]here [was] an ongoing constitutional violation of every child's right to receive the opportunity for a sound basic education" that it (i.e., the

trial court) "ha[d] a *duty* to address." It also observed that by that point, the remaining participants (except the State Board) were working together, along with WestEd, to come up with "specific actions to achieve *Leandro* compliance." The trial court rationalized that "[t]he successful delivery of the *Leandro* right"—in other words, successful delivery of whatever "comprehensive approach" the remaining participants (excluding the General Assembly) jointly contrived with WestEd's assistance—"necessarily require[d] the active participation of the [State Board] in the discharge of its constitutional duty to supervise and administer the school system and its funding." Thus, the trial court would not grant the State Board relief from the Hoke County judgment and its other orders, or the prospective application thereof.

The State Board did not appeal. Instead, it stated that it "intend[ed] to cooperate and collaborate" with WestEd. The trial court subsequently entered an order clarifying "procedures for keeping all parties apprised of the consultant's ongoing work . . . in an effort to encourage collaboration and to insure a transparent and well-vetted study." This order "encouraged" "[t]he parties . . . to communicate among themselves and with WestEd as th[e] process move[d] forward." In December 2019, WestEd submitted to the trial court a document titled, "An Action Plan for North Carolina."

Soon thereafter, on 21 January 2020, the trial court entered another consent order, which was "negotiated by the State Board . . . ; the Office of the Governor; and the Department of Justice, on behalf of the State; the [p]laintiff school districts; and

the [Penn Intervenors]." Without regard for this Court's express warning in *Leandro* that there would be multiple ways to achieve a constitutionally compliant education, the trial court and remaining participants (not the General Assembly) agreed that the remaining participants would "work expeditiously and without delay to create and fully implement a definite plan of action to achieve *Leandro* compliance." This order had "systemic" change in mind, requiring the State to achieve seven statewide goals in the action plan. The trial court ordered the remaining participants to submit a status report sixty days later to apprise the trial court of the short-, mid-, and long-term actions they planned to take.

On 15 June 2020, the remaining participants submitted a joint report to the trial court on remedial steps planned for the next year. Then, on 11 September 2020, the trial court entered another consent order in which it ordered the remaining participants to immediately pursue a list of action items they had provided. By the remaining participants' admission, "the General Assembly['s] . . . direct involvement, cooperation, and assistance [was] necessary to implement the specific actions." The trial court's consent order also directed the remaining participants to develop a statewide "Comprehensive Remedial Plan" (CRP) by the end of that year. The CRP was "to be fully implemented by the end of 2028 with the objective of fully satisfying [d]efendants' *Leandro* obligations by the end of 2030."

Using WestEd's reports and consulting among themselves, the remaining participants developed the CRP, which they submitted to the trial court on 15 March

2021. The CRP contained hundreds of "action steps" for the State to complete over the course of eight years, requiring billions of dollars in taxpayer money to fund. The CRP was "not a 'menu' of options, but a comprehensive set of fiscal, programmatic, and strategic steps necessary to achieve the outcomes for students." The General Assembly was not included in the development of this plan.

On 11 June 2021, the trial court ordered the remaining participants to implement the CRP statewide. And in an ominous foreshadowing, the trial court threatened,

> If the State fails to implement the actions described in the [CRP]—actions which it [(i.e., the executive branch defendants)] admits are necessary and which, over the next biennium, the Governor's proposed budget and Senate Bill 622 confirm are attainable—"it will then be the duty of this [c]ourt to enter judgment granting declaratory relief and such other relief as necessary to correct the wrong."

After the trial court's 11 June 2021 Order, a string of progress reports and orders ensuring implementation of the CRP followed.

On 10 November 2021, the trial court entered an order wherein it said that "the State ha[d] not provided the necessary funding to execute the [CRP]," that "the State ha[d] failed to implement most actions in the [CRP]," and that because "the State's implementation of the [CRP] [was] already behind the contemplated timeline, . . . [it] ha[d] failed yet another class of students." The trial court laid the blame at the General Assembly's feet despite having denied it the ability to participate in the litigation ten years prior. Ultimately, the trial court ordered relevant state actors,

including the State Controller, to transfer over 1.75 *billion* dollars from the General Fund to the appropriate state agencies to fund the second and third years of the CRP.

Eight days after the trial court entered the 10 November 2021 Order, the General Assembly passed, and the Governor signed, the State's budget. Current Operations Appropriations Act of 2021, S.L. 2021-180, 2021 N.C. Sess. Laws 833.

The 10 November 2021 Order led to a flurry of appellate litigation. On 24 November 2021, the State Controller, who was not originally a party to this action, petitioned the Court of Appeals for a writ of prohibition, arguing that the trial court lacked jurisdiction over the Controller and that the 10 November 2021 Order violated the constitution. On 30 November 2021, a divided panel of the Court of Appeals issued a writ of prohibition restraining the trial court from enforcing the transfer provisions of the 10 November 2021 Order. The majority stated, "Under our [c]onstitutional system, that trial court lack[ed] the power to impose [the 10 November 2021] [O]rder."

The remaining plaintiff parties and Penn Intervenors sought this Court's review of the Court of Appeals' decision to issue the writ of prohibition. They filed notices of appeal, each based upon both a dissent and a constitutional question, as well as petitions for discretionary review and the writ of certiorari. The Controller and General Assembly moved this Court to dismiss the appeals. The filings directly appealing the Court of Appeals' writ of prohibition were docketed with this Court under case number 425A21-1.

Meanwhile, on 7 December 2021, executive branch defendants inexplicably

appealed the 10 November 2021 Order even though it ordered the funding of several years of the CRP, which they had sought. Executive branch defendants have never proffered an explanation for why they appealed the 10 November 2021 Order—an order that purported to fund the plan they had helped develop. Notably, executive branch defendants would go on to argue that this Court should uphold the order from which they appealed.

The next day, the General Assembly intervened pursuant to N.C.G.S. § 1-72.2(b) and filed a notice of appeal. Executive branch defendants and the remaining plaintiff parties filed petitions for discretionary review prior to the determination of the Court of Appeals. The filings directly appealing the 10 November 2021 Order were filed with this Court under case number 425A21-2.

On 21 March 2022, in 425A21-1, this Court held the direct appeal of the Court of Appeals' writ of prohibition in abeyance, and in 425A21-2, this Court allowed the petitions for bypass review of the 10 November 2021 Order. Before hearing argument, this Court remanded to the trial court "for the purpose of allowing the trial court to determine what effect, if any, the enactment of the State['s 2021] Budget ha[d] upon the nature and extent of the relief that the trial court granted." The Chief Justice assigned the task of overseeing the proceedings on remand to a third replacement judge because the second replacement judge had reached the mandatory retirement age. The third replacement judge's appointment was expressly limited, lasting only as long as "necessary and proper to address the Order of remand of the Supreme

Court of North Carolina, No. 425A21-2."

On 26 April 2022, the trial court determined "that the 10 November [2021] Order should be amended to remove a directive that [s]tate officers or employees transfer funds from the State Treasury to fully fund the CRP." Nevertheless, the trial court concluded that "the State . . . ha[d] failed to comply with the trial court's prior order to fully fund years 2 and 3 of the CRP." In addition, because the State's 2021 budget in fact funded portions of CRP programs, the trial court revised the amounts to be transferred down to roughly three quarters of a billion dollars.

So revised, this Court considered the 10 November 2021 Order and the 26 April 2022 Order. In July 2022, between the 26 April 2022 Order and this Court's decision, the General Assembly enacted yet another budget. Current Operations Appropriations Act of 2022, S.L. 2022-74, 2022 N.C. Sess. Laws 494.

On 13 July 2022, the General Assembly moved for Justice Earls's recusal because of her prior representation of the Penn Intervenors.[23] On 19 August 2022, Justice Earls denied that motion. Principally, she reasoned that the case before the Court in 2022 was very different from the case in which she sought intervention on behalf of the Penn Intervenors in 2005. *See, e.g.*, *Hoke Cnty. Bd. of Educ. v. State*, 382 N.C. 694, 696, 698, 896 S.E.2d 720, 722, 724 (2022) (order of Earls, J.) (denying

---

[23] The Code of Judicial Conduct provides that "a judge should disqualify himself/herself in a proceeding in which the judge's impartiality may reasonably be questioned, including but not limited to instances where . . . [t]he judge served as lawyer in the matter in controversy." N.C. Code of Jud. Conduct, Canon 3(C)(1)(b).

motion to recuse because "the facts and claims at issue in [the Penn Intervenor's] [c]omplaint . . . are entirely unrelated to the questions presently before the Court," reasoning that "[t]he proceedings are not substantially related" and "the past proceeding is not relevant to the current issues").

## H. Supreme Court of North Carolina Decides *Hoke County Board of Education v. State* (*Hoke County III*)

On 4 November 2022, this Court, on its own motion, entered an order clarifying that we would "treat[ ] the [w]rit of [p]rohibition filed 30 November 2021 by the Court of Appeals in 425A21-1 as consolidated with 425A21-2 to the extent necessary for the Court to address the arguments pertaining to the [w]rit" in the appellate briefing and oral arguments. We also "stay[ed] the [w]rit of [p]rohibition pending any further filings in 425A21-1 pertaining to issues not already addressed in the opinion filed [the same day]."

Also on 4 November 2022, this Court issued its divided decision in *Hoke County Board of Education v. State* (*Hoke County III*), 382 N.C. 386, 879 S.E.2d 193 (2022). A bare majority of four justices, with Justice Earls casting the deciding vote, "affirm[ed] and reinstate[d] the . . . 10 November 2021 Order's directive instructing certain [s]tate officials to transfer the funds necessary to comply with Years 2 and 3 of the State's [CRP]." *Id.* at 391, 879 S.E.2d at 198. It accordingly "vacate[d] in part and reverse[d] in part the trial court's [26] April 2022 Order removing that transfer directive," *id.*, and stayed the Court of Appeals' writ of prohibition, *id.* at 476, 879 S.E.2d at 249. Additionally, the majority remanded with instructions for "the trial

court to recalculate the appropriate distributions in light of the State's 2022 Budget" and "order the applicable [s]tate officials to transfer th[o]se funds as an appropriation under law." *Id.* Finally, the majority ordered the trial court to retain jurisdiction over the matter to ensure implementation of its order and to "monitor [for] continued constitutional compliance." *Id. Hoke County III* did not address whether the trial court in fact had subject matter jurisdiction to enter those orders.

## I.  Post-*Hoke County III*

On remand, the Chief Justice assigned the case to a fourth replacement judge. Then, on 8 February 2023, in 421A21-1, the Controller moved this Court to dissolve or lift its stay of the Court of Appeals' writ of prohibition. "Because the Controller's motion [was] a further filing in 425A21-1 pertaining to issues not already addressed by this Court, and because the Controller ha[d] made a sufficient showing of substantial and irreparable harm should the stay remain in effect," this Court allowed the Controller's motion and lifted the stay, thereby reinstating the Court of Appeals' writ of prohibition.

On 17 March 2023, the trial court held a hearing to recalculate distributions in light of the State's 2022 budget. On 17 April 2023, the trial court entered an order with recalculated figures. Because this Court had reinstated the writ of prohibition, the trial court did not carry out *Hoke County III*'s directive to order the applicable state officials to transfer the funds as an appropriation under law.

A new *Hoke County* appeal—*Hoke County IV*—quickly followed. The General

Assembly appealed the 17 April 2023 Order and petitioned this Court for discretionary review prior to a determination by the Court of Appeals. This Court allowed the General Assembly's bypass petition to address whether the trial court lacked subject matter jurisdiction to enter the 17 April 2023 Order.

On 16 November 2023, the General Assembly again moved to recuse Justice Earls because of her prior representation of the Penn Intervenors. On 31 January 2024, Justice Earls again denied the motion. She repeated her initial justification for her continued consideration of the case: the case currently before the Court is "entirely different" from the case in which she sought intervention on behalf of the Penn Intervenors' in 2005. *See, e.g.*, *Hoke Cnty. Bd. of Educ. v. State*, 385 N.C. 856, 858, 861–62, 896 S.E.2d 620, 622, 624–25 (2024) (order of Earls, J.) (denying motion to recuse even though she had signed the complaint when "Penn[ ]Intervenors sued the Charlotte-Mecklenburg School District (CMS) *as part* of the *Leandro* litigation" because the "2005 suit" and the "2018 litigation" were "distinct—factually, temporally, procedurally, and legally"; in other words, "Penn[ ]Intervenors' 2005 claim against CMS was a different suit based on different facts that raised different legal questions than this appeal" (emphasis added)).

## II.    Analysis

The legal question presented in this appeal concerns the trial court's subject matter jurisdiction to enter the 17 April 2023 Order. In its brief, the General Assembly presented several arguments in support of its position that the trial court

did not have subject matter jurisdiction. Among them, the General Assembly argued,

> The trial court . . . exceeded its jurisdiction by requiring the CRP because, in doing so, it purported to grant relief on a supposed "statewide" claim that no party has ever asserted, much less has standing to bring.
>
> . . . .
>
> . . . [N]o statewide violation has ever been asserted. For this reason, everything that has flowed from the [trial] court's order imposing the CRP—including . . . Judge Lee's 10 November 2021 Order attempting to transfer money out of the treasury to fund the CRP, as well as Judge Robinson's and Judge Ammons's amendments declaring the amounts supposedly owed under that order—has exceeded the court's subject matter jurisdiction. Accordingly, the entire series of orders from the 2018 consent orders appointing WestEd to the 2020 orders requiring the CRP through to Judge Ammons's order of 17 April 2023, should be vacated for lack of subject matter jurisdiction based on the absence of standing.

We agree with the premise underlying its argument: the failure to invoke the trial court's subject matter jurisdiction over a facial challenge means that the trial court did not have subject matter jurisdiction to resolve one. And because we agree that nobody in this case invoked the trial court's subject matter jurisdiction over a facial challenge to the current education system, we agree that the trial court lacked subject matter jurisdiction to enter its 17 April 2023 Order.

**A. General Principles of Subject Matter Jurisdiction**

We begin by surveying some general principles and rules relevant to this inquiry.

At its core, "[j]urisdiction is 'the legal power and authority of a court to make

a decision that binds the parties to any matter *properly brought before it.'*" *In re T.R.P.*, 360 N.C. 588, 590, 636 S.E.2d 787, 789 (2006) (citation modified) (quoting *Judicial Jurisdiction, Black's Law Dictionary* (7th ed. 1999)). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S. Ct. 1003, 1012 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)).

Not merely a personal protection afforded to litigants, a court's power to pass on the merits of the case is established "by law and operates as a structural limitation on the power of courts." *Slattery v. Appy City, LLC*, 385 N.C. 726, 729, 898 S.E.2d 700, 704 (2024). Thus, subject matter jurisdiction is only "conferred by the [c]onstitution, statutes[,] and the law of the land, that is, by sovereign authority." *Askew v. City of Kinston*, 386 N.C. 286, 297, 902 S.E.2d 722, 731 (2024) (quoting *Stafford v. Gallops*, 123 N.C. 19, 22, 31 S.E. 265, 266 (1898)); *see also Steel Co.*, 523 U.S. at 89, 118 S. Ct. at 1010 (describing subject matter jurisdiction as "the courts' statutory or constitutional *power* to adjudicate the case").

Our constitution vests the "judicial power" of this State predominantly in the General Court of Justice, which includes the District Court Division, the Superior Court Division, and the Appellate Division. N.C. Const. art. IV, §§ 1–2. It more specifically provides that the General Court of Justice wields "general jurisdiction,"

*see id.* art. IV, § 12, cl. 3 (vesting "original general jurisdiction" in the Superior Court Division); *see also* N.C.G.S. § 7A-240 (2025), meaning our state courts are broadly empowered to hear any claim that has not been exclusively reserved for another adjudicative body, *Simeon v. Hardin*, 339 N.C. 358, 368, 451 S.E.2d 858, 865 (1994). This broad subject matter jurisdiction, however, has limits. *See, e.g.*, *N.C. State Conf. of NAACP v. Moore*, 382 N.C. 129, 141–42, 876 S.E.2d 513, 524 (2022) ("When presented with a purely political question, the judiciary is neither *constitutionally empowered* nor institutionally competent to furnish an answer." (emphasis added) (quoting *Harper v. Hall*, 380 N.C. 317, 356, 868 S.E.2d 499, 529 (2022), *overruled by*, 384 N.C. 292, 886 S.E.2d 393 (2023))).

Notably, because subject matter jurisdiction is a matter of law, it "rests upon the law and the law alone." *In re T.R.P.*, 360 N.C. at 595, 636 S.E.2d at 793 (quoting *Feldman v. Feldman*, 236 N.C. 731, 734, 73 S.E.2d 865, 867 (1953)). Subject matter jurisdiction accordingly "cannot be conferred upon a court by consent" of the litigants. *In re K.J.L.*, 363 N.C. 343, 345–46, 677 S.E.2d 835, 837 (2009) (quoting *In re T.R.P.*, 360 N.C. at 595, 636 S.E.2d at 793). Moreover, "a court's lack of subject matter jurisdiction is not waivable and can be raised at *any* time." *Id.* at 346, 677 S.E.2d at 837 (emphasis added); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 1244 (2006) (stating objections to subject matter jurisdiction "can never be forfeited or waived" (quoting *United States v. Cotton*, 535 U.S. 625, 630, 122 S. Ct. 1781, 1785 (2002))).

In fact, courts may—indeed, should—raise the issue of subject matter jurisdiction *ex mero motu*. *See State v. Singleton*, 386 N.C. 183, 201, 900 S.E.2d 802, 815 (2024). An appellate court, for instance, must first review its own jurisdiction "and then [that] of the court from which the record comes." *Steel Co.*, 523 U.S. at 94, 118 S. Ct. at 1012 (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453, 20 S. Ct. 690, 692 (1900)). Because subject matter jurisdiction is the power to pass on the merits of a case, a court should not act in a case until it is satisfied that it has the authority to do so.

"Where there is no jurisdiction of the subject matter the whole proceeding is void *ab initio* and may be treated as a nullity anywhere, at any time, for any purpose." *High v. Pearce,* 220 N.C. 266, 271, 17 S.E.2d 108, 112 (1941) (first citing *Clark v. Carolina Homes, Inc.*, 189 N.C. 703, 128 S.E. 20 (1925); and then citing *Carter v. Rountree*, 109 N.C. 29, 13 S.E. 716 (1891)). Thus, courts "shall dismiss the action" whenever it appears that it lacks subject matter jurisdiction. N.C.G.S. § 1A-1, Rule 12(h)(3) (2025); *see also, e.g.*, *Slattery*, 385 N.C. at 730, 898 S.E.2d at 704.

Foundationally, a party must properly invoke a trial court's subject matter jurisdiction before a trial court may exercise subject matter jurisdiction in a case. It is insufficient for a trial court to be "generally authorized to exercise jurisdiction over the type of case presented." *In re T.P.*, 197 N.C. App. 723, 726, 678 S.E.2d 781, 784 (2009). In other words, "[a] trial court's general jurisdiction over the type of proceeding . . . does not confer jurisdiction over the specific action." *In re A.B.D.*, 173

N.C. App. 77, 86–87, 617 S.E.2d 707, 714 (2005).

This means that "[a] court cannot undertake to adjudicate a controversy on its own motion." *In re Transp. of Juvs.*, 102 N.C. App. 806, 808, 403 S.E.2d 557, 558 (1991). Said differently, a court may not exercise subject matter jurisdiction *ex mero motu. See id.* at 808, 403 S.E.2d at 559 ("We conclude that without an action pending before it, the district court was without jurisdiction to enter an order . . . ."). This rule aligns with the role of courts as neutral arbiters of genuine disputes brought before them. *Cf. The Federalist* No. 78, at 464 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The judiciary . . . has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL but merely judgment . . . .").

Instead, a court may "adjudicate a controversy only when a party presents the controversy to it, and then, only if it is presented in the form of a proper pleading." *In re Transp. of Juvs.*, 102 N.C. App. at 808, 403 S.E.2d at 558. "Thus, before a court may act there must be some *appropriate application* invoking the judicial power of the court with respect to the matter in question." *Id.* at 808, 403 S.E.2d at 558–59 (emphasis added) (citing *Carolina Freight Carriers Corp. v. Loc. 61, Int'l Bhd. of Teamsters*, 11 N.C. App. 159, 180 S.E.2d 461, *cert. denied*, 278 N.C. 701, 181 S.E.2d 601 (1971)). The requirement for a court's subject matter jurisdiction to be properly invoked by a litigant is longstanding. *See, e.g.*, *Morse v. Curtis*, 276 N.C. 371, 376, 172

S.E.2d 495, 499 (1970); *In re Peoples*, 296 N.C. 109, 144, 250 S.E.2d 890, 910 (1978); *Boseman v. Jarrell*, 364 N.C. 537, 546, 704 S.E.2d 494, 501 (2010); *Askew*, 386 N.C. at 299, 902 S.E.2d at 732.

In particular, "[a] court's subject matter jurisdiction over a particular case is invoked by the pleading." *Boseman*, 364 N.C. at 546, 704 S.E.2d at 501. As early as 1886, this Court formally observed, "The purpose . . . of the pleadings [is] to give [the court] jurisdiction of the *subject matter* of litigation and the parties in that connection." *Peoples v. Norwood*, 94 N.C. 167, 172 (1886), *cited with approval, In re K.J.L.*, 363 N.C. at 346, 677 S.E.2d at 837. If a party has not properly invoked the trial court's subject matter jurisdiction over a claim, then the trial court is not empowered to rule on that claim. *See, e.g., Eudy v. Eudy*, 288 N.C. 71, 75, 215 S.E.2d 782, 785 (1975), *overruled on other grounds by, Quick v. Quick*, 305 N.C. 446, 290 S.E.2d 653 (1982); *Miller v. McConnell*, 226 N.C. 28, 35, 36 S.E.2d 722, 726 (1946). In other words, the trial court's subject matter jurisdiction is coextensive with the claims raised in the pleadings.

Generally, the pleading by which a plaintiff may invoke the subject matter jurisdiction of a trial court is the complaint (and amendments thereof), although counterclaims may be asserted in answers (and amendments thereof). *See* N.C.G.S. § 1A-1, Rules 3(a), 7(a), 15 (2025). As recently as 2024, this Court said that "[a] complaint . . . *activates* a court's subject[ ]matter jurisdiction." *Askew*, 386 N.C. at 299, 902 S.E.2d at 732 (emphasis added). Absent proper amendment, parties are not

permitted to veer beyond the contours of the pleadings and litigate claims not raised therein. Any attempt to do so is beyond the trial court's subject matter jurisdiction.

The requirement for the invocation of the trial court's subject matter jurisdiction corresponds to principles of due process and fundamental fairness. Indeed, fundamental fairness requires a complaining party to notify the adverse party of the nature of the alleged wrong and the relief sought. Notice of claims and an opportunity to be heard on those claims are foundational to due process. *Cf. Armistead v. Cnty. of Carteret*, No. 66A25, slip op. at 7 (N.C. Mar. 20, 2026) ("Without . . . notice, due process does not permit a judgment that binds the absent parties."). The complaint serves as the roadmap of the litigation, and a party must stay within the contours of the complaint. Going beyond those contours requires complying with the process for amending complaints or bringing a new action. Otherwise, the defending party is not properly apprised of the claims.

There could be other ramifications as well. After all, final judgments in cases trigger all sorts of equitable doctrines potentially foreclosing other relief—for example, res judicata and collateral estoppel. And when attorneys and judges stray outside the bounds of the complaint and the named parties, they risk inadvertently closing the courthouse doors to future litigants who may have stronger claims or unique facts. This is why precisely establishing the contours of a claim—what is being challenged, by whom, against whom, and on what grounds—in the complaint is paramount.

The Rules of Civil Procedure, however, are not unduly rigid. They allow parties to amend their pleadings, which generally enables the pleading of different claims after an action has commenced. *See* N.C.G.S. § 1A-1, Rule 15(a). The Rules even provide that

> [a] claim asserted in an amended pleading is deemed to have been interposed at the time the claim in the original pleading was interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading.

*Id.* § 1A-1, Rule 15(c). The Rules also allow parties to file "supplemental pleadings," which may "set[ ] forth transactions or occurrences or events which may have happened since the date of the pleading sought to be supplemented." *Id.* § 1A-1, Rule 15(d).

But the Rules do not permit every amendment. Recognizing the potential for gamesmanship, unfairness, and injustice, courts afford protection to the nonmoving parties and have imposed boundaries on when permissive amendments are acceptable. These boundaries are rooted in principles of fundamental fairness, notice, and justice. *See, e.g.*, *Isenhour v. Universal Underwriters Ins. Co.*, 345 N.C. 151, 154–55, 478 S.E.2d 197, 199 (1996) ("Although the spirit of the North Carolina Rules of Civil Procedure is to permit parties to proceed on the merits without the strict and technical pleading rules of the past, the rules still provide some protection for parties who may be prejudiced by liberal amendment. Among proper reasons for denying a motion to amend are undue delay by the moving party and unfair prejudice to the

nonmoving party." (citation modified) (first quoting *Henry v. Deen*, 310 N.C. 75, 82, 310 S.E.2d 326, 331 (1984); and then quoting *News & Observer Publ'g Co. v. Poole*, 330 N.C. 465, 485, 412 S.E.2d 7, 19 (1992))); *Johnson v. Nw. Bank*, 27 N.C. App. 240, 244, 218 S.E.2d 722, 725 (1975) ("[W]e perceive no injustice in the court's refusal . . . to allow an amendment which would assert a claim completely different from that alleged in the original complaint, on behalf of persons not parties to the present litigation, which plaintiff . . . has no standing to assert.").

Pleadings do not only give notice of the alleged wrong; they also determine the course of the litigation—including which tribunal may properly exercise subject matter jurisdiction. For instance, our legal system recognizes two kinds of constitutional challenges: facial and as-applied. A "facial challenge" to the constitutionality of a statute is "an attack on [the] statute itself as opposed to a particular application" of that statute to a particular plaintiff. *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 213, 886 S.E.2d 16, 32 (2023) (quoting *Holdstock v. Duke Univ. Health Sys., Inc.*, 270 N.C. App. 267, 272, 841 S.E.2d 307, 311 (2020)). To succeed on a facial challenge, the plaintiff must show "there are *no circumstances* under which the statute might be constitutional." *Id.* at 213, 886 S.E.2d at 32–33 (quoting *Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009)). Alternatively, an as-applied challenge does not deny that a statute is generally enforceable. *See, e.g.*, *State v. Packingham*, 368 N.C. 380, 383, 777 S.E.2d 738, 743 (2015), *rev'd on other grounds*, 582 U.S. 98, 137 S. Ct. 1730

(2017). As-applied challenges "represent[ ] a plaintiff's protest against how a statute was applied in the particular context in which [the] plaintiff acted or proposed to act." *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 32 (quoting *Town of Beech Mountain v. Genesis Wildlife Sanctuary, Inc.*, 247 N.C. App. 444, 460, 786 S.E.2d 335, 347 (2016)).

The law permits one trial tribunal to hear and determine facial challenges raised on or after 7 August 2014: a three-judge panel of the Superior Court, Wake County. N.C.G.S. § 1-267.1(a), (c) (2025); *id.* § 1A-1, Rule 42(b)(4); *see also, e.g.*, *Holdstock*, 270 N.C. App. at 275–76, 281, 841 S.E.2d at 313–14, 317; *Lakins v. W.N.C. Conf. of United Methodist Church*, 283 N.C. App. 385, 391, 873 S.E.2d 667, 674 (2022); *cf.* N.C.G.S § 1-81.1(a1) (2025) (establishing a three-judge panel of the Superior Court, Wake County, as the exclusive venue for facial constitutional challenges raised on or after 7 August 2014). A single trial court judge may not adjudicate such claims. As-applied constitutional challenges, however, may be resolved in the first instance by a single judge. Thus, for a judge or three-judge panel to properly exercise subject matter jurisdiction over a constitutional challenge, the parties and trial court must adhere to the allegations of the complaint.

## B. Application

The trial court and remaining participants transformed their original as-applied constitutional challenges, which involved formerly school-aged children in eleven (later reduced to six) specific school districts with specific concerns about the implementation and delivery of educational opportunities in 1994 and 2005, into a

facial challenge of the General Assembly's current statewide school system. Clearly, this facial challenge was not part of, or foreseeable under, the 1994 and 2005 complaints and amended complaints. Further, the education system of 1994 and 2005, which the complaints and amended complaints identified as leading to the alleged constitutional violations, no longer exists. The education system of 1994 and 2005 ceased to exist as late as the General Assembly's repeal and replacement of the BEP in 2017. This was not the only change, but it was the final one.

For subject matter jurisdiction purposes, the question is at what point did this litigation leave the constraints of the pleadings as refined by this Court's decisions in *Leandro* and *Hoke County I*. We hold that by no later than the Attorney General's filing of the State Board's motion for relief from the Hoke County judgment on 24 July 2017, the litigation had been so transformed that a proper invocation of the trial court's subject matter jurisdiction over a facial challenge to the current system was required. Because no proper invocation was ever made, the trial court did not have subject matter jurisdiction to consider such a claim. Accordingly, any order entered after that date, including the trial court's decision of 17 April 2023 and this Court's decision in *Hoke County III*, are void ab initio. The courts did not have subject matter jurisdiction over the unpled facial challenge to the current education system.

When plaintiff parties filed their complaints in 1994, they presented relatively modest, narrow claims for relief concerning how a particular component of the education system, as it existed at the time, impacted them. Their claims focused on

how state financial resources were allocated to the low-wealth and urban school districts and how such allocations impacted the students in those specific school districts. Plaintiff parties placed particular emphasis on how delays in the State's funding of the BEP in 1994, when paired with their county governments' respective inabilities to raise sufficient county funding, prevented students in their school districts from receiving the educational promises guaranteed by the constitution and set out in the General Statutes as they existed in 1994. Plaintiff-intervenors also raised equal protection concerns regarding the BEP's supplemental funding program.

Importantly, plaintiff parties' allegations did not suggest that the BEP's funding scheme could never meet the students' constitutional education rights. Plaintiff parties simply alleged that the education system, as applied to them in their respective school districts, was inadequate.

These complaints set the initial parameters of this case and described what the case was about. Properly construed, the complaints in this case categorically did not present facial challenges. Instead, the allegations maintained that the BEP's funding structure was operating unconstitutionally in the low-wealth and urban school districts' unique circumstances. These allegations presented classic as-applied challenges. Therefore, plaintiff parties' invocation of the trial court's subject matter jurisdiction was over only as-applied challenges to the public education system that existed in the 1990s.

In line with the invocation of the trial court's subject matter jurisdiction in

their pleadings, plaintiff parties litigated, and our courts adjudicated, the claims as as-applied challenges to the then-existing public education system during the early stages of this litigation. During that time, this Court's decisions narrowed the litigation's scope even further.

In *Leandro*, this Court acknowledged that the State's method of funding education—wherein different school districts may receive unequal funding—did not violate the constitution. Indeed, we recognized that the constitution itself, confirmed by the history of public education in this state, authorized local governments to contribute to the provision of public education in their respective jurisdictions. This, in turn, meant some school districts may be better funded than others. But because a constitution cannot violate itself, this Court held there was no constitutional infirmity with an educational funding system that resulted in discrepancies between school districts, and we dismissed plaintiff parties' claims predicated on equal funding.

This Court allowed, however, several of plaintiff parties' other as-applied claims to proceed. This Court sent the matter back to the trial court for determination of (1) whether defendants had, in violation of the constitution and Chapter 115C, deprived the students in the low-wealth and urban school districts of their right to an opportunity for a sound basic education, and (2) whether the BEP's supplemental funding program denied plaintiff-intervenor students the equal protection of the law. As pled, these claims related to the education system in 1994 and its specific

applications to the named counties. Notably, the Court recognized that the then-current education statutes, if properly implemented, would satisfy the schoolchildren's constitutional education rights.

Following the *Leandro* decision, the trial court announced it would address each school district separately, further confirming that this litigation was focused on the unique implementation of the State's educational funding system in each low-wealth and urban school district instead of blanket, statewide issues. After the Hoke County trial, which was the only trial to take place during this litigation, the trial court observed that the State's education policy in its general curriculum, teacher certifying standards, funding allocation systems, and education accountability standards all satisfied the basic requirements articulated in *Leandro* for providing students with an opportunity for a sound basic education. In other words, the trial court confirmed the general constitutionality of the public education system of 1994 as established by the General Assembly. Plaintiff parties successfully demonstrated, however, that funding allocations by executive branch defendants and/or the Hoke County school board were not addressing the specific needs of at-risk students in Hoke County, thereby depriving those students of an opportunity for a sound basic education.

In *Hoke County I*, this Court affirmed these rulings. This Court expressly limited the determinations of as-applied violations to at-risk students in Hoke County, and we remanded to the trial court for resolution of plaintiff parties' other

pending as-applied challenges. We did not remand for the trial court to consider an unpled facial attack on the statewide education system, nor did we remand for the trial court to consider whether defendants were depriving nonparty schoolchildren across the state in unnamed districts of their constitutional right to an opportunity for a sound basic education. In fact, this Court reiterated the constitutionality of the then-existing education system.

Shortly after this Court's decision in *Hoke County I*, the Penn Intervenors filed their own complaint, raising some claims specifically pertaining to alleged resource allocation shortcomings in the Charlotte-Mecklenburg school district and seeking to intervene in this action. In their complaint, the Penn Intervenors raised their own as-applied challenges. The trial court denied their intervention on claims that were dissimilar to plaintiff parties' existing claims. Regarding the claim that was like plaintiff parties' existing claims, however, the trial court allowed the Penn Intervenors to intervene. Even after the intervention, the Penn Intervenors filed an amended complaint to ensure their claim was properly before the trial court. The trial court severed the Penn Intervenors' claims from plaintiff parties' claims for a separate trial. These procedural developments further confirmed the as-applied nature of the litigation; if the original action had encompassed a challenge to the statewide public education system, there was no need for Penn Intervenors to intervene, or for the trial court to allow the intervention and sever the claims.

The result of the first decade of this litigation was the following: The State's

public education system of 1994, both in terms of its substance and funding, was indisputably facially constitutional. These acknowledgements from *Leandro* and *Hoke County I* were (and remain) the law of the case. The only established as-applied violation of defendants' constitutional duty to provide schoolchildren with an opportunity for a sound basic education was a resource allocation issue impacting at-risk students in Hoke County. This Court affirmed the trial court's decision to allow executive branch defendants and the Hoke County school board to address this resource allocation problem. We remanded to the trial court for trials on the remaining original as-applied claims.

A dispassionate review of this case's ever-growing record leads to one conclusion: The remaining participants in this lawsuit are not actively litigating the original as-applied claims. Indeed, in the decades that have elapsed since *Hoke County I*, there have been no more trials. Nobody is actively prosecuting claims concerning the application of the 1994 or 2005 school system in the school districts specifically named in the complaints. The remaining participants apparently abandoned those claims long ago.

Instead, as the procedural history demonstrates, the case is now a full-scale, facial challenge against the State's education system. Since at least 2017, the trial court and remaining participants have openly sought a systemic overhaul of the public education system. By the trial court and remaining participants' own admission, the litigation no longer seeks redress for students just in the school

districts named in the complaints; rather, they now purport to vindicate the rights of all students across the state. Significantly, counsel for executive branch defendants asserted that this case is a facial challenge at least three times at oral argument. *See* Oral Argument at 59:01–59:08, *Hoke Cnty. Bd. of Educ. v. State* (No. 425A21-3), https://www.youtube.com/watch?v=I9vCYenKjGc ("[T]his lawsuit is in all intents and purposes a facial challenge to the State's funding structure."); *id.* at 1:02:01–1:02:14 ("[W]hat we have here is a resolution of what I think of as a facial challenge, where they're challenging the funding structure and the overall resources that are devoted to the public schools in this State."); *id.* at 1:11:09–1:11:16 ("So, again, my understanding, how I perceive this case is, it's a facial challenge to the statewide . . . provision of education . . . to all students . . . .").

Justice Earls seemingly agrees that the current litigation is distinct from the litigation in which she originally filed the Penn Intervenors' pleadings. She based her refusal to recuse on her view that the lawsuit she filed in 2005 is very different from the one under consideration on appeal. Specifically, in her most recent order, Justice Earls stated her participation only involved suing "the school district where [the Penn Intervenor students] lived" and "s[eeking] a 'limited intervention' in the *Leandro* litigation" to "focus[ ] on a limited issue— . . . changes to CMS's 'student assignment patterns during the past five years.' " *Hoke Cnty. Bd. of Educ. v. State*, 385 N.C. 856, 860, 896 S.E.2d 620, 623 (2024) (order of Earls, J.). In contrast, she reasoned the current matter "stems from separate statewide litigation that [the]

Penn[ ]Intervenors joined in 2018" that was driven by the trial court, which, "at its own behest, . . . invited [the] Penn[ ]Intervenors to participate in the statewide suit." *Id.* at 861, 896 S.E.2d at 624. "In other words, this appeal stem[med] from [the] Penn[ ]Intervenors' role in the statewide proceedings that started in 2018. The 2005 claim against CMS is not—and has never been—before us." *Id.*

The seismic shift in the nature and course of the litigation is not the only change. In addition, and as argued by the Attorney General in his 2017 motion for relief filed on the State Board's behalf, the public education system that was the subject of the original as-applied claims and the Hoke County trial is not the subject of this newly-minted facial challenge. In that filing, the Attorney General, on the State Board's behalf, identified numerous ways that the system of public education had changed as of 2017:

> These changes include: a new accountability model; reformed rigorous curriculum standards; increased graduation rates; career and technical education reforms; digital infrastructure, including a virtual public school; new programs and support structures for identifying and serving at-risk students, including technology components; new means of implementing effective educator practices; and numerous statutory changes in relation to one or more of these changes.[24]

---

[24] The Attorney General, on the State Board's behalf, explained in detail the numerous changes in the education system following the Great Recession of 2008 in efforts to receive a federal "Race to the Top" grant. The information in the brief in support of the motion for relief is itself outdated, not accounting for the ongoing changes to the education system resulting from the COVID-19 pandemic and the rise of even newer technologies and their broader availabilities in the almost nine years since the motion for relief was filed.

These (and other) changes markedly transformed how public education is provided.

As the Attorney General alluded to on the State Board's behalf, the trial court relied on data produced under the ABCs Accountability System in the Hoke County trial. That system was replaced in 2012 by a different accountability system. The new READY Accountability Model used different metrics than the ABCs Accountability System, and the two do not correlate.

As another example, the Attorney General highlighted new technologies that had been incorporated into public school classrooms. The Attorney General was of course correct in this regard; to say that technology has advanced since 1994 is so obvious that it does not require lengthy discussion. Suffice to say, we now live in a world where everyone has supercomputers in their pockets; personal laptops and tablet computers are more commonplace than desktop computers; and the internet is readily available to virtually everyone anywhere at any time.

The education system has naturally incorporated these (and many other) advancements. Since 1994, public schools have been outfitted with digital tools, resources, and courses. Some of these technologies equipped teachers, students, parents, and administrators with digital instruction. Some gave parents online access to monitor their children's performance. Some even enabled "virtual public school," offering over 150 virtual courses. The implementation of new technologies consistently revolutionized how students were being educated.

But perhaps the most significant change respecting the specific claims of this

lawsuit is the repeal of the BEP, which occurred 20 July 2017. Plaintiff parties'

complaints focused specifically on the State's failure to timely fund the BEP and the

resulting burdens placed on their districts. The BEP, however, is no longer a

component of the State's public education system. Thus, the education system

mentioned repeatedly in the complaints and the evidence produced at trial is not the

education system currently in place.

The Attorney General was therefore correct when he remarked that this

litigation is now one over a " 'future school system' which was not the subject of the

original action." Even the trial court and the remaining participants recognized the

education system has not been frozen as it existed in 1994 or 2005. For instance, the

21 January 2020 Consent Order states,

> North Carolina continuously changes and a
> *Leandro*-conforming educational system must take this
> into account. . . . Advances in science and technology have
> re-set expectations for the skills and competencies our
> students must have in order to be ready for the future. . . .
> Our education must adjust to and keep pace with the major
> ongoing technological, social, and economic changes in our
> society.

That order also cataloged numerous and sundry ways that the public education

system had been "improved" over the course of the litigation. All therefore seemingly

acknowledge that the education system as it existed in 2017 was much different than

the system identified in the 1994 and 2005 complaints.

The bottom line is this: On 17 April 2023, the trial court was not resolving one

of the as-applied constitutional challenges to the education system that was raised in

the original complaints. And really, neither the trial court nor the remaining participants have been concerned with those claims since at least 2017. Rather, their focus shifted to resolving a facial challenge to an entirely different public education system.

The fundamental problem, however, is that nobody ever properly invoked the trial court's subject matter jurisdiction over a facial challenge to the current public education system. Indeed, rather than properly seeking to amend their complaints; voluntarily dismissing their claims and filing new lawsuits; or following any recognized procedure for raising new claims, the trial court and remaining participants simply started litigating an entirely different, unpled facial challenge to the current public education system.

Proceeding without a complaint violates the rules of litigation, and it also does not comport with due process and fundamental fairness principles. Consider a simpler example: A mother takes her two children to a kid's museum. During this visit, the mother's elder child is injured while playing on the jungle gym. Believing that the museum was negligent, the mother and elder child commence a lawsuit against the museum. After the lawsuit is filed, the mother and her younger child are lawfully in the museum's parking lot. The younger child is hurt after tripping on loose, broken pavement. At that point, if the mother again believes that the museum was negligent, she would not be permitted to simply start raising issues and producing evidence concerning her younger child's injuries in the elder child's

lawsuit.

A new complaint would be required to invoke the trial court's subject matter jurisdiction over the younger child's claim. And one can easily understand why. The younger child's claim was not the subject of the original pleading; there was never a proper request for the trial court to resolve that claim. In other words, the trial court's subject matter jurisdiction over the younger child's claim was never properly invoked. And it would not be fair to the museum, which prepared to defend against the elder child's negligence claim, to require it to defend against the younger child's different, unpled claim in the same action.

Indeed, to properly litigate a civil claim, the Rules of Civil Procedure require "[a] pleading which sets forth [the] claim for relief, whether an original claim, counterclaim, crossclaim, or third-party claim." N.C.G.S. § 1A-1, Rule 8(a) (2025). Such pleadings minimally require "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief," as well as "[a] demand for judgment for the relief to which [the plaintiff] deems himself entitled." *Id.* § 1A-1, Rule 8(a)(1)–(2). Some claims have heightened pleading standards. *See id.* § 1A-1, Rule 9.

These rules are not jurisdictional in the sense that failure to comply with every jot and tittle deprives a court of subject matter jurisdiction. But, as noted above, the pleading activates a trial court's subject matter jurisdiction and controls the extent

of that jurisdiction. When a litigant uses a pleading to activate a court's subject matter jurisdiction over a claim, that is the only claim over which the trial court then has the power to adjudicate. Activation of the trial court's jurisdiction over one claim does not automatically activate the trial court's subject matter jurisdiction over other claims. If a litigant does not use a pleading to activate the court's subject matter jurisdiction over a claim, the trial court cannot render a decision as to that claim. So, failure to present a claim in a pleading will have jurisdictional ramifications.

As discussed above, however, parties may amend or supplement their pleadings to advance different claims after an action has commenced. *See id.* § 1A-1, Rule 15. Still, litigants must avail themselves of these procedures; they may not raise new claims simply by transfiguring claims already under review. And the remaining participants in this action undoubtedly understood this; after all, several times in the early stages of this litigation the remaining participants amended their complaints to alter the nature of their claims. First, in 1998, plaintiffs and plaintiff-intervenors amended their respective complaints in order to expand the lawsuit to cover prekindergarten services in the low-wealth and urban school districts. Second, in 2005, after the trial court permitted their intervention on just one claim, the Penn Intervenors amended their complaint to refine their allegations as to that claim and add several more intervenors. This apparent understanding of the need to properly amend pleadings renders the remaining participants' failure to properly invoke the trial court's jurisdiction over a facial challenge to the current education system

inexplicable.

Without amending the complaint or filing a new or supplemental one, nobody properly activated the court's subject matter jurisdiction over facial constitutional challenges to the State's current education system. The remaining participants' willingness, with the trial court's complicity, to simply transfigure the claims without regard for the parameters set by the original pleadings does not mean the claim was properly before the court.[25]

Additionally, the trial court's purported exercise of subject matter jurisdiction to resolve a facial challenge to the current education system suffers from another fundamental flaw: since 2014, the General Statutes have vested the subject matter jurisdiction to invalidate acts of the General Assembly as facially unconstitutional only in three-judge panels of the Superior Court, Wake County. If the remaining participants wanted to belatedly raise a facial challenge, it had to be routed through such a three-judge panel. The trial court in this case was not a three-judge panel, but rather a single judge. For this additional reason, the trial court did not have subject matter jurisdiction.

In sum, by at least 24 July 2017, this litigation had been fundamentally transformed as an unpled facial challenge to the current education system. Yet the

---

[25] The participation of the trial court in transfiguring the claim was not a true exercise of "judicial power." It was not exercising judgment; rather, it was exercising force and will. Therefore, to the extent the trial court did so in this case, it fundamentally exceeded its own jurisdiction.

remaining participants failed to properly invoke the trial court's subject matter jurisdiction over the facial challenge to the current public education system and direct it to the proper tribunal. Accordingly, any order or opinion entered after that time, including *Hoke County III* and the 17 April 2023 Order, was issued without subject matter jurisdiction and is therefore void ab initio. The 17 April 2023 Order is vacated, and this entire action is dismissed with prejudice.[26]

---

[26] Remanding for renewed litigation over the original as-applied claims or dismissing without prejudice would be inappropriate for many reasons. We will address only a few.

First, the original as-applied claims are no longer viable—the education system of 1994 and 2005 no longer exists. "Whenever, during the course of litigation it develops . . . that the questions between the parties originally in controversy are no longer at issue, the case should be dismissed, for courts will not entertain an action merely to determine abstract propositions of law." *In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978). As discussed, the BEP—the epicenter of the original complaints—was repealed in 2017. Accordingly, the original claims concerning the State's failure to timely fund the BEP and the resultant burdens placed on the specified local governments are no longer in controversy. Moreover, the parties stopped prosecuting their original as-applied claims long ago. This abandonment reveals that the original claims are no longer at issue—and have not been for quite some time. Remanding for further resolution of the original claims would be futile.

Second, none of the remaining participants possess the constitutional right at issue. In *Hoke County I*, this Court clarified that the right to an opportunity for a sound basic education belongs exclusively to students. 358 N.C. at 617, 599 S.E.2d at 377–78. Although the low-wealth and urban school boards were allowed to participate because resolution of the claims would likely be based in significant part on their role as education providers and impact their operations going forward, this Court emphatically rejected any notion that school boards could independently vindicate the right at issue. *See id.* at 617, 599 S.E.2d at 378 ("[The low-wealth and urban] school boards are not among those endowed with [the right to an opportunity for a sound basic education], and thus they have no justiciable claims on its infringement or denial."). As the case stands today, all of the students named in the complaints have left the public school system, having surpassed the maximum age for enrollment. Counsel for the remaining plaintiff parties confirmed that no participant in this litigation is still enrolled in any public school. Oral Argument at 37:48–38:45. Thus, it would be inappropriate to remand the case for further resolution when the people with the right at issue are not involved.

Third, this litigation lacks a necessary party: the General Assembly. *See* N.C.G.S. § 1A-1, Rule 19(d) ("The Speaker of the House of Representatives and the President Pro

-107-

## III.    Conclusion

Nearly thirty years ago in *Leandro*, this Court warned of the dangers that

---

Tempore of the Senate, as agents of the State through the General Assembly, must be joined as defendants in any civil action challenging the validity of a North Carolina statute or provision of the North Carolina Constitution under State or federal law."); *id.* § 120-32.6(b) ("Whenever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State . . . court, the Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State through the General Assembly, shall be necessary parties . . . ."); *cf. Berger*, 142 S. Ct. at 2202–03 ("Permitting the participation of lawfully authorized state agents promotes federal-court decision making and avoids the risk of setting aside duly enacted state law based on an incomplete understanding of relevant state interests. . . . [A]s we have seen, where a State chooses to divide its sovereign authority among different officials and authorize their participation in a suit challenging state law, a full consideration of the State's practical interests may require the involvement of different voices with different perspectives. To hold otherwise would risk allowing a private plaintiff to pick its preferred defendants and potentially silence those whom the State deems essential to a fair understanding of its interests."). As we stated in *Hoke County I*, "section 1-260 of the General Statutes declares plainly that '[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration.' " 358 N.C. at 617, 599 S.E.2d at 378 (quoting N.C.G.S. § 1-260 (2003)). The General Assembly, as the branch charged with passing the laws establishing and funding our school system, has an interest that would be affected by a declaration regarding the constitutionality of such laws. *Cf. Berger*, 142 S. Ct. at 2205 ("The legislative leaders seek to give voice to a different perspective. Their 'primary objective' is not clarifying which law applies. They are not burdened by misgivings about the law's wisdom. If allowed to intervene, the legislative leaders . . . will focus on defending the law vigorously on the merits without an eye to crosscutting administrative concerns. . . . [D]ifferent branches of government may seek to vindicate different and valuable state interests." (citations omitted)). The General Assembly's exclusion from the litigation also counsels against remanding for further proceedings.

Fourth, since at least 2018, there has not been actual adversity in this litigation. Our courts do not entertain "suit[s] made to order"—i.e., those "arising not out of a real controversy between the parties litigant, but instituted solely for the purpose of obtaining the opinion of the [c]ourt upon a 'feigned issue.' " *Parker v. Raleigh Sav. Bank*, 152 N.C. 253, 255, 67 S.E. 492, 493 (1910). "[T]he inherent function of judicial tribunals is to adjudicate genuine controversies between antagonistic litigants . . . ." *Lide v. Mears*, 231 N.C. 111, 118, 56 S.E.2d 404, 409 (1949). At this point in time, there is little reason to believe that if we were to remand the case for further litigation on the original as-applied claims, the remaining participants would pit arguments and evidence against one another. So, remanding for further adjudication of those claims would be inappropriate.

Thus, the action is properly dismissed with prejudice.

attend litigation concerning the right to an opportunity for a sound basic education, specifically forecasting "protracted litigation resulting in unworkable remedies." *Leandro,* 346 N.C. at 351, 488 S.E.2d at 257. It is difficult to think of a more fitting description of what this case has become.

In *Hoke County I*, this Court lamented "[t]he time and financial resources" that had been "devoted to litigating [education] issues" in this case. 358 N.C. at 610, 599 S.E.2d at 373. It surmised that by that point, just ten years after the case was commenced, this litigation had "cost the taxpayers of this state an incalculable sum of money." *Id.* This Court remarked, "[O]ne can only wonder how many additional teachers, books, classrooms, and programs could have been provided by that money in furtherance of the requirement to provide the school children of North Carolina with the opportunity for a sound basic education." *Id.* If this were true ten years into the litigation, how much more so is it true now, twenty-two years later?

As this litigation comes to a close a few weeks shy of its thirty-second anniversary, we are reminded of these principles from our prior cases: In our constitution, the people established a tripartite system of government. In doing so, the people did not vest the judicial branch with the power to resolve policy disputes between the other branches of government or to set education policy. We would be especially ill-equipped to resolve such questions in any event. As we have noted, there are multiple ways to provide a constitutionally compliant education system. Judges are not experts on education policy. We cannot account for the various policy

alternatives or public opinion. Our consideration of cases is limited to the facts and evidence in the record and the dispassionate application of the law. In short, the judicial branch is not the venue in which to seek education policy reform.

In contrast, the other branches are not bound by the constraints of subject matter jurisdiction or a judicial record. As observed in this opinion, our public education system is ever-changing. This is especially true in our world of rapidly advancing technology. The other branches of government are better suited and constitutionally empowered to widely consider public and expert opinion and settle on preferred policies. Therefore, we encourage all to direct their desire to enhance education policy to the branches that the people constitutionally charged with addressing such policy questions.

On that point, we note that just recently, the Governor, President Pro Tempore of the Senate, and Speaker of the House formed a bipartisan Blue Ribbon Commission on Public Education. The commission, which consists of experienced educators, businesspeople, and elected officials, will explore ways to improve public education in North Carolina. Exec. Order No. 34 (Mar. 10, 2026), https://governor.nc.gov/executive-order-no-34-establishing-blue-ribbon-commission-public-education/open ("The Commission shall study the structure and implementation of public education in the State. The Commission may examine: a. Teacher training and student advancement[;] b. Administrative operations[;] c. Educational leadership[; and] d. Accountability."); Press Release, Office of Governor Josh Stein, Governor Stein,

President Pro Tem Berger, Speaker Hall Announce Formation of a Blue Ribbon Commission on Public Education (Mar. 10, 2026), https://governor.nc.gov/news/press-releases/2026/03/10/governor-stein-president-pro-tem-berger-speaker-hall-announce-formation-blue-ribbon-commission. Like all North Carolinians, we hope this commission is successful in reaching some effective solutions to enhance our education system.

Resolving the instant matter, by at least 24 July 2017, the nature of the litigation as originally brought had completely changed from challenges to the educational opportunities in six named school districts—as-applied constitutional challenges—into a facial challenge to the constitutionality of the current statewide education system. Also, the very education system that was the subject of the original claims is gone. When the litigation changed direction, a proper pleading of a facial challenge to the current education system was needed but never attempted, much less accomplished. Therefore, the trial court's subject matter jurisdiction over the facial challenge was never invoked, and any order or opinion issued after 24 July 2017, including the 17 April 2023 Order and *Hoke County III*, was entered without subject matter jurisdiction and is void ab initio. Accordingly, the 17 April 2023 Order is vacated, and this action is dismissed with prejudice.

VACATED; ACTION DISMISSED WITH PREJUDICE.

Justice BERGER concurring.

One could read the lead opinion and walk away believing that litigation designed to usurp the legislature's exclusive power over education funding is finally laid to rest. But before the ink is dry on this decision, countless lawsuits over education policy and funding will be filed across North Carolina because the lead opinion leaves the reasoning of *Hoke III* untouched. I therefore can only concur that the order below be vacated, this matter be dismissed, and any court action after July 2017 is void ab initio.

*Hoke III* judicially amended our constitution and fundamentally changed the judiciary's role in our constitutional system.[1] In dissent, three members of this Court explicitly agreed that *Hoke III* was "contrary to our system of government, destructive of separation of powers, and the very definition of tyranny as understood by our Founding Fathers," *Hoke Cnty. Bd. of Educ. v. State* (*Hoke III*), 382 N.C. 386, 536 (2022) (Berger, J., dissenting), and we pointed to multiple jurisdictional and doctrinal reasons that countered the reckless action taken by that majority. But despite the emphatic and unequivocal rejection expressed in our dissent there, the Court fails to remove *Hoke III* from our jurisprudence when given the opportunity today.

---

[1] *See* N.C. Const. art. I, § 6 ("The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other"); *id.* art. II, § 1 ("The legislative power of the State shall be vested in the General Assembly, which shall consist of a Senate and a House of Representatives"); *id.* art. V, § 7, cl. 1 ("No money shall be drawn from the State treasury but in consequence of appropriations made by law . . . .").

Consequently, the reasoning of *Hoke III* will remain as persuasive authority, and the judicial branch will continue to be embroiled in incessant litigation over education policy and funding. The dissents foreshadow how the lead opinion will exacerbate this type of litigation, not end it.

To be clear, I would not write separately if the lead opinion simply read, "any order entered after that date, including the trial court's decision of 17 April 2023 and this Court's decision in *Hoke County III*, are void ab initio, *and we expressly disavow the reasoning in Hoke III*." Yet these words remain unsaid, and this Court passes on the opportunity to clearly reject *Hoke III*'s unconstitutional assault on the separation of powers and appropriations clauses.[2]

As Justice Dietz appears to share a similar view of *Hoke III*, simple math would suggest that this Court has the four votes needed to exorcise this aberration from our jurisprudence. *See Hoke Cnty. Bd. of Educ. v. State*, No. 425A21-3 (N.C. Apr. 2, 2026) (Dietz, J., dissenting) ("If the trial court, or this Court, improperly used that judicial power to expand the remedies beyond what the complaint alleged, or beyond what the law permits, that is an error that warrants correction." (citing *State v. Ballance*, 229 N.C. 764, 767 (1949))). So why does the lead opinion stop short? Was *Hoke III*

---

[2] Rather than explicitly disavowing the reasoning of *Hoke III*, the lead opinion appears to suggest that declaring the decision void ab initio obviates any concerns. But merely labelling a decision a nullity does not repudiate the reasoning espoused by the *Hoke III* majority. And if the lead opinion agrees that the reasoning of *Hoke III* has no place in our jurisprudence, why not explicitly say so? Why "hide elephants in mouseholes"? *See Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Put another way, if it matters to the law, it should be plainly stated by judges. Here, it is not.

not "a grievous wrong[?]" *See Ballance*, 229 N.C. at 767.

An older attorney once told me that "the time to kill a snake is when you've got the hoe in your hand." Our precedent reflects that same common sense philosophy. *See Sidney Spitzer & Co. v. Comm'rs of Franklin Cnty.*, 188 N.C. 30, 32 (1924) (instructing that "when we are presented with a single decision which we believe to have been inadvisedly made, it is [i]ncumbent on us" to correct wrong decisions "*at the first practical moment*" (cleaned up) (emphasis added)). And as stewards of the law in this state, we are entrusted to carry out this duty without regard to consequence. *See Lowdermilk v. Butler*, 182 N.C. 502, 506 (1921) ("[G]rave and palpable error, widely affecting the administration of justice, must either be solemnly sanctioned or repudiated, [and] the maxim, [*f*]*iat justitia ruat coelum* should apply . . . ."). Indeed, "this Court has not hesitated to revisit and overrule prior decisions that are erroneous." *Harper v. Hall*, 384 N.C. 292, 374 (2023). Yet we hesitate today and allow appeals to the "inherent power" of the judiciary to linger in the background of every education policy and spending debate.

Half measures will only ensure that we will be back here again with profiteering lawyers and constitutional evolutionists who fetishize a government of the judges, by the judges, and for the judges who can legitimately argue that the reasoning of *Hoke III* remains. For separation of powers stalwarts, this is a

demoralizing head scratcher.[3]

---

[3] On another note, I agree with many of the statements in footnote 26 of the lead opinion and that the mootness of the original as-applied claims would obviate any arguments in favor of remanding for further proceedings rather than dismissal. But I am concerned that the discussion of mootness there could be read as an effort to upend our settled mootness jurisprudence. It would be most ironic to fail to disavow *Hoke III*, while at the same time adopting a position contrary to our mootness precedent which was not argued by the parties.

Mootness for this Court has consistently been held to be a prudential doctrine, not a jurisdictional bar. *See Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.,* 376 N.C. 558, 572 (2021) (mootness is a "prudential limitation on judicial power"); *In re Peoples*, 296 N.C. 109, 147 (1978) ("[E]xclusion of moot questions from determination is not based on a lack of jurisdiction but rather represents a form of judicial restraint."). Unlike federal mootness jurisprudence which is grounded in Article III's case or controversy requirement, North Carolina's "mootness doctrine is not a shield which prevents this Court from engaging in meaningful review of decisions . . . that, if left undisturbed, would be contrary to established law." *State v. Daw*, 386 N.C. 468, 471 (2024). While this Court generally "does not decide moot cases," *id.* (cleaned up), resolution of an underlying issue does not deprive this Court of jurisdiction where there remains an unresolved matter of law. *See id.*

That exceptions to our mootness doctrine exist is further proof that mootness is not jurisdictional. For example, the public interest exception applies where "[e]ven if moot," the case implicates "a question that involves a matter of public interest, is of general importance, and deserves prompt resolution." *N.C. State Bar v. Randolph*, 325 N.C. 699, 701 (1989) (per curiam); *see also Harper v. Hall*, 383 N.C. 89, 113–14 (2022) (denying a party's request to "dismiss their own appeal in order to avoid a ruling by this Court" because "th[e] issue is of great significance to the jurisprudence of our state and is squarely and properly before this Court"), *reh'g allowed*, 384 N.C. 1, *and opinion withdrawn and superseded on other grounds on reh'g*, 384 N.C. 292 (2023).

Justice EARLS dissenting.

This case is—and has always been—about the nature of the constitutional right recognized three decades ago in *Leandro v. State* (*Leandro I*): that the State has a duty to guard and maintain the right of every North Carolina schoolchild to access a sound basic education. 346 N.C. 336, 347 (1997) (citing N.C. Const. art. I, § 15, art. IX, § 2). *Leandro I* and our decisions that followed confirmed that the state Constitution's establishment of a "general and uniform system of free public schools" was meaningful and that state courts must safeguard adequate educational opportunities for *all* students—rich or poor, in urban or rural areas, and from all backgrounds.

The Court today betrays these constitutional commitments. The majority dismisses North Carolina's landmark constitutional education rights litigation with prejudice and with no relief for any injured party because no plaintiff formally filed an amended pleading to challenge the current statewide funding system. In other words, the majority concludes that it will not order the State to correct the way it has harmed public school students, even in very low-wealth school districts like Hoke County, and even as two previous Courts concluded that the State is failing to adequately educate students and must act to fix the public education system. In reaching that decision, the majority relies on a hyper-technicality that is not even lawful grounds to dismiss these proceedings and was not argued by any party to this

appeal. Specifically, no party asked this Court to dismiss this case because it was an improper "facial" challenge.

The majority's narrow holding rests on stunning and unsupported assertions about the nature of the schoolchildren's and school district's claims against the State, the history of this litigation, and the significance of recent changes to the public education system. The majority wrongly conflates pleadings with remedy, and facial challenges with statewide challenges, and hopelessly confuses our doctrine in the process.

For the record, plaintiffs' pleadings did challenge the statewide system. This Court several times confirmed that students and the school districts could and did bring a statewide challenge to the adequacy of the public education system and its funding. The complaint was not required to use the words "facial challenge" to get statewide relief, nor was a three-judge panel required to hear this case. In fact, the statute regarding three-judge panels was enacted twenty years after this litigation began.

Moreover, just three-and-a-half years ago, this Court confirmed that the plan to correct the public education system was appropriate and must be enforced. State political actors could not, we said, use ongoing judicial deference to shirk their obligations and expect courts to stay complicit in ongoing constitutional rights violations. We ordered the State to implement its "chosen remedy"—a Comprehensive Remedial Plan (the Plan) created by the State itself, in *its* policymaking expertise—

to address its long-running constitutional violation. *Hoke Cnty. Bd. of Educ. v. State* (*Leandro IV*), 382 N.C. 386, 473 (2022). These funds, the parties agreed, were "necessary and appropriate . . . to address the constitutional violations." *Id.* at 415. The Plan would work across eight years to, for example, expand student access to pre-kindergarten, recruit and develop teachers and support principals particularly in high-need schools, and increase resources for at-risk students and under-resourced school districts across the state. We ordered the trial court to calculate the final amount by which the Plan was underfunded for its initial stages—which the court did, in the amount of $678 million—and to order the State to honor the Plan's terms by transferring the missing funds. That was 2022, and afterward, no party petitioned to rehear this case. Yet in October 2023, the Court's new majority allowed review of a petition on the issue of "whether the trial court lacked subject matter jurisdiction to enter" the very order this Court compelled it to. *Hoke Cnty. Bd. of Educ. v. State*, 385 N.C. 380, 380 (2023) (order on bypass petition).

Even as the majority vacates the trial court's 2023 order, terminates this landmark litigation, and tries to rewrite the history of this case, it does not point to any evidence that the State has managed to finally meet its *Leandro* obligations or that the Plan is unnecessary. Nor could it. The record shows that North Carolina's uniform system of public education has moved even further away from the standards set forth in *Leandro*—even before the destabilizing effects of a global pandemic.

The State is not offering adequate educational opportunities to all North

Carolina schoolchildren. It is still true, for example, that over 7,000 classrooms in North Carolina's public schools lack an appropriately licensed teacher,[1] our State is next to last in per pupil spending,[2] and there are significant achievement gaps between at-risk students and their peers from wealthier families.[3] These disparities are exactly the challenges the Comprehensive Remedial Plan was designed to address.[4]

---

[1] N.C. State Bd. of Educ. & N.C. Dep't of Pub. Instruction, *Report to the North Carolina General Assembly 2023–2024 State of the Teaching Profession in North Carolina* 14 (Apr. 15, 2025), https://www.dpi.nc.gov/documents/files/state-teaching-profession-2023-24/open (tallying 7,141 vacancies as of the fortieth instructional day of the school year). Many districts with the highest teacher vacancy rates are in poor and rural areas, including Hertford, Washington, Stanly, and Northampton Counties. *Id.* at 15.

[2] Danielle Farrie & Robert Kim, *Making the Grade: How Fair Is School Funding in Your State?* 10 (2025), https://edlawcenter.org/wp-content/uploads/2025/12/Making-the-Grade-2025.pdf (relying on data as of 2023 from the U.S. Census Annual Survey of School System Finances and including the District of Columbia). *See also id.* at 20–21 (characterizing North Carolina as the state with the "lowest effort" education funding, in light of its pre-kindergarten through twelfth grade revenue as a percentage of the state's economic activity).

[3] Recent data show that 42 percent of North Carolina's fourth-grade students perform "below basic" on reading assessments, meaning they lack even partial mastery of fundamental reading skills. *See* Nat'l Assessment of Educ. Progress Main Data Explorer, *Nat'l Ctr. For Educ. Stats.*, https://www.nationsreportcard.gov/ndecore/landing (last visited Mar. 23, 2026) (select "Reading," "Grade 4," "North Carolina" and enter the main data explorer; select years 2024, 2019, and 2009; under "variable" select "all students" and "economically disadvantaged"; under "statistic" select "Achievement levels-cumulative"; select "create report"; select "show report data") (last visited Mar. 23, 2026).

Pre-pandemic data are not substantially better, at 33 percent in 2019 and 35 percent in 2009. *Id.* Economically disadvantaged fourth-graders fared worse and performed "below basic" on reading assessments at rates of 53 percent in 2024, 47 percent in 2019, and 50 percent in 2009. *Id.*

[4] Most of the recurring funding in the Comprehensive Remedial Plan targeted early and K–12 education at the local level. It also addressed financial incentives for the recruitment and retention of certified teachers in high-poverty schools. A third of Plan funding intended to help school districts address the educational needs of the most at-risk students, including students from low-income families, students with disabilities, and English language learners. A copy of the Plan is viewable online. Comprehensive Remedial

So unpersuasive is the majority's stated reasoning that one is left to consider what is unstated. The current Court appears unable or unwilling to meaningfully check constitutional rights violations—particularly those originating from the legislature. That failure threatens constitutional rights of all stripes, foundational rule of law principles, and our system of government. It reflects poorly on our Court as a coequal branch of government entrusted with the solemn responsibility of safeguarding fundamental constitutional rights. The majority concludes that the public education system has meaningfully changed—but in reality, the only meaningful change appears to be to this Court's own commitment to constitutional rights and the rule of law.

I would stand by the law of this case and the constitutional protections that belong to every schoolchild. The judiciary can and must safeguard these rights, and the trial court did have subject matter jurisdiction to direct the State to remedy its ongoing constitutional violations. I dissent.

## I. Purported Subject Matter Jurisdiction Deficiencies

The majority's purported rationale for dismissing North Carolina's landmark constitutional education rights litigation with prejudice and with no relief for any injured party is that no party "properly activated the court's subject matter jurisdiction over facial constitutional challenges to the State's current education

Plan, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1558 (N.C. Super. Ct.), https://www.ednc.org/wp-content/uploads/2021/03/Leandro-Comprehensive-Remedial-Plan-2021-28_03152021_final.pdf (last visited Mar. 23, 2026).

system." *See* majority *supra* Section II.B. By this, the majority apparently means that the pleadings are deficient for the remedy awarded and that too much time has elapsed since these claims were first brought. Neither justification withstands scrutiny. These justifications do not support that state courts lack subject matter jurisdiction over these proceedings or compel the majority's decision to dismiss this case entirely with no relief for any injured party.

## A. Pleadings

The majority intimates that plaintiffs were required to "properly" amend their pleadings to show that their claims were actually a "facial" challenge to the State's funding structure and education system and that the pleadings here alleged only individualized troubles in individual counties. *See* majority *supra* Section II.B. In any event, the opinion asserts that North Carolina's landmark constitutional education rights cases actually upheld the State's public education system as constitutional on its face, so plaintiffs are entitled to no remedy against the State whatsoever. These conclusions do not accurately reflect the prior proceedings or the pleadings. More critically, this rationale is not grounds to divest state courts of jurisdiction over the subject matter of these claims and to dismiss the claims with prejudice.

### 1. Leandro IV *Decided This Issue*

At the threshold, these purported "deficient pleadings" concerns merely revive the legislature's unsuccessful arguments from *Leandro IV*, 382 N.C. at 469–70. There, "Legislative Defendants assert[ed that] this case is properly 'limited to just at-risk

students in Hoke County,' " "because this Court's ruling in *Leandro II* was expressly restricted to Hoke County," and because "there has never been a judgment finding a statewide violation of the right to a sound basic education." *Id.* at 469–70. Thus, the argument went, "the trial court erred by exceeding its jurisdiction and authority by imposing a statewide remedy." *Id.* at 469.

We "unequivocally rejected" that argument. *Id.* at 471. "Based on an abundance of clear and convincing evidence, the trial court repeatedly concluded that the State's *Leandro* violation was not limited to Hoke County but was pervasive statewide." *Id.* at 470. The overwhelming evidence "indicated that in way too many school districts across the state, thousands of children in the public schools have failed to obtain, and are not now obtaining[,] a sound basic education as defined by and required by the *Leandro* decisions." *Id.* (cleaned up). "[T]o contend that there has never been a finding or conclusion of a *Leandro* violation beyond Hoke County reflects, at best, a fundamental misunderstanding of the history of this case and the State's constitutional obligations." *Id.* at 471. At worst, such an argument "suggest[ed] a desire for further obfuscation and recalcitrance in lieu of remedying this decades-old constitutional violation." *Id.* at 469. Thus, *Leandro IV* unequivocally rejected the outlandish notion that this case was only ever about Hoke County.[5]

---

[5] The legislature revived these arguments in the instant appeal, asserting that this case was only ever about the interests of six districts and "no statewide violation has ever been asserted." But just as we rejected that argument in 2022, we rejected a "premise underlying [that] argument," as the majority puts it, that the court lacked subject matter jurisdiction to issue a statewide remedy. *See* majority *supra* Section II. The majority thus

### 2. *The Complaints Alleged Inadequate Statewide Funding and Opportunities*

Not only is the majority's reasoning inconsistent with *Leandro IV*, but it also misrepresents the allegations in the complaints. It is simply not true, as the majority asserts, that plaintiffs' pleadings alleged minor quibbles with narrow educational delivery systems and implementation in five counties. The statewide concerns that were eventually adjudicated in this case were first identified in the complaints giving rise to this action, including specifically concerns with statewide funding, and were enough to put the State on notice of plaintiffs' claims. For example:

- Plaintiffs requested a declaration that the "public education system of North Carolina, including its system of funding," violates the state Constitution.

- Plaintiffs alleged that "all public students throughout North Carolina" have constitutional education rights, and that "adequate and equitable educational opportunities . . . have been denied to children in some of the poorest school districts in the State[ ] as a result of an irrational, unfair, and unconstitutional funding system." Such a system undermines those opportunities "no matter where in the State [students] may live."

- Plaintiffs alleged specific examples of inadequate educational opportunities

revisits issues settled in a recently decided opinion despite no party having filed a petition for rehearing and despite only recently declaring that such a petition is the sole mechanism to overturn recent precedent. *See Harper v. Hall*, 384 N.C. 1, 3 (2023) (order allowing petition for rehearing).

-123-

resulting from inadequate funding, such as "lack [of] adequate classroom space," instructional issues such as a lack of basic science equipment and up-to-date textbooks, and personnel issues such as a lack of well qualified teachers.

- Plainly, "The end result of the inferior educational opportunities caused by this unconstitutional system is poorly educated students."

- Plaintiffs' 1998 amended complaint similarly alleged that "many children living in poverty as well as other children are not receiving an opportunity for a sound basic education" because of the "lack of prekindergarten services and programs," which "plaintiff school districts do not have sufficient resources to provide."

- The intervening urban districts further alleged that the "State has failed to fulfill" its constitutional obligation to establish an educational system that provides adequate educational opportunities for "all students" and failed to provide for "an adequate system of public schools in every area and subdivision of the State."

These claims are not, by any stretch of imagination, "modest, as-applied challenges to the allocation of educational resources in the named school districts." *See* majority *supra* introduction. They are more than enough to give the State notice of the statewide "events or transactions which produced the claim" for purposes of notice pleading and to confer subject matter jurisdiction on state courts to resolve the

same. *E.g.*, *Pyco Supply Co., Inc. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 442 (1988) (explaining notice pleading principles); *In re K.J.L.*, 363 N.C. 343, 345 (2009) ("The allegations of a complaint determine a court's jurisdiction over the subject matter.").

The majority ignores the actual allegations and instead states that the original pleadings only challenged "the way state education funds were allocated in the named students' school districts at that time." *See* majority *supra* introduction. But that is not a plausible reading of the complaint even just looking at the listed parties. If the claims were only about local implementation and allocation, why were school districts original plaintiffs in this action against the State as a named defendant? The majority's suggestion that students joined with local school districts to sue the State for claims that were solely about the local school district's failures does not comport with basic common sense.

That some urban school districts intervened in this case in 1994 is also not evidence that plaintiffs' original claims must have been narrow and not statewide. An attempted intervenor does not define the scope of allegations in the original plaintiffs' complaint. Plaintiffs do, in their complaint.

Moreover, the trial court severed certain of the Penn Intervenors' 2005 claims *precisely because* they addressed narrower issues than the statewide claims and remedies in the original *Leandro* action. Namely, the Penn Intervenors were allowed to proceed on only one claim—related to the adequacy of "human, fiscal, and educational resources" for "central city and high poverty schools" against the

Charlotte-Mecklenburg school district. Order re: Motion to Intervene at 4, 5, 10, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158 (N.C. Super. Ct. Aug. 19, 2005). The intervenors' other claims against the local school district were severed into a separate action. *Id.* In severing those claims, the trial court underscored that the intervenors' suit would not "interfere with the remedial process and proceedings of this case in other school systems throughout the State." *Id.* at 10. Over a decade later, the trial court invited Penn Intervenors to participate in efforts to remedy the statewide violation of the right to a sound basic education, and Penn Intervenors have been specifically noted as a party in subsequent orders and filings. *E.g.*, Order, *Hoke Cnty. Bd. of Educ. v. State*, No. 425A21-2 (N.C. Aug. 30, 2022) (denying Legislative-Intervenors' motion to dismiss plaintiff-intervenors from the appeal).[6]

---

[6] This history is further explained in two orders where I examined Legislative-Intervenors' motions and suggestions for recusal and explained why recusal was not warranted under Canon 3(C)(1)(b) of the North Carolina Code of Judicial Conduct. *Hoke Cnty. Bd. of Educ. v. State*, 385 N.C. 856, 860 (2024) (Earls, J.) (order regarding recusal); *Hoke Cnty. Bd. of Educ. v. State*, 382 N.C. 694, 698 (2022) (Earls, J.) (order regarding recusal). The 2022 order attached the trial court's 2005 Order re: Motion to Intervene for reference. *See Hoke Cnty. Bd. of Educ.*, 382 N.C. at 695 n.2 & 700–08. It also explained why "representing an amicus is not the same as representing a party to a 'matter in controversy'" for the purposes of recusal. 382 N.C. at 696. "Just as a jurist's prior career as a prosecutor is not understood to undermine their capacity to preside impartially in cases involving the State or defendants prosecuted by their office, it would be a disservice to the judiciary and to the people of North Carolina to conclude that my prior career as a civil rights attorney precludes me from acting impartially in cases involving civil rights matters." *Id.* (cleaned up). Members of the majority today also took a position on the claims in this case when, as a Justice, they dissented in this very litigation or, as a legislator, they enacted budgets that failed to adequately provide for the State's public education system. They do not suggest that their prior positions make it unethical for them to rule in the case.

The order also responded to the contradictory reasoning that "this is a statewide case for purposes of disqualifying me but only a Hoke County case for purposes of the Court's jurisdiction." *Hoke Cnty. Bd. of Educ.*, 385 N.C. at 858.

### 3. **Leandro I** *Confirmed the Statewide Nature of the Challenge*

Notwithstanding the plain text of the pleadings, the majority next interprets *Leandro I* and *II* as having narrowed plaintiffs' claims to merely "[constitutional] violations to at-risk students in Hoke County." *See* majority *supra* Section II.B. These decisions, the majority concludes, rejected constitutional challenges to structural inadequacies in the State's public education system. In fact, this Court upheld "the constitutionality of the then-existing education system," the Court proclaims. *See* majority *supra* Section II.B.

As an initial matter, this argument is logically inconsistent with the majority's own interpretation of plaintiffs' pleadings. The majority maintains that plaintiff parties pleaded only "relatively modest, narrow claims for relief," not "facial attack[s] on the statewide education system." *See* majority *supra* Section II.B. Simultaneously,

---

This Court by administrative order provides that a motion filed under Rule 37 of the North Carolina Rules of Appellate Procedure seeking the recusal or disqualification of a Justice shall be assigned to the subject Justice, at which point a Justice may decide the motion, consistent with the Code of Judicial Conduct. Order Concerning Recusal Motions, 379 N.C. 693, 693 (2021), https:// www.nccourts.gov/assets/news-uploads/Order%20re%20 Recusal%20Motions%20Clocked%20In_0.pdf?tF6Vi_8fLKF_2Cd7vX74DItZ0woUshB3=. My previous orders simply followed the very process this Court established. There is nothing irregular or improper about adhering to the recusal process this Court agreed upon—let alone one that other Justices have adhered to in the past. *See, e.g.*, Order on Motion for Disqualification, *Holmes v. Moore*, 380 N.C. 673 (2022) (Barringer, J.); Order on Motion for Disqualification, *N.C. NAACP v. Moore*, 380 N.C. 263 (2022) (Berger, J.). The majority's repeated and misleading invocation of my name and current judicial title appear to be nothing more than inviting partisan political attacks against a Justice standing for re-election. It is demeaning to the dignity of the Court.

Similarly, the concurring opinion's characterization of advocates who seek to vindicate the rights of children across this state as "profiteering lawyers" is not based on anything apparent in the record of this case and is demeaning to the legal profession as a whole.

the majority asserts that this Court facially upheld such statewide systems in this very action. The majority thus posits that this Court definitively resolved broad statewide claims that plaintiffs failed to bring. Truly, the majority cannot have it both ways.

Logical contradictions aside, *Leandro I* and *II* did not do what the majority describes. In very general terms, *Leandro I* rejected the argument that the Constitution requires exactly equal educational opportunities across localities. But it embraced the argument the State must provide *adequate* educational opportunities to all students and across all districts. Courts would adjudicate those claims by looking both at student performance according to standard metrics and by looking at "per-pupil funding or general educational funding provided by the state." *Leandro I*, 346 N.C. at 355 (citing Molly McUsic, *The Use of Education Clauses in School Finance Reform Litigation*, 28 Harv.J. on Legis. 307, 332 (1991)). After a trial, *Leandro II* confirmed that the evidence showed that the State was not providing all students with adequate educational opportunities—and specifically that the statewide system was failing at-risk students. Thus in 1997, 2004, and the years since, we have understood that this case is about the adequacy of the statewide system—the State's duty to provide quality educational opportunities to every schoolchild in a general and uniform system of public schools.

A short summary explains this history. After plaintiffs filed their complaint, the State moved to dismiss for failure to state a claim and lack of subject matter

jurisdiction. *Leandro I*, 346 N.C. at 344. The State appealed, and *Leandro I* confirmed that plaintiff parties' allegations validly stated claims against the statewide system over which state courts had subject matter jurisdiction.

*Leandro I* first rejected defendants' argument that the complaint raised "nonjusticiable political questions." *Id.* at 344–45. "It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution," we reasoned. "When a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits." *Id.* at 345. So, "it is the duty of this Court to address plaintiff-parties' constitutional challenge to the state's public education system." *Id.* at 344–45. We affirmed that the complaint challenged the state's public education system on constitutional grounds and that state courts can and must hear such claims.

As to the substance of the allegations, *Leandro I* further held that plaintiff parties did state a claim for relief under the North Carolina Constitution. Specifically, we considered Article I, Section 15, which provides that "the State" has a "duty . . . to guard and maintain" "[t]he people['s] . . . right to the privilege of education." *Leandro I*, 346 N.C. at 345 (quoting N.C. Const. art. I, § 15). We also examined Article IX, Section 2, which provides that "[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools . . . wherein equal opportunities shall be provided for all students." *Id.* (quoting N.C. Const. art. IX, § 2(1)). These provisions, we held, "combine to guarantee every child of this state" a

"minimum standard of quality" education. *Id.* at 345, 347. Specifically, the Constitution guarantees access to a "sound basic education." *Id.* at 347. We rejected the Court of Appeals' contrary determination that plaintiffs failed to state a claim because these constitutional provisions required only "equal access to education," or access without a "qualitative standard." *Id.* at 346 (quoting *Leandro v. State*, 122 N.C. App. 1, 11 (1996)).

Recognizing a constitutional *minimum*, we noted, was different from recognizing a constitutional requirement of *equal* educational opportunities, an approach taken in other states. *Id.* at 350–51 (distinguishing other states' recognition of "the purported right to *equal* educational opportunities in every one of the state's districts" with the Court's recognition that our Constitution "ensur[es] that the children of the state have the opportunity to receive a *sound basic* education" (emphases added)). Put another way, it was not necessarily a constitutional problem if hypothetically the State gave one local district $15,000 per student and another $10,000 per student. Funding need not be exactly equal across localities under the Constitution. It could, however, be a constitutional problem if the State gave all districts only $900 per student if that is not enough to afford every student the opportunity to receive an adequate education. Similarly, if the State gave one local district $10,000 per student and another $900, students from both districts may have a constitutional challenge if neither sum was enough for districts to teach them how to read. Educational quality could be constitutionally deficient due to insufficient

funding.[7]

We enumerated four qualitative components of a minimally adequate public education:

> [A] "sound basic education" is one that will provide the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.

*Id.* at 347.

To support this conclusion, we cited two cases from other jurisdictions. Those decisions addressed similar challenges to the constitutional adequacy of statewide public-school systems, including the adequacy of state funding. *Id.* (first citing *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989); and then citing

---

[7] *See also* Eric A. Hanushek, *School Finance and the Courts: Equity and Adequacy* 2, (March 2025), https://hanushek.stanford.edu/sites/default/files/Hanushek%202025% 20AEFP%20Handbook.pdf ("Early school finance court cases focused on differences in resources across districts (equity). These equity lawsuits were based on the equal protection clauses of the U.S. Constitution and state constitutions. Over time, [school finance court cases] have been more heavily weighted toward claims focused on the overall level of spending, and they have been based on the education clauses of state constitutions (adequacy).").

*Pauley v. Kelly*, 255 S.E.2d 859, 878 (W. Va. 1979)). Both peer jurisdictions recognized that adequate funding was an integral part of a qualitatively adequate educational opportunity. *See Rose*, 790 S.W.2d at 211 ("The system of common schools must be adequately funded to achieve its goals. The system of common schools must be substantially uniform throughout the state. . . . The children of the poor and the children of the rich, the children who live in the poor districts and the children who live in the rich districts must be given the same opportunity and access to an adequate education. This obligation cannot be shifted to local counties and local school districts."); *Pauley*, 255 S.E.2d at 878 ("Because education is a fundamental constitutional right in this State, then, under our equal protection guarantees any discriminatory classification found in the educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification."). Our decision thus recognized that plaintiff parties advanced a constitutional adequacy challenge to the state's system of public education—a claim which was sufficiently pled and should not have been dismissed. *Id.* at 348 ("The trial court properly denied defendants' motion to dismiss this claim for relief. The Court of Appeals erred in concluding otherwise.").

In light of this constitutional guarantee, we held that plaintiff parties validly alleged that the State was failing to provide a qualitatively adequate education system. *Id.* That was true even as we rejected plaintiffs' constitutional challenge to unequal funding across local districts alone. *See id.* at 350 ("[A]s the North Carolina

Constitution so clearly creates the likelihood of unequal funding among the districts as a result of local supplements, we see no reason to suspect that the framers intended that substantially equal educational opportunities beyond the sound basic education mandated by the Constitution must be available in all districts.").

Within this framework, plaintiff parties' claims against the State for inadequate educational opportunities included their challenge to the state funding system. For example, we noted that, should plaintiff-intervenors show "the current state [funding] system leaves them unable to provide all of their students a 'minimally adequate' basic education," fixing it may require a "large[r] per-pupil allocation of state school funds." *Id.* at 351–52. That funding argument "[w]hen reduced to its essence . . . is merely repetitious of [plaintiff-intervenor's] previous argument that the state must provide all of its children with the opportunity to receive a sound basic education." We explained, "As we have already concluded that the children of the state enjoy that right and *that plaintiff-intervenors may proceed on that claim*, we need not and do not address this argument by plaintiff-intervenors." *Id.* at 352 (emphasis added). Plaintiff-intervenors could thus proceed on their claim that "the current state system leaves them unable to provide all of their students a 'minimally adequate' basic education," including because of inadequate funding from the State.[8] *Id.* at 351.

---

[8] Even in the majority's retelling, *Leandro I* preserved plaintiffs' Count I that "[p]laintiff [students] ha[d] not received the [adequate] educational opportunities guaranteed by the . . . [c]onstitution[ ] because the State ha[d] failed to provide the necessary funds." *See*

Moreover, plaintiff-intervenors were permitted to proceed on their claim against the State for an "arbitrary and capricious" school funding system that was "unrelated to legitimate educational objectives." *Id.* at 353 ("[A] funding system that distributed state funds to the districts in an arbitrary and capricious manner unrelated to such educational objectives simply would not be a valid exercise of [the State's] constitutional authority.").

That the allegations included broad challenges to the state funding system is also clear from the instructions we gave for remand. Plaintiff parties could, we noted, adduce evidence of "the level of the state's general educational expenditures and per-pupil expenditures" as well as the "level of performance of the children of the state

---

majority *supra* Sections I.B (alterations in original) & I.C.3. The majority does not explain why this claim fails to give the State notice that plaintiffs challenged its statewide system of public education and specifically its failure to provide localities with adequate funding.

Further, even in the majority's retelling, *Leandro I* preserved plaintiff-intervenor's Count II, that "[t]he State's public education system, including its educational funding system . . . [was] inadequate, inequitable, irrational, arbitrary and capricious, and not general and uniform, in violation of the . . . [c]onstitution." *See* majority *supra* Section I.B. (first, third, fourth, and fifth alterations in original). The majority concedes this claim was subsumed by Count I, on which plaintiff-intervenors were also allowed to proceed, that the State failed to "provide the urban school boards with the resources necessary to provide all of their students with an adequate education." *See* majority *supra* Sections I.C.3 & note 12. The majority also does not explain why these counts fail to give the State notice that the plaintiff-intervenors challenge the State's system of public education and specifically its inadequate provision of resources.

Here, I directly quote the majority's own recitation of the complaint allegations. The majority critiques this analysis for "mischaracteriz[ing]" or "selectively quot[ing]" the complaint. *See* majority *supra* note 4. But surely that critique also would apply to the majority's analysis because again, I am only quoting their own explanation of the complaint.

More generally, the majority does not explain how an injured student can sue the State for failing to provide a general and uniform system of public education without necessarily challenging the statewide system. This suggests the real intent here is to strip away any ability to address the State's failings.

and its various districts on standard achievement tests." *Id.* at 355. Thus, quite explicitly, we instructed that the adequacy of the State's funding scheme was relevant evidence of the parties' claims.

*Leandro I* therefore confirmed that the complaints here alleged that the State's public education system was so inadequate that the State was violating the constitutional education rights of schoolchildren and that the State's system of education funding perpetuated that violation. *Id.*; *see also id.* at 355 ("We have concluded that some of the allegations in the complaints of plaintiff-parties state claims upon which relief may be granted if they are supported by substantial evidence."). We understood plaintiff-intervenors' claims to be against the state system. *Leandro I* did not, as the majority asserts, narrow the remaining claims to only those challenging the "unique circumstances" in plaintiff school districts. *See* majority *supra* Section II.B.

### 4. Leandro II *Affirmed Proven Violation by State*

The majority next suggests that *Hoke County Board of Education v. State* (*Leandro II*), 358 N.C. 605 (2004), "affirmed . . . rulings" that "the public education system" that was "established by the General Assembly" was "general[ly] constitutional[ ]" but that "funding allocations by executive branch defendants and/or the Hoke County school board were not addressing the specific needs of at-risk students in Hoke County." *See* majority *supra* Section II.B.

This proposition is again logically inconsistent with the majority's assertion

that the pleadings never advanced claims against the statewide public school system and its funding structure. The majority simultaneously insists that the only claims that survived *Leandro I* were narrow, modest challenges to unique dynamics in particular localities, and that *Leandro II* upheld the "structure and funding of the State's education system" as "facially constitutional" thus "settling that matter for purposes of this action." *See* majority *supra* Section II.F. So, the majority again declares that this Court definitively resolved claims that plaintiffs never brought.

Further, the majority does not accurately describe our decision in *Leandro II*. On remand from *Leandro I*, plaintiff parties' statewide claims proceeded to the merits. "[S]everal years of fact finding, research, and hearings culminat[ed] in a fourteen-month trial in which the court took evidence from over forty witnesses and thousands of pages of exhibits to answer one foundational question: whether the State was complying with or violating *Leandro I*'s constitutional mandate to provide all children with the opportunity to receive a sound basic education." *Leandro IV*, 382 N.C. at 398. The trial court's findings and legal conclusions were memorialized "via four 'Memoranda of Decision' published between October 2000 and April 2002." *Id.*

On appeal of those final determinations, *Leandro II* affirmed that the trial court correctly found a violation of the State's constitutional duty. 358 N.C. at 637 (affirming because evidence showed the State "failed to identify the inordinate number of 'at-risk' students and provide a means for such students to avail themselves of the opportunity for a sound basic education"). This Court underscored

the statewide breadth of the issues on review, "adopt[ing] and apply[ing] the broadened parameters of a declaratory judgment action" to an inquiry about whether the "*children of North Carolina . . .* are wrongfully being denied their constitutional right to the opportunity for a sound basic education." *Id.* at 616 (emphasis added). We reiterated that this case is about "the right at issue to all children of North Carolina, regardless of their respective ages or needs." *Id.* at 620.

Nowhere in the opinion did this Court suggest that the Hoke County School Board's resource allocation system was the source of the constitutional violation. Quite the opposite: The decision repeatedly made clear that the inquiry was whether "the State has failed to provide Hoke County school children with the opportunity to receive a sound basic education," whether "the State has demonstrated that its failure to provide such an opportunity is necessary to promote a compelling government interest," and whether the relief ordered by the trial court for any State failures "correct[s] the failure with minimal encroachment on the other branches of government." *Id.* at 610.

We affirmed the trial court's ruling that the State must "assume the responsibility for, and correct, those educational methods and practices that contribute to the failure to provide students with a constitutionally-conforming education." *Id.* at 609. We affirmed the trial court's instructions "holding the State accountable for the failings of local school boards," "and by the State we mean the legislative and executive branches which are constitutionally responsible for public

education." *Id.* at 635. We rejected the State's argument that it could not be exclusively responsible for providing the opportunity to obtain a sound basic education because localities like the Hoke County School Board were also at least partly responsible for failing to provide a sound basic education. *Id.* We explained that the State "created the school board and . . . authorized the school board to act on the State's behalf," and the trial court rightly "placed responsibility for the school board's actions on the entity—the State—that created [it]." *Id.* We noted that the trial court rightly "exclude[d] the Hoke County School System from responsibility for correcting allocation deficiencies" because Hoke County and other localities are merely "subdivision[s] of the State created solely by the State," and therefore hold "no authority beyond that accorded [them] by the State." *Id.* Plainly, "*[T]he State bore ultimate responsibility* for the actions and/or inactions of the local school board," and it alone must act "to provide a *Leandro*-conforming educational opportunity to students." *Id.* (emphasis added); *accord Silver v. Halifax Cnty. Bd. of Comm'rs*, 371 N.C. 855, 865 (2018) (explaining this understanding of *Leandro II*). The opinion thus upheld the trial court's finding of a violation *by the State*.

Even so, we determined that a particular statewide remedy—"requiring the State to provide pre-kindergarten services as the remedy for constitutional violations"—was "premature." *Id.* at 645. Contrary to the majority, I do not know through what ordinary use of English language the adjective "premature" can be construed to mean "grossly inappropriate" for a narrow case about Hoke County.

-138-

As for the overall adequacy of the State's funding system, *Leandro II* stood by *Leandro I*'s instruction that this issue was subsumed in these adequacy claims against the State. "We concur[red] with the trial court's view" that the "essence" of *Leandro I* was that "no [local education agency] may be funded in such a fashion that [the State] fails to provide the resources required to provide the opportunity for a sound basic education." *Id.* at 634. State funding could not allow educational opportunities to fall below the constitutional floor. The State was required to provide sufficient funding so that "all students, irrespective of their [local educational agencies]," would at the very least have "the opportunity to obtain a sound basic education." *Id.* at 634. For these proceedings in particular, the sufficiency of the State's existing funding system vis-à-vis the proven violations was a question of remedy for remand. And the courts of this state are "empowered to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it." *Id.* at 642.

Although *Leandro II* affirmed the trial court's finding of a violation, we specifically did not order a remedy. Thus, even as the constitutional violation was attributable to "a combination of State action and inaction," *id.* at 637, the trial court was "premature" in "requiring the State to provide pre-kindergarten services as the remedy for constitutional violations," *id.* at 645. We affirmed that "the State must act to correct" its deficiencies and "remand[ed] to the lower court and ultimately into the hands of the legislative and executive branches" to "meet the constitutional mandates

set forth in *Leandro*." *Id.* at 647–49. We credited that the State may be able "to meet its educational obligations . . . by alternative means," and "a single or definitive means for achieving constitutional compliance for such students has *yet* to surface from the depths of the evidentiary sea." *Id.* at 644–45 (emphasis added).

As to the remedy, we stressed the trial court's conclusion that it was "not *yet* convinced" that "the State's overall funding, resources, and programs scheme lacked the essentials necessary to provide a sound basic education," and that some combination of changes—or additions—to those elements may remedy the violations. *Id.* at 634 (emphasis added). I hope all North Carolina schoolchildren are taught the important distinction between a statement that says, "this system is adequate," and one that asserts, "I am not yet convinced this system is adequate."

After *Leandro II*, the trial court oversaw a remedial phase to "meet the constitutional mandates set forth in *Leandro*." *Id.* at 647–49. It was exactly the scope of the remedy that the trial court supervised from 2004 on. *See id.* at 647–49 (remanding "to the lower court and ultimately into the hands of the legislative and executive branches" to "meet the constitutional mandates set forth in *Leandro*"); *accord Leandro IV*, 382 N.C. at 405.

As the summary here shows, the majority's assertion that *Leandro II* broadly upheld the State's public education system as "facially constitutional" blatantly misrepresents that decision. The notion that *Leandro II* understood the remaining claims to only pertain to Hoke County and individual named plaintiffs and school

districts is unsupported. The idea that *Leandro II* intended to cabin the scope of proceedings to uniquely local conditions in select counties and effectively let the State off the hook is likewise unsupported. Rather, *Leandro I* and *II* confirm that this Court for decades understood this case as a broad challenge to the adequacy of the State's performance in providing a general and uniform system of free public schools wherein all schoolchildren can access a sound basic education. *Leandro II* confirmed that the State was failing this obligation, particularly for at-risk students, as evidence at trial showed.

The majority's revisionist history belongs not in a judicial opinion, but in a George Orwell novel our schoolchildren should be reading in high school English class.

### 5. *The "Facial" v. "As-Applied" Distinction Is Irrelevant*

In support of the majority's conclusion that there was no "proper" invocation of judicial power to hear claims against the adequacy of the State's public education system, the Court retroactively injects a new distinction between "facial" and "as-applied" challenges. It implies that the pleadings filed in 1994 were deficient because the complaint did not specifically plead a "facial" challenge, namely that "districts across all one hundred counties were facing similar challenges [as plaintiffs], or that there was no way for the State's funding system to operate constitutionally." *See* majority *supra* Section I.B. The claims were also "not directed to the one tribunal empowered to address it: a three-judge panel of the Superior Court, Wake County."

*See* majority *supra* introduction. Thus, the majority reasons, the courts of this state lacked jurisdiction to adjudicate the supposed "facial" challenges.

To start, whatever the nature of their claims, plaintiffs were not required to first bring their claims before a three-judge panel when they initiated this action. The statutory requirement that a three-judge panel first hear "facial" challenges was enacted in 2014, over two decades *after* plaintiffs filed their first complaint and well into the remedial phase of this litigation. *See* Current Operations and Capital Improvements Appropriation Act of 2014, S.L. 2014-100, § 18B.16(a), 2014 N.C. Sess. Laws 328, 542. That statute does not apply here and is not relevant here.[9] To suggest otherwise would pose serious separation of powers concerns. Namely, it would raise the possibility that the legislature could, mid-litigation, retroactively deprive a court of subject matter jurisdiction over constitutional rights claims against the State by simply passing a statute that requires those already brought claims to have been brought in a different court.[10]

---

[9] The same is true with the majority's allusion to the supposed "pleading" deficiency that the House of Representatives and the Senate were not joined as a necessary party in "any civil action challenging the validity of a North Carolina statute . . . under State . . . law." N.C.G.S. § 1A-1, Rule 19(d) (2025). That requirement, too, was introduced in 2017, long after the action commenced and far into the remedial proceedings in this matter. *See* Current Operations Appropriations Act of 2017, S.L. 2017-57, § 6.7(j), 2017 N.C. Sess. Laws 248, 264.

The majority's frequent citations to *Berger v. State Conf. of NAACP*, 142 S. Ct. 2191 (2022), suffer the same flaw. The United States Supreme Court's reasoning in that case relied on the statute that gives the legislature the power to intervene as of right in certain proceedings, which similarly was enacted in 2013, long into the remedial phase of this litigation and after the legislature's 2011 intervention attempt. *See id.* at 2202 (citing N.C.G.S. § 1-72.2(b) (2021)).

[10] The majority may wish the three-judge panel requirement applied here. Notably the legislature has, over time, granted the Chief Justice of the Supreme Court of North

Moreover, this case was litigated consistent with the procedures designated by this Court. Multiple members of this Court assigned and reassigned the proceedings to various trial court judges across the decades. *E.g.*, *Leandro IV*, 382 N.C. at 398 ("Upon remand [from *Leandro I*], then-Chief Justice Mitchell designated the case as exceptional under Rule 2.1 of our General Rules of Practice and assigned it to Judge Howard Manning."). It is not fair or just to penalize parties for not litigating under one procedure when they simply followed a different procedure this Court prescribed.[11]

---

Carolina, the author of the majority opinion, increasing discretion to constitute these three-judge panels that hear so-called "facial" challenges:

> Under the new law, any of the state's superior court judges—resident, emergency, or special—may be appointed to three-judge courts. Previously, after a facial challenge was raised, the chief justice of the North Carolina Supreme Court selected three locally elected *resident* superior court judges to hear the challenge. But now, the chief justice may appoint unelected judges to three-judge courts, including the ten new special superior court judges that are appointed exclusively by the legislature—thanks to a simultaneous revision. The new law also eliminates geographic and administrative constraints that previously cabined the chief justice's appointment discretion. And it codified an interlocutory appeal mechanism for denials of motions to transfer to a three-judge court.

Matt Queen, Note, *The Return of Three-Judge Constitutional Courts*, 73 Duke L.J. 1577, 1585–88 (2024) (cleaned up) (describing the legislative history of N.C.G.S. § 1-267.1(a) (2023)).

[11] That includes the current Chief Justice, who enjoyed discretion to reassign this case between trial court judges. *E.g.*, Emily Walkenhorst, *Ex-*Leandro *case judge says he didn't ask to be removed from the case*, WRAL News (Mar. 24, 2022, 1:59 p.m.), https://www.wral.com/story/ex-leandro-case-judge-says-he-didn-t-ask-to-be-removed-from-the-case/20202057 ("[Judge] Lee, though already retired, had reached mandatory retirement age for a superior court judge in North Carolina on Jan. 23. 'I certainly got the impression from that phone call that I would not be handling further matters in *Leandro*, but I wasn't

Even when the three-judge panel statute does apply, it is not a jurisdictional defect if the case fails to first transfer to a three-judge panel. Two years ago, this Court determined that a complaint that brought facial-constitutional challenges to the state's certificate of need law must be remanded for further proceedings consistent with the three-judge panel requirement in N.C.G.S. § 1-267. *Singleton v. N.C. Dep't of Health & Hum. Servs.*, 386 N.C. 597 (2024) (per curiam). We did not dismiss the claims with prejudice in that case. That precedent further supports that the alleged failure to begin these proceedings before a three-judge panel is not jurisdictional or grounds to dismiss these claims.

It is also not correct as a matter of law that any plaintiff is required to use the magic words "facial challenge" in their complaint to confer jurisdiction to the trial court to hear such claims. *E.g.*, N.C.G.S. § 1A-1, Rule 9 (2025) (listing "special matters" that must be specifically plead and omitting "facial challenge" as one). Plaintiff parties' entitlement to relief depends on what they proved of the merits of their claim, not on their pleadings. *E.g.*, N.C.G.S. § 1A-1, Rule 54(c) (2025) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."); *Nation Ford Baptist Church Inc. v. Davis*, 382 N.C. 115, 127 (2022) ("The specific relief a plaintiff seeks does not dictate a court's jurisdiction to adjudicate a claim."). That

sure why or what the rationale was,' Lee said. 'But apparently it was just a matter that it was in the discretion of the chief justice and he had exercised his discretion.' ").

includes any declaration by this Court as to the constitutionality of a challenged statute for infringing on fundamental rights. *Cf. GI Surplus Store v. Hunter*, 257 N.C. 206, 214 (1962) ("An Act will be declared unconstitutional and its enforcement will be enjoined when it clearly appears either that property or fundamental human rights are denied in violation of constitutional guarantees.").

Moreover, when all parties to litigation and the trial court share the same understanding of the nature of the claims actually being litigated, the pleadings *were de facto amended* and an appellate court is without power to say otherwise. *Mangum v. Surles*, 281 N.C. 91, 98 (1972); *see also Eudy v. Eudy*, 288 N.C. 71, 77 (1975). As we have explained,

> [W]here no objection is made to evidence on the ground that it is outside the issues raised by the pleadings, the issue raised by the evidence is nevertheless before the trial court for determination. The pleadings are regarded as amended to conform to the proof even though the defaulting pleader made no formal motion to amend. *Failure to make the amendment will not jeopardize a verdict or judgment based upon competent evidence.* If an amendment to conform the pleadings to the proof should have been made in order to support the judgment, the Appellate Court will presume it to have been made.

*Mangum*, 281 N.C. at 98 (emphasis added).

It is certainly the case here that everyone—the courts, the parties, the relevant State branches—understood the nature of the claims at issue: a challenge to the adequacy of the State's general and uniform system of public education.

The political branches have shared this understanding of the claims and

potential statewide remedial scope. The State in 2002 confirmed that it "ha[s] always understood that this case was about whether the State was fulfilling its constitutional obligation to provide a 'general and uniform system of free public schools' " and that it must "improve educational opportunities for at-risk students in the plaintiff-party [local education agencies] along with their similarly disadvantaged peers across the State" in light of this litigation. The trial court and parties shared that understanding after *Leandro II*—the evidence presented warranted a statewide remedy, not simply a Band-Aid over particular districts or special treatment for the students and districts who sued. That history is consistent with the State's identical representations in this very appeal that it has "always understood that this case was about whether the State was fulling its constitutional obligation to provide a 'general and uniform system of free public schools.' "

The legislature also shared this understanding. In *Hoke County Board of Education v. State* (*Leandro III*), 367 N.C. 156 (2013), the State appealed a trial court order finding that the State had failed to comply with *Leandro II* when it altered the allocation procedures for More-at-Four, the statewide pre-kindergarten program for at-risk students. *Hoke Cnty. Bd. of Educ. v. State*, 222 N.C. App. 406, 408–10 (2012)*, vacated as moot, Leandro III*, 367 N.C. at 160. That reallocation reduced statewide funding for pre-kindergarten programs to support at-risk children. *Hoke Cnty. Bd. of Educ.*, 222 N.C. App. at 410. The Court of Appeals noted that, because the State had offered the trial court statewide evidence of the More-at-Four program's effectiveness,

the State could not later object that the trial court ordered it to take statewide action to preserve that program for at-risk students across the state. *Id.* at 414–15. The State appealed that decision to this Court, but the legislature meanwhile acceded to the Court of Appeals' decision and restored the statewide funding. *Leandro III*, 367 N.C. at 159–60. We recognized that the legislation mooted the appeal and reiterated that "[o]ur mandates in *Leandro* [*I*] and [*Leandro II*] remain in full force and effect." *Id.* at 160. So even the legislature (and, impliedly, the *Leandro III* Court) has recognized that plaintiffs broadly challenged the adequacy of the general and uniform system of public education and that a statewide remedy would be required to effectively remedy plaintiff parties' proven harms.

It bears emphasizing that the trial court frequently considered statewide evidence presented by the State, long before 2017. In October 2004, for example, the State submitted to the trial court a list of statewide education programs that it believed achieved *Leandro* compliance, and the following year, the court heard evidence from the State on "the problem of poor academic performance in high schools throughout North Carolina."

In summary, the record amply shows that all parties effectively did consent to this "facial" challenge as the majority puts it. Even if the legislature's current leadership wishes that body had objected sooner, that desire is beside the point. As we have already observed, "Legislative Defendants have had any number of opportunities to intervene in this litigation and thereby earnestly engage with these

important issues from within the arena where the parties and the trial court sought to solve the formidable problems facing our state." *Leandro IV*, 382 N.C. at 469. That is especially true for the time period between 2013 and 2021, at which point the legislature had given itself the power to intervene in certain cases as of right, yet chose not to do so here. *Id.* (citing N.C.G.S. § 1-72.2). Instead, "Legislative Defendants have largely opted to comment upon the proceedings from the sidelines, including by publicly disparaging the trial court itself," thus "functionally abdicat[ing] their constitutional duties and accordingly undermin[ing] their own credibility." *Id.*

The majority hints that this implicit pleadings amendment rationale should not apply because amendments should not be allowed when they would result in "gamesmanship, unfairness, and injustice." *See* majority *supra* Section II.A. The majority is not specific about whose interest in "fairness, notice, and justice" it believes has been unfairly denied by these proceedings. *See id.*

Perhaps the majority believes the legislature has been treated unfairly. But it is worth emphasizing that the legislature chose for decades not to intervene in these proceedings to advance its particular view of the adequacy of the public education system, despite having ample notice of the statewide implications of this litigation. Specifically, back in 2011, the legislature sought to intervene on only narrow grounds: it disputed a trial court order interpreting the 2011 budget and its effects on pre-kindergarten for at-risk four-year-olds. The executive branch did not share the legislature's interpretation of the budget, so it would not consent to the Attorney

General moving for "clarification" of the same on the State's behalf. The legislature thus argued that intervention was warranted because otherwise "there would be no vehicle for the interests of the legislative branch of government to clarify the scope of the Court's Order."

The trial court denied intervention on this basis and stood by its original order on the 2011 budget. It noted that "[t]he admission of affidavits (or statements) of legislators to show the legislative purpose and intention of the legislature which passed a statute is not permitted and such evidence is not competent." It declined to "clarify" its Order in the way the legislature requested, noting that the plain text of the budget did not match the legislature's purported intent, and courts should not "revis[e] an act of the General Assembly" to make it "consistent with the General Assembly's true intent."

The trial court further observed that the legislature sought to intervene essentially to obtain a ruling that the executive branch's understanding of the budget was wrong and that the legislature meant something other than the budget's plain text. The trial court refused to "put[ ] itself, or the judiciary, in the middle of th[at] political dispute" or to unilaterally amend the budget act by ruling that it meant something other than its text. The court thus denied the motion to intervene.

It is certainly possible that the legislature intended in 2011 to assert broader grounds for intervention than a narrow interest in clarifying one order. But it is not clear the legislature ever made that argument to the trial court. Nor did the

legislature appeal the order denying intervention. It is not reasonable to conclude based on all the circumstances that the legislature had no notice as to the statewide claims at issue. What is more, *Leandro II* confirmed our view that the judgment and remedy in this matter were binding on "the State, and by the State we mean *the legislative and executive branches* which are constitutionally responsible for public education." 358 N.C. at 635 (emphasis added).

In any event, perhaps the majority does not specify whose interest in "fairness, notice, and justice" it believes has been unfairly denied by these proceedings because it cannot. Dismissing landmark constitutional education rights claims, including those that proved the State was violating schoolchildren's rights, which this Court affirmed, with prejudice and with no relief for any injured party, using arguments not advanced in briefing and outside the scope of the issue on which this Court allowed review, hardly coheres with elementary principles of "fairness, notice, and justice."

### 6. *Remedial Scope is Not Jurisdictional and Was Already Decided*

Without legal support for its positions, the majority falls back on a folksy-sounding hypothetical involving a mother, her two kids, and a museum. It posits that a trial court would obviously not have subject matter jurisdiction over the younger child's injuries from broken parking lot pavement where the mother's original claim against the museum was for her older child's injury on a jungle gym.

To start, this is not what subject matter jurisdiction is. Subject matter

jurisdiction is, fundamentally, "a court's legal authority to adjudicate the kind of claim alleged." *In re McClatchy Co.*, 386 N.C. 77, 85 (2024). As the name suggests, it deals with a suit's substance. For state constitutional claims specifically, it asks whether the issues raised fall within the adjudicatory power "granted to [the court] by the Constitution and laws of the sovereignty." *Henderson County v. Smyth*, 216 N.C. 421, 423 (1939). No one would say a court lacks adjudicatory power under the laws of sovereignty to hear a negligence claim, when the issue was only whether the claim was pled and the museum, as the opposing party, had notice of it.

Ironically, this hypothetical shows that the majority's concern with "fairness" over "unpled facial challenges" in the "subject matter jurisdiction" sense is actually a lingering objection to the judicial remedial power. Imagine the eldest child tripped inside on the museum's unkempt carpet and the youngest child tripped outside on broken parking lot pavement. If the eldest child brought a claim for negligence, and evidence at trial showed that the museum had a practice of negligently maintaining its walkways (such as filtering all complaints about unsafe paths to an email inbox it never checked and refusing to hire a maintenance custodian), and lots of young kids had tripped and hurt themselves on museum property, the trial court is not without power to order the museum to remedy the tripping hazards—in addition to ordering whatever damages would make the eldest child whole. Again, plaintiff parties' entitlement to relief depends on what they proved of the merits of their claim, not on their pleadings. *E.g.*, N.C.G.S. § 1A-1, Rule 54(c); *Nation Ford Baptist Church, Inc.*,

382 N.C. at 127. The majority's contrary view would suggest that, even though evidence showed pervasive negligence, a court is without power to order the museum to fix all its hazardous pathways because each child who tripped or may have tripped was not specifically named in the complaint, or because the mother did not know how pervasive the museum's negligence was at the outset of her claims. The Court notably does not cite any legal support for that proposition.

For good reason—courts are surely capable of remedying pervasive constitutional rights violations even when only one impacted plaintiff brings them to the court's attention. *E.g.*, *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1152–53 (9th Cir. 2004) (per curiam) (affirming, in an action for damages under 42 U.S.C. § 1983 brought by one inmate, that a statewide injunction against a state prison system's internet mail policy was permissible as it was "no broader than the constitutional violation"). A government defendant can hardly shirk legal accountability by pointing out that its unconstitutional conduct was more widespread than the plaintiff originally thought at the outset of her complaint.

Besides, *Leandro IV* already approved the remedy ordered in this case. 382 N.C. at 429 ("[W]e hold that the trial court's November 2021 Order properly directed certain State officials to transfer State funds in compliance with the [Comprehensive Remedial Plan]."). And the scope of a remedy is *not* a subject matter jurisdiction issue that can be raised at any point in a proceeding—even on constitutional grounds. *See, e.g.*, *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276–77

(1989) (holding that a constitutional challenge to an award of punitive damages was waived when not raised below); *Greene v. Royster*, 187 N.C. App. 71, 77 (2007) (noting that even constitutional challenges to a damages award cannot be raised on appeal if waived below). Thus, the majority's hypothetical does not support that the trial court lacked subject matter jurisdiction here. This is another example of how the majority confuses notice pleading of a plaintiff's harm with an appropriate remedy after a harm has been proven and muddies subject matter jurisdiction doctrine in the process.[12]

### 7. So-Called "Facial Leandro Claims" Would Always Fail

Across three decades of proceedings, these claims have never been understood as squarely "facial" or "as-applied."[13] This distinction is, as a general matter, far less

---

[12] It bears emphasizing that standing to state a claim for relief is separate from remedy. "When a person alleges the infringement of a legal right arising under . . . the North Carolina Constitution,"—for example, their constitutional education rights—"the legal injury itself gives rise to standing." *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 608 (2021). Remedy, by contrast, hangs on the merits of a party's claims. The classic example is *Corum v. University of North Carolina Board of Governors*, 330 N.C. 761 (1992), and its progeny. Those cases confirm that the appropriate remedy for a constitutional claim is a function of "the facts of the case developed at trial." *Id.* at 784; *accord Comm. to Elect Dan Forest*, 376 N.C. at 596 n.42 (distinguishing constitutional standing requirements from injury or damages questions). The majority recently reiterated as much in *Howell v. Cooper*, 388 N.C. 71, 84 (2025) (stressing that questions of an appropriate remedy are "implicated only on the 'back end' of the litigation" of a *Corum* claim).

Yet here, the majority muddies standing and remedy. The legislature's arguments that plaintiffs lacked "standing" are distinct from whether a court has subject matter jurisdiction over claims arising from the education provisions of our state Constitution. The Court is effectively making arguments for the legislature and confusing our doctrine in the process.

[13] The majority states that "in [the State Board's 2017 motion for relief from judgment] supporting brief, the State Board, through the Attorney General, argued that 'a new lawsuit would be needed to challenge [legislative changes to the education system], both on their face

"categorical[ ]" than the two labels suggest. *State v. Grady*, 372 N.C. 509, 546 (2019) (quoting Richard H. Fallon Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1321, 1341 (2000)).[14] And it makes little sense here, where plaintiffs' claims are against the State for its singular failure to meet its constitutional duty to provide adequate educational opportunities to all schoolchildren in a general and uniform public school system.

Consider precisely what the majority suggests plaintiffs would have had to allege and prove to succeed in their "facial" challenge: "that *all* children in *all* school districts across *all* one hundred counties were facing similar challenges" as plaintiffs. *See* majority *supra* Section I.B (emphases added). Or "that there was no way for the State's funding system to operate constitutionally." *See id.* Or the State's "funding

___

and as-applied.'" *See* majority *supra* Section I.G.2.b (second alteration in original). This alleged quotation to the State Board's brief does not appear in the record for this case or the previous appeal in this case.

Moreover, the State did not advance a "facial" and "as-applied" jurisdictional distinction in its brief in this appeal. The State's brief did not even use those words.

The majority gratuitously quotes remarks by counsel for the State during argument as support for its conclusions. *See* majority *supra* Section II.B. But counsel for the State never suggested that viewing these claims as a "facial challenge" conveyed a jurisdictional basis for dismissing plaintiffs claims and abandoning the ordered remedy altogether. *See*, *e.g.*, Oral Argument at 1:11:10–1:11:25, *Hoke Cnty. Bd. of Educ. v. State* (No. 425A21-3), https://www.youtube.com/watch?v=I9vCYenKjGc ("My understanding, how I perceive this case, is it's a facial challenge to the statewide provision of education to all students. And that there is nothing, as a matter of formal principles of collateral estoppel, that would bar additional lawsuits brought by people who are not parties to this claim."). It is profoundly unfair to take such remarks out of context in this way.

[14] Indeed, some legal scholars have argued the theoretical view that "[t]here is no such thing as a true as-applied constitutional challenge." *See* Matthew D. Adler, *Rights Against Rules: The Moral Structure of American Constitutional Law*, 97 Mich. L. Rev. 1, 157 (1998) (emphasis and footnote omitted).

scheme could never meet the students' constitutional education rights." *See* majority *supra* Section II.B. These so-called "facial" challenges would put plaintiffs in the impossible position of having to prove a negative, that no student in any district has the requisite learning opportunities. Claims against the State would apparently be defeated, in the majority's view, if the State can point to at least some students that do have the requisite learning opportunities under the existing system. The State can surely always do that in a diverse statewide public school system of 1.5 million students, regardless of how substantively deficient public educational offerings might be to everyone else.[15]

Thus, dismissing plaintiffs' claims here as a matter of jurisdiction because they are "unpled facial challenges" potentially could be argued to actually foreclose all structural claims against the State for its failure to provide a qualitatively adequate general and uniform system of free public schools. This would render the quality of statewide public education system nonjusticiable. Strictly applying the traditional "facial challenges" legal standard as the majority describes it would let the State completely off the hook for its constitutional mandates. "Facial *Leandro* claim against the State" would become an oxymoron, because cabining the claims here by retroactively forcing them into that rigid category would render the underlying right practically meaningless.

---

[15] *See* Average Daily Membership for the Final Month of Fiscal Year 2024–2025, *N.C. Dep't of Pub. Instruction*, https://www.dpi.nc.gov/documents/fbs/fy-2024-25finaladm (select link to download spreadsheet and sum column Q totals) (last visited Mar. 23, 2026).

## B. "Times Have Changed"

The majority's other purported basis for dismissing these claims for lack of subject matter jurisdiction is that too much time has passed since the complaint was first filed. The majority gestures to legislative changes of accountability models and Obama-era Race to the Top education grants—and even technological developments like smart phones. *See* majority *supra* Sections I.G.2, II.B. It explains that these developments mean that plaintiffs have not adequately challenged "the current public education system." *See* majority *supra* Section II.B.

### 1. Subject Matter Jurisdiction Is Not Capable of Being "Lost"

The notion that the trial court had jurisdiction yet lost it along the way is contrary to blackletter law on judicial jurisdiction. Subject matter jurisdiction is, fundamentally, "a court's legal authority to adjudicate the kind of claim alleged." *In re McClatchy Co.*, 386 N.C. at 85. It is "not a light bulb which can be turned off or on." *In re Peoples*, 296 N.C. 109, 146 (1978) (quoting *Silver Surprize, Inc. v. Sunshine Mining Co.*, 74 Wash. 2d 519, 523 (1968)). It attaches at the outset of the suit when the pleadings are filed and according to the allegations in the complaint. *Town of Midland v. Harrell*, 385 N.C. 365, 371 (2023); *Askew v. City of Kinston*, 386 N.C. 286, 297 (2024). And once it attaches, it attaches for good, "for all time until the cause is fully and completely determined." *In re Peoples*, 296 N.C. at 146 (quoting *Kinross-Wright v. Kinross-Wright*, 248 N.C. 1, 11 (1958)). That includes up "until the judgment is satisfied." *Kinross-Wright*, 248 N.C. at 10.

This principle is foundational to judicial authority. Without it, defendants would reserve the power "to preserve or destroy jurisdiction of the court at [their] own whim." *In re Peoples*, 296 N.C. at 146 (quoting *Silver Surprize, Inc.*, 74 Wash. 2d at 523); *accord In re Orr*, 254 N.C. 723, 727 (1961). That would reward bad actors and prevent courts from redressing harms through the legal process. Thus, jurisdiction depends on the nature of the plaintiff parties' claims, not conduct by the defendants after the claims were brought, "even when the [subsequent] events are of such a nature that they would have prevented jurisdiction from attaching in the first instance." *Id.*; *accord Abernethy Land & Fin. Co. v. First Sec. Tr. Co.*, 213 N.C. 369, 371 (1938); *Fed. Land Bank v. Davis*, 215 N.C. 100, 103 (1939).

### 2. *This Case Is Not Moot*

Because a court either has subject matter jurisdiction or it does not, the majority's assertion that jurisdiction simply expired during the course of proceedings sounds like a mootness argument. Generally, "North Carolina appellate courts do not decide moot cases." *Chavez v. McFadden*, 374 N.C. 458, 467 (2020). But a case is only "moot" when further judicial determination "cannot have any practical effect on the existing controversy." *Id.* (quoting *Roberts v. Madison Cnty. Realtors Ass'n*, 344 N.C. 394, 398–99 (1996)).

This case is far from moot. For one, there is no evidence in the record that the changes cataloged by the majority actually enabled the State to finally offer a *Leandro*-compliant public education system. Superficial changes to the General

Statutes do not impact the fundamental inquiry: "[W]hether the State [i]s complying with or violating *Leandro I*'s constitutional mandate to provide all children with the opportunity to receive a sound basic education." *See Leandro IV*, 382 N.C. at 398. And the issue of $678 million in missing "necessary" funding to adequately support the public school system, as outlined in the Comprehensive Remedial Plan, is not moot.[16]

Superficial changes to the legislature's statutory scheme are especially irrelevant here, where we already held that plaintiff parties' constitutional claims subsumed their statutory claims because the statutes merely codified the constitutional minimum. *See Leandro I*, 346 N.C. at 353. In *Leandro I*, this Court noted that the plaintiffs alleged that students' rights had been violated under Chapter 115C of the North Carolina General Statutes, and specifically the provisions requiring a "general and uniform system of free public schools throughout the State, wherein equal opportunities shall be provided for all students," *id.* at 353–54 (cleaned up) (quoting N.C.G.S. § 115C-1 (1994)), forbidding "denial of equal educational opportunity on the basis of economic status in the provision of services to any child," *id.* at 354 (cleaned up) (quoting N.C.G.S. § 115C-122(3) (1994) (repealed 2006)), and mandating "necessary resources are provided from State revenue sources for the instructional expenses for current operations of the public school system as defined in the standard course of study," *id.* (cleaned up) (quoting N.C.G.S. § 115C-408(b)

---

[16] The majority also transgresses an appellate court's appropriate role by effectively inserting the Court as factfinder and pronouncing that the factual changes had a given effect while denying parties the opportunity to be heard or to marshal evidence on this issue.

(1994)).[17] We concluded that "th[e]se statutes, at most, reiterate the constitutional requirement that every child in the state have access to a sound basic education." *Id.* This observation was not a limitation on plaintiffs' claims; rather, "[t]o the extent that plaintiff-parties can produce evidence tending to show that defendants have committed the violations of chapter 115C alleged in the complaints and that those violations have deprived children of some districts of the opportunity to receive a sound basic education, plaintiff-parties are entitled to do so." *Id.* We simply noted that the statutes represented the State's implementation of its constitutional duty to offer every student "equal access to a sound basic education." *Id.* And that plaintiffs adequately claimed that the State was not meeting that constitutional duty.

The trial court likewise recognized that new statutory changes did not alter the fundamental constitutional analysis in its order denying the State Board of Education's 2017 motion for relief from judgment. (Notably, that motion made exactly the arguments the majority now recycles.) The trial court cited objective metrics showing that "thousands of children in the public schools have failed to obtain, and are not now obtaining a sound basic education as defined by and required by the

---

[17] Several of these provisions remain in the present-day statutes. *See* N.C.G.S. § 115C-1 (2025) ("A general and uniform system of free public schools shall be provided throughout the State, wherein equal opportunities shall be provided for all students, in accordance with the provisions of Article IX of the Constitution of North Carolina."); § 115C-408(b) (2025) ("To insure a quality education for every child in North Carolina, and to assure that the necessary resources are provided, it is the policy of the State of North Carolina to provide from State revenue sources the instructional expenses for current operations of the public school system as defined in the standard course of study.").

*Leandro* decision" in "way too many school districts across the state." Specifically, "reading, math[,] and biology results . . . reflect[ed] in each and every category that more than half of the students tested below grade level." Further, "the demand for new teachers is not being met; . . . there were then more schools rated 'D' or 'F' than can be served; . . . [and] federal funding ('Race to the Top') ended in 2014–15," resulting in severe staffing shortages in low performing schools and "loss of critical funding used to develop and implement effective teaching." Thus, "the evidence before this court upon the [State Board's] motion is wholly inadequate to demonstrate that these enactments [cited as factual changes by State defendants] translate into substantial compliance with the constitutional mandate of *Leandro* measured by applicable educational standards."

Courts should not accept at face-value even well-intentioned changes to how the State measures student academic performance. The State cannot divest courts of jurisdiction to hear claims against it simply by reframing how the constitutional harm is measured as a policy matter.

Because the evidence showed that the State's violation was still ongoing, the trial court in 2018 proceeded to appoint, with consent of all parties, an independent, nonparty consultant, WestEd. WestEd was charged with identifying concrete actions the State could take to remedy these ongoing deficiencies and implement "sustained compliance with the constitutional mandates articulated in this case." In turn, WestEd studied the *then-existing* educational system, with input from the parties and

the political branches. WestEd collaborated "with the Friday Institute for Educational Innovation at North Carolina State University and the Learning Policy Institute" to conduct a sophisticated series of "thirteen distinct studies to better identify, define, and understand key issues and challenges to North Carolina's education system and to offer a comprehensive framework of change for the State." *Leandro IV*, 382 N.C. at 411.[18]

The extensive research findings refuted any suggestion that new enactments mooted the *Leandro* litigation. WestEd's final report showed that, as of 2019–2020, "*the state [wa]s further away* from meeting its constitutional obligation to provide

---

[18] As *Leandro IV* explained,

> The researchers developed and carried out an extensive research agenda to investigate the current state and major needs of North Carolina public education in four overarching areas: (1) access to effective educators, (2) access to effective school leaders, (3) adequate and equitable school funding and resources, and (4) adequate accountability and assessment systems.
>
> WestEd's methodology was comprehensive. Each of its thirteen studies was designed to address specific research questions and used mixed-method designs such as data analysis, school visits, focus group interviews with key stakeholders, statewide surveys, reviews of prior studies, and cost function analysis. "Site visits, interviews, and focus groups were designed to maximize engagement with education stakeholders representing the diversity of the state in terms of geography, school level, and school type as well as the characteristics of the student and educator populations." Researchers collected new data from schools in forty-four counties, engaged with over 1,200 educators, and examined existing data from Duke University's North Carolina Education Research Data Center and UNC's Education Policy Initiative at Carolina.

382 N.C. at 411.

every child with the opportunity for a sound basic education than it was when the Supreme Court of North Carolina issued the *Leandro* decision more than 20 years ago." *Id.* at 411 (emphasis added). This research showed "systemic deficiencies in teacher and principal quality and supply (especially in low-wealth districts) and programmatic funding and resources (especially those necessary to support disadvantaged students), among other statewide shortcomings." *Id.* at 412. And even as "many promising initiatives had been put in place, they have neither been sustained nor been brought to scale and are insufficient to adequately address the *Leandro* requirements." *Id.* (cleaned up). Far from fixing the profound troubles in the State's system of education, changing times brought "increase[s]" in "the number of at-risk students" public schools must serve and in "the challenges of providing every student with a sound basic education." *Id.*

The WestEd report in part informed the parties' joint creation of the Comprehensive Remedial Plan, which "laid out both broad programs and discrete, individual action steps to be taken between 2021 and 2028 to achieve the overarching constitutional obligation" and that parties agreed were "the necessary and appropriate actions . . . to address the constitutional violations in providing the opportunity for a sound basic education to all children in North Carolina." *Id.* at 415 (cleaned up). So the Comprehensive Remedial Plan was based on the current education system, crafted by the parties, and accounted for the changes to which the majority gestures. That plan is what *Leandro IV* ordered to be enforced.

Contrary to all record evidence, the majority broadly asserts that "[t]he education system of 1994 and 2005 ceased to exist as late as the General Assembly's repeal and replacement of the [Basic Education Program] in 2017." *See* majority *supra* Section II.B. The legislation the majority apparently believes was so transformational to the state's public education system was entitled "An Act to Make Organizational and Technical Changes to the Courses of Study Statutes." S.L. 2017-126, § 1, 2017 N.C. Sess. Laws 913, 913. The General Assembly's legislative analysis division explained that this law "repeal[ed] and recodifie[d] various provisions related to the standard course of study" and that "the recodification [now] separates topics based on subject matter." Brian Gwyn, Legis. Analysis Div., N.C. Gen. Assembly, *House Bill 135: Technical Changes to Courses of Study Statute* (Aug. 25, 2017), available at https://www.ncleg.gov/Legislation/Bills/Summaries/2017/H135. "The act also removes references to the Basic Education Plan and replaces that term with the term 'standard course of study,' and makes conforming changes to other statutes." *Id.* So, in the majority's telling, the legislature can formally change the title of its curriculum program and thereby divest a trial court of subject matter to hear claims alleging the statewide system of public education is inadequately funded. It is not difficult to see why giving such carte blanche to the legislature would neuter the constitutional command of a qualitatively adequate general and uniform system of public education.

The majority's suggestion that three decades of collective effort to identify and

remedy structural, constitutional deficiencies in our state's public education system is jurisdictionally defective because plaintiffs in 1994 could maybe not foresee laptops and tablets is too ludicrous to merit further response.

### 3. *Mootness Is Not Jurisdictional*

Not only are the constitutional violations here not moot as a factual matter, but mootness is not jurisdictional in any event and is not grounds to summarily dispose of these proceedings. *See Chambers v. Moses H. Cone Mem'l Hosp.*, 374 N.C. 436, 447 (2020) ("In state court, mootness is 'a form of judicial restraint,' rather than a jurisdictional concern, as it is in federal court." (quoting *In re Peoples*, 296 N.C. at 147)). Additionally, at least two well-established exceptions to the mootness doctrine would apply here: the public interest exception and exception for legal issues that are "capable of repetition, yet evading review." *Chavez*, 374 N.C. at 467. These are in fact the very exceptions employed by peer state supreme courts when confronted with similar arguments by state defendants.[19]

---

[19] *E.g.*, *Idaho Schs. for Equal Educ. Opportunity v. State*, 129 P.3d 1199, 1206 (Idaho 2005) (declining to moot a lawsuit over the constitutionality of Idaho's school funding system under the public interest exception, rejecting the state's argument that factual changes since the original suit "render[ed] many of the district court's findings moot and are significant enough to warrant reversal of the [trial] court's conclusion that the Legislature has failed to provide" for constitutionally adequate facilities, because the court saw no evidence of "any commitment to continued funding of the Loan and Grant Fund, or that the amount appropriated was sufficient to carry out the Legislature's constitutional responsibilities"); *Comm. for Educ. Equal. v. State*, 294 S.W.3d 477, 486 (Mo. 2009) (explaining that students "who are no longer in Missouri's public schools have claims that are not moot because they present claims capable of repetition that otherwise may evade review"); *Abbeville Cnty. Sch. Dist. v. State*, 767 S.E.2d 157, 163 & n.4 (S.C. 2014) (rejecting the State's argument that legislative changes to the state's education system mooted the case, because the State did not "substantially change[ ] the baseline funding mechanism," so plaintiffs "may validly argue

Incidentally, State defendants often gesture to new educational policies or initiatives to try to skirt judicial scrutiny. Courts have wisely rejected those arguments when the new changes fail to show a sustained commitment "sufficient to carry out the Legislature's constitutional responsibilities," *Idaho Schs. for Equal Educ. Opportunity v. State*, 129 P.3d 1199, 1206 (Idaho 2005), and when the enactments did not "substantially change[ ] the baseline funding mechanism[ ]" giving rise to the suit, *Abbeville Cnty. Sch. Dist. v. State*, 767 S.E.2d 157, 163 (S.C. 2014). It is unclear what feature of our state Constitution the majority believes would render North Carolina courts less capable of adjudicating structural inadequacy claims against the State for its public education system than courts in Idaho and South Carolina, for example.

Because this lawsuit is plainly not "moot" in a legal sense, the majority's "times have changed" rationale appears to mean simply that too much time has passed in a literal sense. The majority notes that the original student-plaintiffs long ago graduated from high school and that the matter has now stretched into its thirty-second year. *See* majority *supra* Sections II–III & note 26.

### 4. *Judicial Respect for the Political Branches Drew Out These Proceedings*

---

that the overall funding scheme continues to disadvantage them in the same fundamental way," and "[e]ven assuming *arguendo* that the instant controversy is moot, we may still properly exercise jurisdiction, as our decision provides necessary judicial guidance regarding whether the State's current educational program is sufficient to satisfy the [State's] constitutional burden").

Putting aside the hypocrisy of the majority belaboring how long this litigation took in an opinion it filed more than two years after oral argument and more than three years after the earlier Order in *Leandro IV* was stayed pending review by the newly-elected Court, it is important to remember that *the reason* this case took so long is because the trial court and this Court deferred again and again to the political branches to remedy the violations. That deference was an inherent part of the right first recognized in *Leandro I*. We stressed that "the courts of the state *must grant every reasonable deference* to the legislative and executive branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education." 346 N.C. at 357 (emphasis added). And even as it was "so clearly the province, *initially at least*, of the legislative and executive branches as the determination of what course of action will lead to a sound basic education," this Court could not abandon our own "duty under the North Carolina Constitution" to enter "relief as needed to correct the [proven] wrong while minimizing the encroachment upon the other branches of government." *Id.* (emphasis added).

Over the years, we commended the trial court's "admirable restraint by refusing to dictate how existing problems should be approached and resolved," as "education concerns were the shared province of the legislative and executive branches." *Leandro II*, 358 N.C. at 638. The trial court acted appropriately by first affording the political branches "an unimpeded chance" to correct constitutional

deficiencies revealed at trial. *Id.* But even as we guarded against "premature" judicial intervention, *id.* at 645, we maintained that such deference was not endless. Courts are the backstop for fundamental constitutional rights. "[W]hen the State fails to live up to its constitutional duties, a court is empowered to order the deficiency remedied," we cautioned. *Id.* at 642. "[I]f the offending branch of government or its agents either fail to do so or have consistently shown an inability to do so, a court is empowered to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it." *Id.*

From 2004 to 2018, "despite its growing impatience with the State's failure to remedy its statewide violation, the trial court continued—for well over a decade—to defer to the executive and legislative branches to craft a remedy." *Leandro IV*, 382 N.C. at 408. Only "in response to the repeated failure of various piecemeal remedial attempts[ did] the trial court ultimately order[ ] the State to propose and implement a comprehensive 'definite plan of action' to remedy its statewide *Leandro* violation." *Id.* In doing so, the trial court wisely noted that a central tenet of *Leandro I* is that, at some point, deference to the political branches *could* run out:

> The clear import of the *Leandro* decisions is that if the defendants are unable to [chart a course that would adequately address this continuing constitutional violation], it will be the duty of the court to enter a judgment granting declaratory relief and such other relief as needed to correct the wrong while minimizing the encroachment upon the other branches of government.

*Id.* at 410 (cleaned up) (quoting the trial court's March 2018 order denying the motion

for relief from judgment). Even as many members of the bench "sincere[ly] desire[d] . . . that the legislative and executive branches heed the call" of voluntary compliance, the *Leandro* right would not hang on hope alone. *Id.*

*Leandro IV* cataloged twenty-five years of judicial deference when we held plainly, "Today, that deference expires." *Id.* at 390. Too much patience would eventually "constitute complicity in the violation, which this Court cannot accept." *Id.* at 390–91. Judicial complicity would transform respect for separation of powers into abdication of our own constitutional duties and the Constitution itself: "[U]ltimately '[i]t is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens.'" *Id.* at 391 (second alteration in original) (quoting *Corum v. Univ. of N.C.*, 330 N.C. 761, 783 (1992)). Only after an undeniable period of deference did this Court take the extraordinary step of ordering State officials to transfer funds to safeguard the constitutional right to a sound basic education.

The majority would thus convert the time required to afford judicial deference into grounds for stripping courts of jurisdiction to even hear these claims. The shield for constitutional separation of powers would become the sword on which the *Leandro* right falls. This insight, together with the above explanation of the majority's impossible view of how to bring a "facial" challenge against the State for failing to provide every schoolchild with the opportunity of a sound basic education, reveals the majority's unstated reasoning: that *Leandro* claims against the State are not

justiciable, notwithstanding three prior decisions by this Court that hold otherwise.

## II.    *Leandro* Claims Against the State Are Justiciable

The majority purports to respect the law of the case and the constitutional rights of every schoolchild—yet its decision does anything but. It attempts to subtly gut the structural right recognized three decades ago in this very case and could effectively prohibit students and communities from bringing such claims against the State.

Putting together the majority's statements reveals this shell game. The Court intimates that plaintiffs may only prove their entitlement to relief by establishing current rights violations. Harms that are "too old" will be stale under the majority's "times have changed" rationale, thus divesting the trial court of jurisdiction. New legislative enactments may similarly "make stale" the earlier harm and require plaintiffs to amend their complaint—or even file a new complaint—to proceed. That is true even when the legislative enactments are formalities: non-substantive changes to existing systems would apparently divest a court of jurisdiction over these claims. Of course, filing a new complaint risks litigators losing the record they have built thus far. It could also run into issues with legal doctrines that prohibit multiple legal cases arising from the same conduct. It is not clear how plaintiffs could both prove injury or harm with existing evidence and challenge a perfectly contemporaneous public education system.

If bringing claims against the State for its policies and practices would require

plaintiffs to show that those policies are incapable of providing any students the opportunity to access a sound basic education, potentially only extreme State actions like shuttered schools, nonexistent curriculum standards, or zero funding would give rise to a constitutional violation under this rationale.

The remedial stage as envisioned by the majority is no less dire. The judiciary may only order a remedy after reasonable deference to the legislative and executive branches. But if the legislature makes changes—even if they fail to fully remedy the harm, and *even if they make the harm worse*—courts "lose" jurisdiction over the remedial process. If the State does nothing for enough years, then it may never have to act at all: new technology will make its way into the classroom, and changing times will expire the trial court's subject matter jurisdiction in any event.

Education systems are, by definition, continually changing. New students start school every year. Teachers move classrooms or schools, in or out of the profession. New technology will hopefully always work its way into any school setting designed to equip students to succeed in an evolving society. If the changing nature of the state's education system is what deprives the Court of jurisdiction to hear these claims, then by definition courts cannot hear these claims.

In practice, then, the majority perceives no role for judicial adjudication of the quality of the State's system of public education. It would reduce the State's obligation to provide a general and uniform system of free public schools into a set of formalities and checked boxes, not meaningful constitutional protections. The current Court

would transform the *State's* obligation to guard and maintain the constitutional right to a sound basic education into a matter of legislative discretion.[20]

The legal doctrine that applies when a constitutional provision is committed to the sole discretion of another branch of government and thus cannot be subject to judicial adjudication is the "nonjusticiable political question doctrine." *E.g.*, *Cooper v. Berger*, 370 N.C. 392, 407 (2018). That doctrine precludes judicial review of "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the legislative or executive branches of government," rooted fundamentally in separation of powers concerns. *Id.* at 408 (cleaned up).

The majority could simply explain that it now holds that *Leandro* claims against the State are nonjusticiable political questions. But gone would be its "law of

---

[20] Parts of the majority opinion make this suggestion explicit. The Court repeatedly alludes that, as long as the General Assembly is complying with the education statutes it enacted, the statewide system of public education is "constitutionally compliant"—a suggestion which turns *Leandro I*'s qualitative focus on its head. *See* majority *supra* Section I.C.3 (interpreting *Leandro I* for the proposition that, because the statutes give effect to the State's constitutional requirements, the "statutory framework established by the General Assembly provided for a constitutionally compliant statewide public education system"); Section I.F (concluding that, because *Leandro I* subsumed the statutory question into the constitutional question, "compliance with the statutes would equate to constitutional compliance"); Section II.B. (interpreting *Leandro I* to mean that "the then-current education statutes, if properly implemented, would satisfy the schoolchildren's constitutional education rights").

Needless to say, *Leandro I*'s holding that the State has duty to provide all schoolchildren a quality, sound basic education does not comport with the conclusion that the Constitution only polices whether the General Assembly is complying with its statutes. To hold that compliance with the statute is sufficient to prove compliance with the Constitution essentially means the General Assembly's laws are the Constitution. That ends any power of judicial review by an independent judiciary.

the case" fig leaf. Three times over the lifespan of this case, this Court has rejected the State's arguments that these claims raise nonjusticiable political questions.[21]

Specifically, *Leandro I* held that the Constitution created this qualitative educational baseline, that claims against the State for failing to meet that baseline could proceed, and that courts have the duty to determine whether a challenged government action "exceeds [such] constitutional limits." 346 N.C. at 345. Accordingly, the claims did not raise nonjusticiable political questions. *Id. Leandro II* agreed. Although we held that the determination of the proper age for school children is in the General Assembly's discretion, and thus was not justiciable, the issue of whether the State "must help prepare those students who enter the schools to avail themselves of an opportunity to obtain a sound basic education" was justiciable. *Leandro II*, 358 N.C. at 639. *Leandro IV* provided the same. We reaffirmed that educational adequacy is justiciable and stood by our Court's duty to resolve constitutional challenges to the statewide public education system. *Leandro IV*, 382 N.C. at 438–42.[22]

---

[21] Note that this Court denied review of the issue of whether "the trial court violate[d] the doctrine of separation of powers and impermissibly intrude[d] into the powers of the political branches by dictating education policy and budging [sic] for the State through court orders." This Court allowed review "solely on the question of whether the trial court lacked subject matter jurisdiction to enter its order of 17 April 2023." *Hoke Cnty. Bd. of Educ. v. State*, 385 N.C. 380, 380 (2023) (order). That limits any holding by this Court in the instant decision because "[t]he scope of review by this Court is limited by the nature of the question before it." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 691 (1986).

[22] *Leandro IV* also rejected the Legislative-Defendants' and the dissent's arguments that "deciding the amount of State funds to be transferred to certain State agencies" was a political question because it "requires the trial court to engage in policy-based prioritization that 'is precisely the type of determination the people must make through their elected

The majority's cavalier attitude toward precedent it disagrees with is one thing, which I will address in Part III of this opinion. But the point to stress here is that the majority's unstated reasoning is simply wrong as a matter of constitutional interpretation.

As we explained in *Leandro IV*, constitutional text, structure, and history confirm the "inherent substance, broad scope, and paramount importance of the fundamental right to the opportunity to a sound basic education enshrined in our Constitution." 382 N.C. at 435–36. Courts can, and indeed are obligated to, adjudicate claims against the State for transgressing such constitutional guarantees. *See Leandro I*, 346 N.C. at 345.

### 1. Text

Start with the text, where the education right is twice enumerated. The first time is in the Declaration of Rights, the "Bill of Rights" equivalent in North Carolina's Constitution. John V. Orth, *The North Carolina State Constitution* 37–38 (1993). Article I, Section 15 declares that "[t]he people have a right to the privilege of education." N.C. Const. art. I, § 15. That expressly creates the individual right for the schoolchildren at issue here. Section 15 elaborates that "it is the duty of the State to

---

representatives.' " 382 N.C. at 473. The trial court, we noted, "assessed the State's compliance with *the State's own determination* of constitutional educational adequacy [via the Comprehensive Remedial Plan], not the court's." *Id.* at 473–74. In brief, "[c]onstitutional compliance is not a policy choice; it is a mandate that this Court is obligated to protect." *Id.* at 474. The trial court did not exceed separation of powers limits by recognizing as much, this Court held.

guard and maintain that right." *Id.* This "obligatory" language rests responsibility for the privilege of education on the State and State alone. *Leandro IV*, 382 N.C. at 430.

The second time is in Article IX, which is entitled, "Education." N.C. Const. art. IX. Article IX, Section 2(1) establishes that "[t]he *General Assembly* shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students." *Id.* (emphasis added). This is plainly a limit on the General Assembly. *Accord* N.C. State Const. Study Comm'n, *Report of the North Carolina State Constitution Study Commission* 2 (1968), https://www.ncleg.gov/Files/Library/studies/1968/st12308.pdf (noting that "what may appear in form to be a grant of authority to the General Assembly to act on a particular matter normally is in legal effect a limitation, not a grant"). "[I]t does not declare that the General Assembly *may* provide for a system of free public schools, but that it *shall* do so" under certain conditions. *Leandro IV*, 382 N.C. at 431. Even as the General Assembly "may," in the permissive, assign local units some responsibility for "financial support of the free public schools," N.C. Const. art. IX, § 2(2), it "shall" retain ultimate responsibility for "provid[ing]" public education in a "general and uniform" system, N.C. Const. art. IX, § 2(1). *See also Leandro I*, 346 N.C. at 348 ("[A]t the time this provision was originally written in 1868 providing for a 'general and uniform' system but without the equal opportunities clause, the intent of the framers was that every child have a fundamental right to a sound basic

education which would prepare the child to participate fully in society as it existed in his or her lifetime.").

The people's commitment to adequate public education and the corresponding limit on the General Assembly as to the same is confirmed in other sections of this article. Article IX, Sections 6 and 7 earmark certain funds to support public education: for example, the "proceeds of all lands" and other property given or belonging to the State. *See* N.C. Const. art. IX, § 6. Such proceeds shall be used "*exclusively* for establishing and maintaining a uniform system of free public schools." *Id.* (emphasis added). Similarly, Section 7 requires the General Assembly to appropriate funds generated by criminal fines, civil penalties, and forfeitures paid to county courts and state agencies "*exclusively* for maintaining free public schools." N.C. Const. art. IX, § 7 (emphasis added). These exclusive appropriations give constitutional guidance on how the State is to fulfill its duty to "guard and maintain" Article I, Section 15's "right to the privilege of education." They also demonstrate "the Constitution's repeated emphasis on adequately funding the State's system of free public schools." *Leandro IV*, 382 N.C. at 432; *accord Bd. of Educ. v. Bd. of Cnty. Comm'rs*, 174 N.C. 469, 472 (1917) ("[T]hese constitutional provisions were intended to establish a system of public education *adequate to the needs of a great and progressive people*, affording school facilities of recognized and ever-increasing merit to all the children of the State, and to the full extent that our means could afford and intelligent direction accomplish." (emphasis added)).

The language used in Article I, Section 15 and Article IX varies meaningfully. Although the Constitution tasks the "General Assembly" with adequately funding education, it simultaneously tasks "the State" writ large with the express duty to "guard and maintain" the people's right. The Constitution thus makes it *the collective duty* of state institutions to safeguard the education right. "As a coequal part of 'the State,' the judiciary—like the legislative and executive branches—is constitutionally bound by Article I, § 15 to fulfill its own unique role in guarding and maintaining the right to a sound basic education." *Leandro IV*, 382 N.C. at 445. Part of "guarding" a right the General Assembly is required to "maintain" is through judicial review, a practice which predated the 1868 Constitution in which this education clause originated. *See Bayard v. Singleton*, 1 N.C. (Mart.) 5, 7 (1787). This plain text is in strong contrast to other provisions that give the legislature the sole power to define and enforce substantive protections: for example, only the General Assembly can "freely give[ ]" consent for a tax, N.C. Const. art. I, § 8, or establish "other means of trial for misdemeanors" apart from a jury trial, N.C. Const. art. I, § 24.

### 2. Structure

Constitutional structure confirms that public education is not the sole, discretionary province of the legislature. The fundamental right to education appears alongside other fundamental rights like the right to free elections, N.C. Const. art. I, § 10, the right to religious liberty, N.C. Const. art. I, § 13, and the right to freedom of speech and press, N.C. Const. art. I, § 14. Including a fundamental education right in

Article I confirms the Framers' view that education rights strengthen and safeguard other fundamental rights, including to democratic participation, economic liberty, and free expression. *Leandro IV,* 382 N.C. at 432–33 (first citing N.C. Const. art. IX, § 1 ("Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged."); and then citing *Brown v. Bd. of Educ.,* 347 U.S. 483, 493 (1954) (describing education as "the very foundation of good citizenship")). Accordingly, education rights merit the heightened judicial scrutiny attendant to those other fundamental freedoms, which courts of this state have a special obligation to protect. *See Corum*, 330 N.C. at 783. "[T]he judicial branch derives inherent and inalienable authority to address the violation of constitutional rights from its very status as one of three separate and coordinate branches of our state government." *Leandro IV*, 382 N.C. at 445 (first citing *Ex Parte McCown*, 139 N.C. 95, 105–06 (1905); and then citing *Corum*, 330 N.C. at 783). When the legislature ignores its constitutional duty to fund schools, the judiciary is obligated to remedy that violation.

Not only is the positive right to the privilege of education enshrined in the Declaration of Rights, but it is also given further import by virtue of the standalone article dedicated to it. *Leandro IV*, 382 N.C. at 433. The abundant constitutional provisions in that standalone article undermine the notion that this issue is insulated from judicial review. After all, the people only agree to be bound by the General Assembly's laws subject to the Constitution's guarantees. If the legislature can act in

violation of such guarantees, the legislature may unilaterally usurp power not given to it by the Constitution and the people. *See State ex rel. Att'y-Gen. v. Knight*, 169 N.C. 333, 352 (1915) (noting that our Constitution most directly expresses "the will of the people," while "legislators" are "but agents of the people"); *In re Martin*, 295 N.C. 291, 299 (1978) ("The North Carolina Constitution expresses the will of the people of this State and is, therefore, the supreme law of the land."). Individuals must have lawful recourse when the legislature transgresses constitutional bounds, or else the Constitution conflicts with the very "popular sovereignty" on which it is premised. *See* N.C. Const. art. I, § 2 ("All political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole."). Denying citizens such recourse would also conflict with the Constitution's guarantee of a remedy for injury. *See* N.C. Const. art. I, § 18 ("All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay."); *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 342 (2009) (explaining the Constitution's emphasis on providing a "redress for every constitutional injury"). After all, "a constitution cannot violate itself." *Leandro I*, 346 N.C. at 352. Thus, constitutional structure further supports the power of judicial review of the substance of the education rights enshrined in our Constitution.

### 3. History

Finally, history illuminates why the people through our Constitution obligated the legislature to fund and the State specifically to safeguard adequate public education. This genesis of this provision is rooted in the pre-Civil War era, when legislative majorities abolished a robust statewide system of public schools rather than allow African American students to receive a public education. As *Leandro IV* explained,

> "Throughout the colonial period, the provincial government accepted no responsibility for education." N.C. Dep't of Public Instruction, The History of Education in North Carolina, 5 (1993) (hereinafter DPI Report). Because of the absence of State funding, what few educational opportunities that did exist were largely private, religious, and limited to affluent white families. *Id.*
>
> In 1776, North Carolina's original Constitution provided "[t]hat a school or schools shall be established by the Legislature, for the convenient instruction of youth, with such salaries to the masters, paid by the public." N.C. Const. of 1776 art. XLI. Nevertheless, educational opportunities remained underfunded and exclusive, and "[m]any North Carolina citizens were dissatisfied with the deplorable state of affairs and efforts were begun to remedy the situation." DPI Report at 7.
>
> The 1825 enactment of the Literary Fund was one such effort. *Id.* at 8. Over time, the fund grew and, in conjunction with further legislative support, "ushered in a period of expansion and progress for North Carolina public schools." *Id.* at 9. "By the time the Civil War erupted in 1861, it was generally recognized that North Carolina had one of the best school systems in the South." *Id.* Notably, though, this system still expressly excluded Black children, who could only access educational opportunities—if at all— at freedmen schools established and funded by private groups such as the American Missionary Association. *See* John L. Bell*, Samuel Stanford Ashley, Carpetbagger and*

*Educator*, 72 N.C. Hist. Rev. 456, 459, 461 (1995) (hereinafter Bell).

The Civil War "brought this progressive period in education to an abrupt halt." DPI Report at 10. First, the Literary Fund was depleted due to wartime economic instability. Bell at 476. Then, in 1866, due to this economic fallout and "fear[ ] that the federal government would force integration of [B]lack pupils into the statewide school system," the General Assembly abolished North Carolina's public school system entirely, instead leaving county governments to establish schools "at their discretion." *Id.*

Against this historical backdrop, North Carolina's first ever multiracial cohort of state leaders "met in the winter of 1868 to draft a new state constitution." *Id.* at 473; *see also* Leonard Bernstein, *The Participation of Negro Delegates in the Constitutional Convention of 1868 in North Carolina*, The Journal of Negro History, Vol. 34, No. 4, 391, 394 (Oct. 1949) (describing the composition of the Constitutional Convention of 1868) (hereinafter Bernstein); John V. Orth, The North Carolina State Constitution 12 (1993) (same) (hereinafter Orth). The resulting 1868 Constitution was markedly more progressive than its predecessor, including, for instance, the expansion of property rights to women and elimination of property qualifications from political participation. *See* Orth at 15; DPI Report at 10.

The 1868 Constitution likewise expanded educational rights. "Seeing that the legislature could abolish the school system by law in 1866, [delegates] insisted that the guarantee of a public school education for all children of North Carolina be embedded in the [C]onstitution beyond the reach of legislative majorities." Bell at 482–83. Thus, Article I, § 27 of the 1868 Constitution established the express positive right of the people to the privilege of education and corresponding duty of the State to guard and maintain that right. *See* Orth at 52 ("[T]he right to education was intended to mark a new and more positive role for state government."). The 1868 Constitution likewise established the General Assembly's

duty to fund the state's public education system, declaring that "[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of Public Schools," and specified that certain funds "shall be faithfully appropriated for establishing and perfecting in this State a system of Free Public Schools, and for no other purposes or uses whatsoever." N.C. Const. of 1868 art. IX, §§ 2, 4. Although conservative legislators attempted "to add segregation amendments to the [Education Provisions,]" these were rejected. Bernstein at 398. Instead, these constitutional guarantees "made no mention of race." Bell at 473. As noted above, our current State Constitution, ratified in 1971, includes substantially similar or identical language within its Education Provisions as its 1868 predecessor. *See* N.C. Const. art. I, § 15; N.C. Const. art. IX, §§ 2, 6, 7.

382 N.C. at 433–36 (alterations in original) (footnote omitted).[23]

North Carolina's constitutions have increasingly spread responsibility for the statewide school system across the branches of state government. Where the 1776 Constitution merely instructed that "a school or schools shall be established by the Legislature," N.C. Const. of 1776, art. XLI, the 1868 Constitution created the State Board of Education and empowered it to "make all needful rules and regulations in relation to Free Public Schools," subject to amendment, repeal, or alteration by the General Assembly, N.C. Const. of 1868, art. IX, § 9. The Board included executive officials popularly elected in their own right: the governor, lieutenant governor,

---

[23] "However, 'a post-Reconstruction amendment in 1876 required segregated schooling (separate but equal) . . . [until] [o]utlawed in 1954 by the U.S. Supreme Court's ruling in *Brown v. Board of Education* [and subsequently] forbidden by the 1971 Constitution.'" *Leandro IV*, 382 N.C. at 435 n.13 (alteration in original) (citing John V. Orth, The North Carolina State Constitution 145 (1993)).

secretary of state, state treasurer, state auditor, superintendent of public works (a position abolished in 1873), attorney general, and superintendent of public instruction. N.C. Const. of 1868, art. IX, § 7.[24] The 1868 Constitution also empowered the people to directly elect the superintendent of public instruction. N.C. Const. of 1868, art. III, § 1.

The expanding constitutional authority of the State Board of Education tracked the State's increasing role in public education funding. Specifically in the 1930s, when the education system looked unlikely to survive the cataclysmic economic conditions of the Great Depression, the State assumed responsibility for providing most of the funding for public schools. William W. Peek, N.C. Dep't of Pub. Instruction, *The History of Education in North Carolina* 13–14 (1993), https://digital.ncdcr.gov/Documents/Detail/history-of-education-in-north-carolina/2533439?item=2555702. In addition to financial support, the State stepped up by contributing textbooks, library books, and other school supplies. *Id.* at 15. It also bolstered staff support by establishing "a retirement plan for state employees, including all public school personnel." *Id.* Accordingly, by "1942, a constitutional amendment established a State Board of Education in a new and strengthened format," and moved "responsibility for handling the fiscal affairs of public education"

---

[24] *See also* Andy Baxter and E. Michael Latta, *A Short Constitutional History of Public School Governance in North Carolina, 1776–1990*, N.C. Insight (N.C. Ctr. for Pub. Pol'y Rsch.), Sept. 1990, at 13, https://www.ednc.org/wp-content/uploads/1990/09/NC-Public-Schools.pdf.

from the State School Commission to the State Board of Education, and specifically to a Controller's Office. *Id.* This constitutional history undermines the notion that the fundamental education right involves a "textually demonstrable constitutional commitment" to the legislature. *Bacon v. Lee*, 353 N.C. 696, 717 (2001) (cleaned up). Unlike, for example, the clemency right, which belongs to the governor alone, *see id.*, education responsibilities are not vested in any single branch or office, but in "the State" writ large.

*       *       *

In summary, constitutional text, structure, and history support that the State's obligation to provide a sound basic education is not a nonjusticiable political question. And there are "judicially manageable" standards for making these determinations. *Baker v. Carr*, 369 U.S. 186, 226 (1962); *cf. Bacon*, 353 N.C. at 717 (citing *Baker* for guidance for North Carolina's political question doctrine). This Court previously adopted "general guidelines for a *Leandro*-compliant resource allocation system":

> (1) that every classroom be staffed with a competent, certified, well-trained teacher; (2) that every school be led by a well-trained competent principal; and (3) that every school be provided, in the most cost effective manner, the resources necessary to support the effective instructional program within that school so that the educational needs of all children, including at-risk children, to have the equal opportunity to obtain a sound basic education, can be met.

*Leandro II*, 358 N.C. at 636 (cleaned up). These criteria stave off inappropriate judicial detours into the "nuts and bolts" of controversial education policy, *id.* at 636, and focus judicial inquiry on the essentials of a functioning education system: one

that "prepar[es] students to participate and compete in the society in which they live and work," *Leandro I*, 346 N.C. at 345. These criteria informed the Comprehensive Remedial Plan that the parties designed here, which built out a "systemic" plan "to deliver fully the *Leandro* [constitutional] right to all children," targeting foundational areas such as teacher quality and supply, principal quality and supply, resources and school funding, assessment and accountability systems, low-performing and high-poverty schools, early childhood learning and pre-K, and alignment and preparation for postsecondary opportunities.

The bottom line is that educational adequacy claims against the State are justiciable, and courts act consistent with our constitutional scheme when we hold peer branches accountable to constitutional guardrails. To the extent there was a policy choice here, it was by the people of this state and the Framers of the North Carolina Constitution to enshrine robust constitutional protections for education in our foundational governing document. "It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution," *Leandro I*, 346 N.C. at 345 (first citing *Mitchell v. N.C. Indus. Dev. Fin. Auth.*, 273 N.C. 137, 144 (1968); then citing *Ex Parte Schenck*, 65 N.C. 353, 367 (1871); and then citing *Bayard*, 1 N.C. (Mart.) at 6–7). The power "to say what the law is" is fundamental to the "judicial power" vested in our branch. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 136, 177–78 (1803); N.C. Const. art. IV, § 1. And "[t]he General Assembly shall have no power to deprive the judicial department of any power or

jurisdiction that rightfully pertains to it as a co-ordinate department of the government." N.C. Const. art. IV, § 1. Even the political branches are bound by the Constitution—that is the essence of the rule of law in a democracy.

### III.     Consequences of *Leandro V*

It is one thing for this Court to take the view that the State's failure to provide a general and uniform system of public education that provides adequate educational opportunities is nonjusticiable. It is quite another to surreptitiously impose that view in a decision that tries to gut three decades of decisions by this Court in this very case. Yet that is where *Leandro V* leaves us. The Court attempts to obliquely close the door to any claims against the State for violating schoolchildren's rights while hiding behind legal jargon like "facial challenge" and "proper pleading."

It is difficult to discern exactly what new legal doctrine the majority's decision is making, in part because it is so littered with clear misrepresentations of the history of these proceedings as well as troubling internal contradictions. In addition to those discussed above, others are important to note here. The majority observes that, "[w]here there is no jurisdiction of the subject matter the whole proceeding is void *ab initio*." *See* majority *supra* Section II.A (quoting *High v. Pearce*, 220 N.C. 266, 271 (1941)). Yet the majority also states that jurisdiction expired over the life of these proceedings and only proceedings after a certain point in time are void.

The majority admits that "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the

only function remaining to the court is that of announcing the fact and dismissing the cause." *See* majority *supra* Section II.A (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Yet far from announcing it does not have jurisdiction and dismissing the case, the majority expends tens of thousands of words trying to refashion our precedent in *Leandro I, II*, and *III*, while purporting to vacate *Leandro IV* and directing schoolchildren to petition the legislature for redress for their constitutional injuries.

The majority states that "the trial court's subject matter jurisdiction is coextensive with the claims raised in the pleadings." *See* majority *supra* Section II.A. Yet it invokes changes in the State's education system that occurred *after* pleadings as reasons that the trial court lost subject matter jurisdiction in this case. So "[a] court's subject matter jurisdiction over a particular case is invoked by the pleading," *see id.* (alteration in original) (quoting *Boseman v. Jarrell*, 364 N.C. 537, 546 (2010)), unless it is not?

The majority is bound by the law of the case doctrine to the extent it must respect previous judicial decisions that the "structure and funding of the State's education system" were held "facially constitutional." *See* majority *supra* Section I.F. But it ignores the law of the case in *Leandro IV* and selectively revives arguments that decision rejected. It insists both that plaintiffs never brought so-called "facial" challenges and that this Court resolved plaintiffs' facial challenges in the State's favor.

The distinction between as-applied and facial challenges is jurisdictional, the majority writes, because of notice principles—parties apparently must have express notice of plaintiffs' facial claims in order for the court to have jurisdiction over the subject matter of those claims. But this line of reasoning itself was apparently concocted from thin air. It was not advanced during briefing to this Court. It was not cited in oral argument as grounds for dismissing this action. The majority's purported quotation of the State's 2017 brief in support of its motion for relief from judgment, the sole place where the State apparently invoked this distinction as grounds to dismiss the action, does not appear in the record in this appeal or the preceding one. The supposedly central, fatal defect is nowhere in the record or the briefing yet now applies retroactively to over thirty years of proceedings. In other words, the majority invokes notice principles in a line of reasoning for which parties themselves had no notice.

Finally, the only issue over which this Court allowed review is whether the trial court had jurisdiction to issue the 2023 order. Yet the majority purports to reach back to review a 2017 order on a motion for relief from judgment and bases its reasoning on that unappealed order. So, the majority tries to exceed its jurisdiction in a decision deriding multiple courts of this State for apparently exceeding their jurisdiction.

Given these manifold inconsistencies and contradictions, it is difficult to discern exactly what the majority's decision means for our legal doctrine. But it seems

fair to conclude that the majority would limit the judicial power to remedy proven violations of fundamental constitutional rights based on the defendant's mid-litigation conduct. For the first time, a defendant has the power "to preserve or destroy jurisdiction of the court at [their] own whim." *In re Peoples*, 296 N.C. at 146 (quoting *Silver Surprize, Inc.*, 74 Wash. 2d at 523). It is not clear if this inclination will carry over to benefit other defendants or just the legislature—a body the Court seems unable or unwilling to check for constitutional violations of fundamental education rights in any meaningful way.

Not only is this approach contrary to innumerable decisions by this Court, but it is also at odds with state and federal jurisdictions across the country. *See generally* 20 Am. Jur. 2d *Courts* § 95 (2015) ("The jurisdiction of a court is continuing; once a court has acquired jurisdiction of a case, its jurisdiction continues until the cause is finally determined or disposed of, or is resolved, subject to appellate review, that is, all the issues of fact and law are determined and a final judgment is entered." (footnotes omitted) (citing cases nationwide)). It is especially troubling where the defendant is the State and the claims are constitutional. Allowing the State to escape judicial scrutiny for constitutional rights violations through its behavior during litigation quickly turns constitutional rights into words on paper—morally compelling but functionally useless.

The majority's decision also upsets over a century of doctrine that determinations on subject matter jurisdiction must become final once resolved by an

appellate court—even where Justices would have made a different decision in the first instance. *E.g.*, *Cheshire v. First Presbyterian Church*, 222 N.C. 280, 281 (1942) ("The decision of this court on the previous appeal [including on issues of jurisdiction], upon the same facts then and now presented, constituted the law of the case."); *N.C. Pub. Serv. Co. v. S. Power Co.*, 181 N.C. 356, 359 (1921) (Walker & Allen, J.J., concurring) ("We concur because the former decision in this case [on removal jurisdiction], to which we did not agree, is the law of the case . . . ."). It bears emphasizing that this Court twice confirmed that state courts do have subject matter jurisdiction over plaintiffs' adequacy claims against the State. *Leandro I*, 346 N.C. at 344–45; *Leandro IV*, 382 N.C. at 469–71. It is not difficult to see the invitation the majority sends to opportunistic litigants to take advantage of changes in this Court's composition. The majority would apparently roll out the red carpet for destabilizing re-hearings of settled issues and invite the public to view our work less as judicial decision-making and more as a function of partisan political power.

It also seems clear that this Court will not adjudicate structural claims against the State for failing to perform its "duty" to "guard and maintain" the people's right to the privilege of education," through an adequately maintained "general and uniform system of free public schools . . . wherein equal opportunities shall be provided for all students." N.C. Const. art. I, § 15; art. IX, § 2. As long as the system exists in name, the majority will not entertain a challenge to whether it exists in substance. The majority would thus potentially narrow the right first recognized in

*Leandro I* to the type of claim recognized in *Deminski v. State Board of Education*, 377 N.C. 406 (2021), that individual students can sue local county school boards and local school districts for local failures to ensure students receive the opportunity for a sound basic education.

But in terms of adequate resources, this appears to be an open door to nowhere. It is no consolation to a student in an under-resourced school district that she can sue her school district for not having enough resources. And this Court has already ruled that local governments are not proper defendants in such adequacy actions because the duty to provide adequate funding for a sound basic education rests with the State and the State alone: "[A]ny complications born of the incompetence or obstinance of a county board of county commissioners relating to the finances of local education are the 'ultimate responsibility' of the State, which must step in and ameliorate the errors." *Silver*, 371 N.C. at 866–67 (quoting *Leandro II*, 358 N.C. at 635).

One result of today's decision of which we can be certain is the sad stain this Court leaves on its own reputation and the self-inflicted injury it deals to the Court's standing as a coequal branch of North Carolina's government. It is difficult to estimate the damage this Court has done to its own legitimacy by trying to rewrite a fundamental constitutional guarantee because it no longer comports with the Justices' individual political preferences—and denying any relief to injured parties who proved in a court of law that the State violated their fundamental education

rights.[25] Such politicization threatens not just public confidence in the judicial system, *see* Amy Coney Barrett, *Precedent and Jurisprudential Disagreement*, 91 Tex. L. Rev. 1711, 1725–26 (2013), but also our system of government writ large. As one scholar put it, "if law is weaponized in a way that assimilates it to partisan politics,

---

[25] It is worth emphasizing how unfairly this Court treats Hoke County and its students in particular. Even if the majority were correct that this case was only ever about Hoke County, surely *Hoke County itself* is still entitled to relief. After all, even under the majority's retelling, Hoke County did prove a constitutional rights violation which this Court affirmed in 2004. Far from "abandoning" or "neglecting" this claim, the record shows that when the Hoke County School Board sought individual relief for just its district in 2004, the trial court refused because it understood that the violation went beyond Hoke County and any remedy would have to address the full violation.

Yet according to the majority, Hoke County gets nothing. Other students and poor school districts across the state similarly get no relief. The majority dismisses all the claims with prejudice.

The majority justifies this outcome in a six-paragraph footnote. *See* majority *supra* note 26. It states first the education system has changed. But the majority does not explain why that matters when the violation was proven based on the erstwhile system and no record evidence shows Hoke County has ever been made whole. It asserts that none of the original plaintiffs are still in high school. But it does not explain why that matters when the Hoke County school district, one of the original plaintiffs in this action, remains and certainly wants a remedy for its current students who do not have adequate resources from the State to obtain a sound basic education. It concludes that "this litigation lacks a necessary party: the General Assembly." But the legislature is an intervening party, the requirement that the legislature be made a necessary party was passed in 2013, nearly a decade after the violation in this case was found in 2004, and *Leandro II* clearly stated that the judgment and remedy were binding on "the State, and by the State we mean *the legislative and executive branches* which are constitutionally responsible for public education." *Leandro II*, 358 N.C. at 635 (emphasis added). Finally, the majority states that the litigation is friendly, so any remand would not be appropriate. But as a matter of common sense, thirty-two years of hard-fought litigation surely puts to rest any question of whether the parties had a sufficient stake in the case. The majority's repeated recycling of arguments the State made at various points throughout that time confirms as much. And *Leandro IV* squarely rejected the notion that this litigation lacked adversarial qualities or was a fatally defective "friendly suit." 382 N.C. at 474.

Accordingly, I cannot understand the majority's treatment of Hoke County specifically as anything other than the majority's apparent refusal to hold the legislature accountable for proven violations of constitutional education rights.

then . . . we don't have rule of law"; without rule of law, we cannot have a democracy. *Why Democracy Depends on the Rule of Law*, Duke Law News (Oct. 28, 2025) (quoting Professor Jedediah Britton-Purdy), https://law.duke.edu/news/why-democracy-depends-rule-law. That is not simply academic theory, it is historical fact. *See, e.g*, William E. Nelson, *Politicizing the Courts and Undermining the Law: A Legal History of Colonial North Carolina, 1660–1775*, 88 N.C. L. Rev. 2133, 2135 (2010) (describing how North Carolina's judiciary experienced "complete politicization" which led inevitably to the "breakdown of law enforcement and the rule of law").

The worst damage from this decision, though, is to generations of North Carolina's schoolchildren: those who believed in this Court's pronouncements about the right to the opportunity for a sound basic education and who this Court leaves to their own devices. The majority swaps $678 million in "necessary and appropriate" funding to remedy the ongoing violation of schoolchildrens' rights for three decades of broken promises and a shoddy explanation.

## IV.    Conclusion

The state Constitution contains many principles North Carolinians know to be true. The paramount value of education is one. The "right to the privilege of education" in a "general and uniform system of free public schools" is more than words on paper. N.C. Const. art. I, § 15, art. IX § 2(2). Educational opportunities impact our children's health and well-being, the ability of our state's economy to grow and develop, and the strength of our democracy. With education, we know ourselves. We

learn our history, so we may know our shortcomings and our possibilities for the future. We learn language and critical thinking, so we can appreciate the blessings of liberty, freedom, and equality. Our public schools are ordained to provide all these opportunities and more: a safe space and a warm meal, a teacher who believes in you, exposure to classmates with different viewpoints and backgrounds, a path out of poverty into prosperity, and the means to overcome many of life's greatest adversities.

The majority's decision to absolve the State of its solemn obligation to provide opportunities for a sound basic education in a uniform system of public education, and arguably when a remedy is needed most, is one more adversity our schoolchildren will have to face bravely. It is with those schoolchildren in mind, and with enduring hope that an independent and impartial judiciary will one day again fulfill its own obligations to protect the constitutional education rights of all schoolchildren and to check the State when it fails to do the same, I dissent.

Justice RIGGS joins in this dissenting opinion.

Justice DIETZ dissenting.

There is an incongruity in this case that is too obvious to ignore. The heart of *Leandro* is the notion of a sound basic education. But the Enlightenment principles that form the building blocks of that education—rationality, objectivity, tolerance, skepticism—have been abandoned by all sides in this long-running lawsuit. Instead, this case and the discourse around it have become a study in the opposite— partisanship, bias, generalization, straw-manning, and appeals to ignorance. Simply put, *Leandro* has lost its way.

I want to put it back on track. I see a path forward in this case that cures the State's shameful failure to meet its constitutional obligations. But critically, that path also returns public education policy to the other branches of government, rather than resting it permanently in the courts.

The Court chose not to walk that path today. But I think it is still worth mapping out. This is the end of *Leandro* as a lawsuit, but not *Leandro* as a promise to public school students. Because this constitutional issue will return, there is value in outlining the flaws I see on both sides of this polarized case, so that some future court might avoid the problems that led this lawsuit to its unfortunate demise.

I'll begin with the majority's analysis. I do not agree with the majority that there are fatal jurisdictional defects in this case. Trial courts have subject matter jurisdiction over claims that the State is violating an express provision of the North

Carolina Constitution. *See, e.g.*, *Corum v. Univ. of N.C.*, 330 N.C. 761, 784 (1992). Thus, our state court system certainly has the judicial power to entertain the claims asserted here. *See id.* If the trial court, or this Court, improperly used that judicial power to expand the remedies beyond what the complaint alleged, or beyond what the law permits, that is an error that warrants correction. *See State v. Ballance*, 229 N.C. 764, 767 (1949). It is not a defect in subject matter jurisdiction that deprives the court of all power to adjudicate anything in the case. *See In re N.P.*, 376 N.C. 729, 731–32 (2021).

Still, I understand some of the frustration that echoes through the majority opinion. Although I do not agree with the majority's analysis, the current appeal in this case has revealed serious flaws in the implementation of the comprehensive remedial plan. Specifically, as the majority correctly points out, this case rapidly transformed into a statewide remedial lawsuit. When it did so, the court system failed to put in place the protections that *Leandro II* envisioned to avoid due process concerns. Then, for reasons I cannot discern, this Court skipped over these glaring issues in *Leandro IV*, leaving the trial court to work it out. The result is an implementation that threatens the due process rights of the very students it seeks to protect.

I want to speak more about the errors in the majority opinion, but first I need to frame what I see as the two most critical flaws in the implementation of the current comprehensive remedial plan. Highlighting these flaws shows why the defects

identified by the majority are not actually jurisdictional and can be corrected through the procedural safeguards envisioned by *Leandro II*.

The first flaw concerns a lack of adequate representation for students impacted by the plan. The express purpose of the so-called "comprehensive remedial plan" is to be comprehensive. Its aim is "to bring North Carolina into constitutional compliance so that *all students* have access to the opportunity to obtain a sound basic education." *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158, 2020 WL 13310241, at *1 (N.C. Super. Ct. Jan. 21, 2020) (emphasis added).

The trial court's order implementing the comprehensive remedial plan repeatedly states that the plan would "bring North Carolina into constitutional compliance" with its obligations to educate our children. *Id.* It ensures that, going forward, North Carolina will now "achieve the outcomes for students required by our State Constitution." *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158, 2021 WL 8566348, at *4 (N.C. Super. Ct. Nov. 10, 2021).

But everyone involved in this case admits that the comprehensive remedial plan isn't *actually* comprehensive. It is a trade-off. Despite a warning from WestEd that its recommendations were not a "menu" of options from which the parties could pick and choose, that is exactly what happened. *Id.* Both programs and funding got cut from the plan. Specific recommendations were watered down. Others ignored. All of this had to be done to create a plan acceptable to the parties and the trial court. The plaintiffs summed it up at oral argument: "The comprehensive remedial plan is

not perfect. It is not the plan that plaintiffs would have put before the court. There are pieces in the WestEd report that are not included in the comprehensive remedial plan." *See* Oral Argument at 48:42–59.

This highlights a due process problem with the trial court's order. Students who would have benefited from the remedies left on the cutting room floor had no opportunity to be heard on that issue. *See Taylor v. Sturgell*, 553 U.S. 880, 892–93, 900–901 (2008). There could be groups of students, even entire school populations, who believe the portions of the WestEd report that got cut are more important than other parts that were left in. But they had no representation in this lawsuit. *Id.*

At oral argument, plaintiffs insisted that this lack of representation was not an issue. They explained that any students who were harmed by the decisions that the plaintiffs made *for them* (without any input *by them*) could simply bring their own lawsuits:

> [COUNSEL]: I believe they bring that lawsuit. I believe they bring it against the State of North Carolina, perhaps they also include the State Board of Education. If they prove that their violations are not being redressed by the comprehensive remedial plan, then there may be an order that the comprehensive remedial plan needs to be amended. As I said, it's not perfect.

Oral Argument at 49:42–50:29.

But that is *not* what the parties told the trial court in this case. The trial court expressly relied on the parties' representation that the plan would "provide the opportunity for a sound basic education to *all children* in North Carolina." *Hoke Cnty.*

*Bd. of Educ.*, 2021 WL 8566348, at \*5 (emphasis added). If the plan doesn't do that, it violates a key insight and holding of *Leandro II. See Hoke Cnty. Bd. of Educ. v. State* (*Leandro II*), 358 N.C. 605, 615–16 (2004).

In *Leandro II*, we held that any remedies obtained by the so-called "named plaintiffs" in the case must adequately redress a harm that "has occurred to those 'within the zone' to be protected by the constitutional provision at issue." *Id.* at 615. We emphasized that, because the case was limited to students in Hoke County, those named plaintiffs, "as Hoke County students, are certainly positioned within such a zone." *Id.* But we were careful to indicate that this zone of protection did not extend even to students in other similar "rural districts." *Id.* at 613 n.5. It was limited to Hoke County. By doing so, we created built-in due process protections because the "named plaintiffs" were closely matched with the students whose interests they were vindicating. This is a familiar concept that is found in other types of representative actions as well. *See Taylor*, 553 U.S. at 900–01.

This lawsuit is very different now. The case expanded until it became a statewide challenge to the funding and resources for public education. When it did so, the student plaintiffs slowly left the case and now only a small group of government school boards remain as plaintiffs. But the courts never returned to this core holding of *Leandro II* to assess the rights of students within the new, much larger "zone of protection." Nor did the courts examine whether the government plaintiffs could adequately vindicate the rights of those in this newly expanded zone. *Id.* at

615–16. As a result, the government plaintiffs agreed to a plan that, by their own admissions, removed portions of the WestEd report that would have benefited certain public school students without giving those students a voice in the decision. *See* Oral Argument at 48:42–59, 50:24–51:12.

This is an injustice, and it creates due process problems with the judgment. *See Hansberry v. Lee*, 311 U.S. 32, 45 (1940). The range of possible remedies is too complex, resources are too scarce, and the risk of conflicts is too great to permit a so-called "comprehensive" judgment, obtained by a group of government actors, without adequate safeguards for the students whose rights are being violated. *Id.* This flaw must be fixed so that all students are adequately represented and their constitutional violations adequately remedied. *See Leandro II*, 358 N.C. at 616.

This brings me to my second flaw in the comprehensive remedial plan: no one ever proved that the plan is the right one. In *Leandro IV*, we acknowledged that the comprehensive remedial plan was "by no means the only path toward constitutional compliance under *Leandro*." *Hoke Cnty. Bd. of Educ. v. State* (*Leandro IV*), 382 N.C. 386, 471 (2022). But no court ever compared the comprehensive remedial plan to these other "paths." *See id.* Put another way, we recognized that the trial court did not choose the comprehensive remedial plan because it was the best solution. There could be a better plan. There could be a *far* better plan.

Why, then, did the trial court choose the comprehensive remedial plan? Because the parties in this case made it the only choice. As this Court previously has

observed, and as plaintiffs candidly admitted at oral argument, "the comprehensive remedial plan is the only plan that was ever put before the court." Oral Argument at 50:56–51:03; *see also Leandro IV*, 382 N.C. at 471.

When we teach our children about rationality, we have a name for this sort of logical fallacy. We call it an appeal to ignorance. The plaintiffs contend that the comprehensive remedial plan must be the proper remedy in this case not because someone proved that it is, but because no one proved that it isn't. It is no different from concluding Bigfoot is real because no one has ever proved otherwise. Worse yet, there are many indications in the record that there are parties who were (and still are) willing to present competing evidence or offer a competing plan. *See, e.g.*, Motion to Intervene and for Clarification or Relief from Order, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158 (N.C. Super. Ct. Aug. 15, 2011). Beginning in the mid-2010s, every decision in *Leandro* appears designed to exclude those parties and their contrary viewpoints.

The easiest way to see the injustice here is to imagine a counterfactual. Suppose that instead of the plaintiffs in this case pursuing the interests of traditional public schools and their political allies, it was the opposite. A *Leandro*-style case arrives before a trial court brought by plaintiffs asserting that the only way to cure the constitutional failures of public education is to expand school choice. They present a report from a consultant recommending a massive build-out of public charter schools. On the other side of the case is an attorney general whose own political views

generally align with the plaintiffs' interests.

If the trial court approved a comprehensive remedial plan from those plaintiffs' consultant, and ordered billions in funds diverted from traditional public schools to public charter schools, what would happen? Would the plaintiffs in this case, would my dissenting colleagues, would everyone defending the current plan also defend this alternative plan because it, too, was "the only plan that was ever put before the court"?

Of course not. They would all point to centuries of court precedent requiring this sort of judgment to be "tested by fire in the crucible of actual controversy." *See City of Greensboro v. Wall*, 247 N.C. 516, 520 (1958). They would point out that there are obvious, competing proposals to remedy the violation, and the court system cannot simply put on blinders and pretend that these competing ideas do not exist. *See State v. Byrd*, 363 N.C. 214, 223 (2009). They would assert that it would be unjust to bind them to a judgment obtained by parties that do not truly represent their interests. *See Hales v. N.C. Ins. Guar. Ass'n*, 337 N.C. 329, 334–35 (1994). They would argue that the court should have joined them as parties so their voices could be heard or, at a minimum, appointed a second consulting firm so that opposing interests could "pit their evidence and arguments against each other" in a way that "best promotes the ultimate objective—truth and justice." *See Bouvier v. Porter*, 386 N.C. 1, 12 (2024) (cleaned up). They would contend that, no matter how commendable the plaintiffs' goals may be, entering a judgment this impactful and consequential in this limited,

restricted way is "a breakdown in the adversarial process that our system counts on to produce just results." *See State v. Oglesby*, 382 N.C. 235, 245 (2022). And they would be right. That judgment would be fatally flawed. This one is too.

Having laid out these flaws in the recent *Leandro* rulings, the question becomes what to do about it. I certainly do not think permanently dismissing the case is the answer. The trial court has subject matter jurisdiction over these constitutional claims. *See Corum*, 330 N.C. at 784. There were parties with sufficient standing to invoke the court's jurisdiction. *See Town of Midland v. Harrell*, 385 N.C. 365, 371 (2023). There is actual and genuine controversy that is justiciable in court. *See N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 447 (1974). And there is a live, existing dispute among the parties that is not remotely moot. *See In re A.K.*, 360 N.C. 449, 452–53 (2006). Thus, I see no basis to dismiss this proceeding with prejudice and unwind decades of progress in remedying this constitutional violation.

In my view, the solution is procedural. I would remand this case so that the parties and the courts can quickly take a series of process-related steps that correct the flaws in the earlier rulings. These steps would ensure that the final judgment in this case is an inclusive, lasting solution to the constitutional failings of public education.

*First*, I would order the trial court to join the legislature as a defendant in the remedial phase of this case. Admittedly, the Republican-led majority in the General Assembly is among the least sympathetic groups impacted by the comprehensive

remedial plan. Still, the courts did not treat the legislature fairly. The General Assembly has the will and the resources to fund competing research and offer an alternative plan to remedy the failures of our public education system. Examining these opposing viewpoints is vital to reaching an outcome that all parties can accept as legitimate. This would permit the courts to select a truly appropriate remedy by testing the competing proposals through the adversarial process. *See Wall*, 247 N.C. at 520.

Frustratingly, the plaintiffs blame the legislature for its own absence. But when the General Assembly timely moved to intervene in the early 2010s, the trial court denied the motion. *See* Motion to Intervene and for Clarification or Relief from Order, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158 (N.C. Super. Ct. Aug. 15, 2011); Order re: Motion to Intervene and for Clarification or Relief from Order, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158 (N.C. Super. Ct. Sep. 2, 2011).

In other words, the legislature tried to come to court and present its own arguments and evidence. The court said no. *Id.* Then, in the legislature's absence, that same court ruled that lack of funding from the legislature was the principal cause of the failings of public education. *Hoke Cnty. Bd. of Educ.*, 2021 WL 8566348, at *5. On appeal, plaintiffs defended the court's ruling by pointing out that the legislature never came to court to present any evidence to the contrary. *Leandro IV*, 382 N.C. at 458. Even schoolchildren can see the unfairness here. We must right this wrong going forward and permit the General Assembly to present its own arguments

and evidence to the trial court.

*Second*, it is time to use the procedural tools of the court system to give public school students a voice in this case. As I noted above, when we last examined these concepts in *Leandro II*, we focused on how the "named plaintiffs"—at the time a small group of Hoke County students—could represent others within the "zone of protection" in their school district and ensure that "the court will redress the harm inflicted on those within such a zone of protection." *Leandro II*, 358 N.C. at 615–16. We relaxed the traditional "standing and evidentiary parameters" of the case because "our state courts cannot risk further and continued damage because the perfect civil action has proved elusive." *Id.*

This is sound reasoning in my view. *Leandro* is truly *sui generis*. Many of the prudential justiciability rules that our state courts apply in litigation, such as standing and mootness, are impractical in a case of this size and scope.

But the *Leandro* plaintiffs took our words and distorted them, turning a holding that was designed to be comprehensive and inclusive into one that was restrictive and partisan. The "broadened parameters" of standing and representation in this case certainly go far beyond normal lawsuits. *Leandro II*, 358 N.C. at 616. But they cannot go so far that they permit the government plaintiffs in this case to abandon due process protections for the students whose rights are actually at issue. *See Hansberry*, 311 U.S. at 45. Because crafting a proper remedy in this case involves allocating funds, personnel, and school resources among a list of competing priorities,

the courts must ensure that the suit includes representative plaintiffs—or "named plaintiffs" as we described them in *Leandro II*—with a genuine interest in advocating for all possible alternatives. 358 N.C. at 616.

At oral argument in this case, the existing plaintiffs asserted that this inclusivity was impossible. When asked what would be wrong with creating a process that gives students notice of their *Leandro* claims and then provides them with an opportunity to be heard, plaintiffs responded that there was no "procedural mechanism" to do that:

> [COUNSEL]: I don't think there would necessarily be anything wrong with that, your honor. The problem is, there is absolutely no procedural mechanism in this case, no proper mechanism in this case to do that.

*See* Oral Argument at 53:22–34.

I disagree. Throughout the thirty-year legacy of *Leandro*, this Court consistently has broken new ground in the interests of justice. We devised novel constitutional doctrine. *Leandro v. State*, 346 N.C. 336, 345 (1997). We "broadened the parameters" of traditional declaratory judgment actions. *Leandro II*, 358 N.C. at 616. We relaxed fundamental concepts of justiciability and jurisdiction. *Id.* We even held that the *Leandro* courts can exercise "some activities usually belonging to one of the other two branches" of government. *Leandro IV*, 382 N.C. at 457.

If the judiciary can do all this, we can also tinker a bit with our own rules of procedure. Thus, I would remand this case with instructions to convert it into a special, streamlined class action. Our court system permits so-called "class action"

lawsuits when there are so many potential plaintiffs that it is "impractical to bring them all before the court." *Surgeon v. TKO Shelby, LLC*, 385 N.C. 772, 777 (2024). A class action allows small groups of people to represent much larger groups after first taking steps that ensure due process, such as providing notice to class members and ensuring that the representatives of the class have no conflicts of interest and can fairly represent everyone. *Id.*

A class action corrects the flaws inherent in the earlier *Leandro* rulings. And, importantly, I am not the only one to acknowledge this reality. At oral argument, the State conceded that "there are aspects of this that could have been resolved more effectively if we had a class action or a mass action with all the counties as plaintiffs or a certified class of all parents in the state. That would lead to true global peace here." Oral Argument at 1:01:50–1:02:03.

I would remand the case to pursue this "true global peace." That is what I believe *Leandro* desperately needs—a truly "global" solution. Or, to use a phrase more connected to this case, a truly "comprehensive" solution. On remand, the trial court could order the State to provide notice to all public school students and their parents that the courts are crafting a comprehensive remedy for the failures of our public education system. The court could then work with the parties to select representative students (and their parents) from across the state to stand in for their local peers as named plaintiffs. These representatives would be accountable to their subclass of students and obligated to seek remedies that provide them with meaningful relief.

*Third*, and finally, I would not leave the management of this streamlined class action lawsuit to a single "*Leandro* judge." *See Leandro II*, 358 N.C. at 612. Now that the case has evolved into a statewide remedy for every impacted student everywhere in the state, it is too much for one judge. We should use the provisions in the General Rules of Practice for the Superior and District Courts to designate a superior court judge to serve as a "*Leandro* judge" in every judicial district, if not every county. *See* N.C. R. Prac. Sup. & Dist. Cts. 2.1.

This would permit the courts to dig deep into the failings of our public schools at the local level. The judiciary could rely not just on the views of a single paid consultant, as we were forced to do in the past, but on the views of students, parents, teachers, and administrators. Hearings could occur district by district, or even school by school. When this task is not imposed on a single busy judge, the judiciary would have the freedom to truly get to the heart of this constitutional problem in a matter of months, rather than years or decades.

As I said at the beginning, public education is grounded in the principles of the Enlightenment. So too is the law. In *Leandro II*, this Court rightly observed that every day without a resolution to this case is another day where we allow the State to violate the constitutional rights of our children. 358 N.C. at 616. It is shameful that, even as we observed this reality, the court system also allowed *Leandro* to languish for decades.

But in the past few years, the courts went too far in the other direction. In our

rush to judgment, we abandoned the Enlightenment principles that inform our decision-making. We allowed a small group of government plaintiffs to impose a flawed remedy on every public school student across the state without the due process protections that the law requires.

I can only speculate about why this Court felt so compelled to rush *Leandro* to the finish line by the end of 2022. Whatever the reason, no *Leandro* decision will stand the test of time unless it is obtained through a process of inclusion, not exclusion. A comprehensive, statewide remedy for these constitutional violations must include due process safeguards for the students whose rights are being vindicated; it must provide every interested party with a full opportunity to present their opposing evidence and views; and it must test competing positions in the crucible of adversity so that the courts can arrive at objective truth.

The most recent *Leandro* decisions did not do this. But by innovating on the procedural tools at the court system's disposal, we can fix these flaws and still reach a speedy resolution to this long-running lawsuit. For these reasons, I cannot join the majority in dismissing this case. I would remand this case to the trial court with instructions to stay the implementation of the comprehensive remedial plan, to pursue the procedural steps I outlined above, and to put this landmark case back on a path to a prompt, fair, and comprehensive judgment.

Justice RIGGS dissenting.

Two timeframes bear remembering while reading today's opinion and dissents: 771 days and 11,511 days. Today's decision represents a sad day amongst the many days our state judicial system has allowed our children to languish in uncertainty and without the resources they need to start their lives as productive members of our society.

The first, 771 days, is the time it took for this Court to issue this decision, inexcusable in a matter of this importance. The second, 11,511 days, is the time in which students, educators, and parents have sought to secure an important right: the right to a sound basic education for all North Carolina children. It has taken 11,511 days to resolve whether our courts would actually enforce that right or merely treat it as a parchment promise, worth no more than the paper on which it was written. Our state's children have already waited too long for their state government to provide them with the start in life that our Constitution promises them, and after making them wait even longer, this Court has now pulled the rug out from under them.

Before diving into the majority's long list of factual and legal errors, it is worth stating plainly what the majority does with today's opinion. Under the guise of a narrow subject matter jurisdiction question, the majority voids a decision from a prior composition of this Court with which it disagrees, undermines decades of precedent

regarding our state Constitution's unique promise of a sound basic education, and solidifies its reputation as willing to selectively enforce constitutional provisions based on political preference, radically transforming the power of this Court to do its job without fear or favor.

I agree with Justice Earls's detailed analysis of the myriad flaws in the majority's ruling today. I write separately for three reasons: (1) to emphasize the historical significance of the erosion of meaningful judicial review in this state; (2) to ensure that North Carolinians understand just how wrongheaded the majority opinion is factually, doctrinally, and practically; and (3) to perhaps offer some hope to readers that our jurisprudence and our politics need not always be so hopelessly tribal (and resultingly careless of the needs of our state's most vulnerable persons— our children).

## I. Situating Today's Decision in Our Court's History

Today's decision not only dramatically reshapes the constitutional rights and educational realities of the millions of schoolchildren here in North Carolina; it also erodes this state's long tradition of judicial review and expansive state constitutionalism. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). This Court not only abandons that responsibility but does so in a manner that will negatively impact the development

of constitutional analysis in North Carolina and possibly across the country. Today's decision, following the pattern of *Harper v. Hall*, 384 N.C. 292 (2023), is the next in a line of improper and partisan attempts to strategically narrow judicial review to avoid fulfilling constitutional promises and remedying constitutional wrongs. Our Constitution is clear: "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. Today's decision betrays the robust understanding of positive rights in our state Constitution and can further contribute to the parsing of other rights and legal norms across the country.

### A. History of Judicial Review in North Carolina

Our state played a prominent role in the establishment of judicial review in our developing nation. *See* James Iredell, *To the Public* (1786) (articulating an early theory of judicial review); *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 7 (1787) (invalidating a legislative act as conflicting with the North Carolina Constitution and holding that, because the North Carolina Constitution was the "fundamental law of the land," no legislative act "could by any means repeal or alter the Constitution"). North Carolina was among the first states to formally recognize the concept of judicial review—that in the delegation of powers to different branches of government, the judicial branch must be able to strike down laws that are inconsistent with constitutional guarantees. *Glenn v. Bd. of Educ. of Mitchell Cnty.*, 210 N.C. 525, 530 (1936) ("It has been frequently said that this State was the first in the United States to declare an

act of the General Assembly unconstitutional . . . ."); *State v. Baldon*, 829 N.W.2d 785, 806 (Iowa 2013) (Appel, J., concurring) (listing *Bayard* as an example of "state court judges operating under Revolutionary Era state constitutions . . . developing the principle of judicial review in a series of state constitutional cases decided before ratification of the United States Constitution and *Marbury*"). North Carolina's articulation of judicial review came sixteen years before the Supreme Court of the United States recognized the federal judiciary's power to invalidate legislative enactments in *Marbury v. Madison*, a case familiar to all first-year law students.

Without judicial review, the promise of the balance of powers between the three separate branches of government would be illusory: the judiciary would have no power to rein in any excess of the other branches nor enforce the primacy of the constitutional documents that created each branch. The Court's 1787 decision in *Bayard* established that, while the legislative branch is powerful and where the people's representatives serve, the relationship between the people and its representatives cannot always be assumed to be (and, at times, has demonstrably not been) aligned. *See* 1 N.C. (Mart.) at 7. *But see State ex rel. McCrory v. Berger*, 368 N.C. 633, 651 (2016) (Newby, J., concurring in part and dissenting in part) ("The presumptive constitutional power of the General Assembly to act is consistent with the principle that a restriction on the General Assembly is in fact a restriction on the people.").

The Court in *Bayard* said "if the members of the General Assembly could"

dispense with the right to a jury trial in a case involving the loss of property rights, "they might with equal authority, not only render themselves the Legislators of the State for life, without any further election of the people, from thence transmit the dignity and authority of legislation down to their heirs male forever." 1 N.C. (Mart.) at 7. This hypothetical explicitly acknowledged that the legislature, absent the deterrent effect of a judiciary empowered to enforce the people's rights, would be enticed to take positions or actions antithetical to its obligation to represent the people of this state. The Court in *Bayard* also noted that, notwithstanding the Court's desire to respect and avoid a dispute with the legislature, those concerns could never "come in competition or authorize [judges] to dispense with the duty they owed the public, in consequence of the trust they were invested with under the solemnity of their oaths." *Id.* at 6–7.

## B. Our Judiciary's Role in Shaping State Constitutionalism

North Carolina's leadership in *Bayard* is significant not just for establishing the power of judicial review, but also for influencing the establishment of the judiciary's authority in our new nation and in other states. *See* William Michael Treanor, *Judicial Review Before* Marbury, 58 Stan. L. Rev. 455, 459 (2005) ("The prevalence of pre-*Marbury* exercises of judicial review helps explain why the assertion of judicial review in *Marbury* provoked little controversy . . . ."). *Bayard* demonstrated an important and underappreciated aspect of state constitutionalism: that judicial decisions regarding constitutional norms and rights often percolate up

from individual state courts and directly affect how constitutional law develops across the country. *See* Gerald S. Dickinson, *The Bottom-Up Constitution: States and the Evolution of American Constitutional Law*, Nat'l Civil Just. Inst. (July 19, 2025), https://ncji.org/wp-content/uploads/2025/06/2025-NCJI-Judges-Forum-Dickinson-The-Bottom-Up-Constitution-States-and-the-Evolution-of-American-Constitutional-Law.pdf. For decades, other states have looked to our precedent to help expand rights and define doctrine in a range of constitutional areas, including redistricting,[1] separation of powers,[2] and economic rights.[3] The influence that state constitutional decisions can have across the country is perhaps best exemplified by the sheer number of out-of-jurisdiction cases that cite *Leandro v. State* (*Leandro I*), 346 N.C. 336 (1997), including at least fifteen state courts and various federal courts. Several of the cases from outside of this jurisdiction explicitly cite to *Leandro I*'s holding that

---

[1] *Clarke v. Wis. Election Comm'n*, 998 N.W.2d 370, 385 (Wis. 2023) (citing *Stephenson v. Bartlett*, 357 N.C. 301 (2003), for its understanding of "contiguous").

[2] *Legis. Rsch. Comm'n ex rel. Prather v. Brown*, 664 S.W.2d 907, 914 (Ky. 1984) (citing North Carolina case and claiming, "Nearly every one of our sister state courts have similarly resisted any weakening of the doctrine of the separation of powers."); *In re Advisory Op. to the Governor*, 732 A.2d 55, 101 (R.I. 1999) (Flanders, J.) (quoting the Court's rejection in *State ex rel. Wallace v. Bone*, 304 N.C. 591 (1982), of legislative encroachment on executive power).

[3] *Wilkins v. City of Harrison*, 236 S.W.2d 82, 84 (Ark. 1951) (quoting *State v. Ballance*, 229 N.C. 764 (1949), in holding that an ordinance prohibiting solicitation for the purpose of selling goods was unconstitutional); *Abdoo v. City & Cnty. of Denver*, 397 P.2d 222, 223 (Colo. 1964) (en banc) (listing *Ballance* as a decision that "overturned legislative enactments purporting to impose regulations upon photographers, which were comparable to those regulations contained in the ordinance under question in this case"); *State ex rel. Whetsel v. Wood*, 248 P.2d 612, 615 (Okla. 1952) ("We have . . . cited to no case involving the regulation of watchmakers; but we have read with considerable interest the case of *State v. Ballance*, . . . where the Supreme Court of North Carolina had under consideration a statute regulating the occupation of photography.").

the positive right to education is justiciable and within this Court's authority.[4]

However, even as other states look to our decisions to help constitutional rights

progress, they also take note of our worst mistakes.[5] This Court can serve as a leader

in the development of positive, rights-enforcing doctrine or we can cede the role we

have claimed from *Bayard* to *Leandro* at the forefront of the development of state

constitutionalism across the country. While North Carolinians could be proud of state

constitutional leadership, it seems those days are at least temporarily behind us.

**C. The Majority's Revisionist History in Recounting *Leandro I,* this Case's Trial Court Proceedings, and *Leandro II***

---

[4] *See, e.g., Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 781 n.183 (Tex. 2005) (listing North Carolina as a state that rejected the argument that school finance raised a nonjusticiable political question and characterizing *Leandro* as "rejecting political question argument and stating that when a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits. Therefore, it is the duty of this Court to address plaintiff-parties' constitutional challenge to the state's public education system" (cleaned up)); *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 294 A.3d 537, 952 (Pa. Commw. Ct. 2023) ("North Carolina supplies another example of a high court finding education to be a fundamental right."); *State ex rel. Dickey v. Besler*, 954 N.W.2d 425, 444–45 (Iowa 2021) (Appel, J., dissenting) (listing *Leandro* as an example of how "most courts considering education claims under state constitutions with positive rights education provisions have not been daunted by the political questions doctrine in addressing the claims" (cleaned up)); *Gannon v. State*, 319 P.3d 1196, 1225 (Kan. 2014) (citing *Leandro* for the provision that "other state supreme courts have concluded that discerning standards to interpret their states' education articles is well within their judicial authority").

[5] Our decisions have the potential to influence other states to curtail constitutional rights, as in the states that cited *State v. Mann*, 13 N.C. (2 Dev.) 263 (1829), to strip enslaved people of their civil rights. *See Minor v. State*, 36 Miss. 630, 632 (1859); *Neal v. Farmer*, 9 Ga. 555, 583 (1851). Other states evaluated North Carolina's doctrine and recognized our mistakes. *Merrick v. Betts*, 101 N.E. 131, 132 (Mass. 1913) ("[rights-stripping] statements, like those of Ruffin, J., in State v. Mann, 2 Dev. (13 N.C.) 263, 265, have furnished convincing evidence of the injustice and inherent wickedness of the institution itself"); *State v. D.E.D.*, 402 P.3d 851, 862 (Wash. Ct. App. 2017) (Fearing, C.J., concurring) (citing *State v. Mann* as demonstrative of the "era of slavery when a member of a race of people lacked any right to be left alone and lacked any entitlement to the possession of his or her corporeal existence").

Many of the majority's legal errors are premised on a stubborn misreading of the prior decisions in this litigation, from both the trial court and our Court. Indeed, the majority seemingly hopes that no one ever actually bothers to pull up the 1994 complaint or reread the earlier trial and appellate court decisions in this case. We will never be able to agree on the law if we do not have some shared understanding of the facts. And if today's polarized times tell us anything, it is that we have work to do to commit ourselves to an honest and accurate recitation of facts and history.

To start, the majority extensively but erroneously reviews the first iteration of this case, *Leandro I*. *See* majority *supra* Section I.C. The majority states that this Court "acknowledged the facial constitutionality of the State's educational funding system multiple times[,]" purportedly citing *Leandro I*, 346 N.C. at 349–50, 353. Majority *supra* Section I.C.3. I do not find that reasoning or those words in the *Leandro I* decision. Indeed, the majority goes on to cite the "three 'surviving claims for trial'" after *Leandro I* by quoting from *Hoke County Board of Education v. State* (*Leandro II*), 358 N.C. 605 (2004), in a prefatory comment that did not even purport to actually quote *Leandro I*. *See* majority *supra* Section I.C.3. In its discussion of the *Leandro I* decision, the majority includes the following quotation:

> (1) whether the State ha[d] failed to meet its constitutional obligation to provide an opportunity for a sound basic education *to plaintiff parties*, (2) whether the State ha[d] failed to meet its statutory obligation, pursuant to Chapter 115C of the General Statutes, to provide the opportunity for a sound basic education *to plaintiff parties*, and (3) whether the State's supplemental school funding system [was] unrelated to legitimate education objectives and, as

> a consequence, [was] arbitrary and capricious, resulting in a denial of equal protection of the laws *for plaintiff-intervenors.*

*Id.*

While the majority accurately quotes *Leandro II*, that was not the *Leandro I* rule. To put it more simply: through some opportune cherry-picking of quotations, the majority rewrites history by quoting our cases out of order and without context. To the extent it is not intentionally misleading, it certainly represents a stark misunderstanding of the prior rulings and procedural posture at various points in the long history of this case.

Second, the majority offers a misleading explanation of the "Hoke County Trial." *See* majority *supra* Section I.E. The majority asserts that "[t]he trial court stated that the State's educational funding system was 'structurally sufficient to enable school systems to distribute and allocate funds for every child to have an equal opportunity to obtain a sound basic education.'" *Id.* The majority, however, does not clarify that the trial court was specifically reviewing North Carolina's "educational funding delivery system" and that the trial court noted that its "analysis of the funding delivery system will not address, at this point, whether the State is spending enough on education, but rather, whether the system to provide funding is constitutionally sufficient." The majority unapologetically glosses over the following from the trial court's Memorandum of Decision:

> <u>Caveat.</u>
>      The Court's determination that North Carolina's

> educational funding delivery system is sound and flexible
> enough to provide for the delivery of funding to all school
> systems so that they may provide each child with a sound
> basic education does not answer the issue of whether or not
> the State of North Carolina, is providing sufficient funding
> to [the Hoke County School System] or any other [local
> education agency] in a manner that ensures that all
> children are receiving an equal opportunity to obtain a
> sound basic education.

The distinction between "funding" and "funding delivery system" is an important one, particularly when considering what the trial court found.

Third, the majority's review of the 2004 decision in *Leandro II* (or *Hoke County I*, as the majority refers to the decision) seems misfocused. The Court largely affirmed the trial court's findings, including those described above that recognized that the state's funding delivery system was sound enough and flexible enough to satisfy the *Leandro* standard, but we specifically reserved the question of whether the State was adequately funding the system for later in the proceedings. Later proceedings did, in fact, squarely take up this issue. *See, e.g.*, Order on First Progress Reports for Implementation of Comprehensive Remedial Plan, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158, 2021 WL 8444440, at *2 (N.C. Super. Ct. Sep. 22, 2021) (ordering the parties to appear in October 2021 "to inform the Court of the State's progress in securing the full funds necessary to implement the Comprehensive Remedial Plan"). This Court affirmed "those portions of the trial court's order that conclude that there has been a clear showing of a denial of the established right of Hoke County students to gain their opportunity for a sound basic education and those portions of the order

that require the State to provide" *Leandro*-compliant allocations to the county's schools. *Leandro II*, 358 N.C. at 638. Recognizing that Hoke County was "the representative plaintiff district" for the rural counties' claims, *id.* at 613, our Court held that cases "involving either other rural school districts or urban school districts" should "proceed, as necessary," consistent with the opinion, *id.* at 648.[6]

## II. North Carolina State Courts Had and Continue to Have Subject Matter Jurisdiction to Resolve this Dispute

Despite the sleight of hand the majority employs in recounting the history of this case, the reality is that the affected entities, from official parties to educational leaders to lawmakers, have always grappled with a basic proposition: our Constitution charges the State with implementing and overseeing a *uniform* system of public education in a world where resources are not unlimited. *See* N.C. Const. art. I, § 15 (emphasis added); majority *supra* Sections I.C.3, I.E, I.F, I.G. No court can assess *uniformity* without consideration of how the State is running and funding education statewide—it is just preposterous to think otherwise. Plaintiffs in this case have never shied away from this reality, notwithstanding the pressures of

---

[6] The majority also ignores the fact that the Court recognized "that the evidence presented in this case reaches a broader constituency than the two designated plaintiff-school children in the case's caption." *Leandro II*, 358 N.C. at 615. The Court explained, "[T]he nature of a declaratory judgment action and the mandate of *Leandro* combine to afford the trial court and the participating parties greater evidentiary leeway than in a conventional civil action." *Id.* This Court rejected risking "further and continued damage" to "[t]he children of North Carolina [as] our state's most valuable renewable resource" because "the perfect civil action has proved elusive." *Id.* at 616. Sadly, that sage conclusion is erased by today's opinion.

"conventional civil action[s]," *Leandro II*, 358 N.C. at 615, and the devil is always in the details when implementing an educational system encompassing 100 counties and 115 different local education agencies.

## A. The Majority's Understanding of Facial and As-Applied Challenges is Flawed

The majority's flawed legal analysis is perhaps most on display in its treatment of whether this case is properly understood as a facial or an as-applied challenge. In some cases, the distinction between facial and as-applied constitutional challenges will be both legally significant and easily discernible. But that is not always the case, and the fact that much of this litigation predates the legislature's imposition of a distinct framework for venue decisions in facial and as-applied challenges does not retroactively deprive our courts of subject matter jurisdiction over these constitutional claims.[7] Rather than myopically focusing on labels, this Court should focus on remedies. That approach is consistent with our constitutional education jurisprudence. *See Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 610, 619 (1980) (upholding the remedy of a system-wide injunction on collecting modest

---

[7] Even to the extent that retroactive jurisdictional law changes are not impermissible, the legislative requirement of three-judge panels for facial constitutional challenges was explicitly not retroactive. *See* The Current Operations and Capital Improvements Appropriation Act of 2014, S.L. 2014-100, § 18B.16(f), 2014 N.C. Sess. Laws 328, 546–47 ("G.S. 1-267.1(b2), as enacted in subsection (a) of this section, becomes effective September 1, 2014. The remainder of this section is effective when it becomes law and applies to any claim filed on or after that date or asserted in an amended pleading on or after that date that asserts that an act of the General Assembly is either facially invalid or invalid as applied to a set of factual circumstances on the basis that the act violates the North Carolina Constitution or federal law.").

instruction fees plaintiffs alleged were vague and "unnecessary obstacles to the [right to education]'s fulfillment" until the waiver policy was revised). Instead, the majority's conclusion requires the reader to suspend all logic and plain meaning to conclude that a statewide remedy was never implicated by this litigation; and the reader must also believe that, in a case as procedurally unique and important as this one, *see Leandro II*, 358 N.C. at 616, the label of "facial" necessitates a dramatically different outcome over thirty years into the case.

As recently as two years ago, in *Singleton v. North Carolina Department of Health and Human Services*, 386 N.C. 597 (2024), this Court reasoned, in a case raising constitutional claims under the Monopolies Clause, Exclusive Emoluments Clause, and Law of the Land Clause, that "[w]e recognize that plaintiffs initially characterized their claims as 'as-applied' challenges and expressly sought declaratory and injunctive relief 'as applied to Plaintiffs.' But when courts distinguish between facial and as-applied challenges, the 'label is not what matters.' " *Id.* at 598–99 (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)). Now, apparently, the label matters. Unfortunately, the majority is in effect applying one set of rules to plaintiffs seeking to vindicate economic rights and another to plaintiffs, including schoolchildren, seeking to vindicate their educational rights.[8]

---

[8] Limiting our authority and the scope of judicial review will almost certainly act to the detriment of even the constitutional guarantees that members of the conservative majority seem to highly value, such as property and economic rights. Those of us on the Court who have consistently argued that this institution does wield significant authority to enforce the Constitution have not parsed where we exercise that power, including in recent

Perhaps we need to revisit the history and purpose of the North Carolina notice pleading standard. Rule 8(a) of the North Carolina Rules of Civil Procedure was adopted on 27 July 1967, when both chambers of the General Assembly voted to adopt it. An Act to Amend the Laws Relating to Civil Procedure, ch. 954, § 1, 1967 Sess. Laws 1274, 1284–85. In a landmark case interpreting the text of Rule 8 shortly after its adoption, we said that under the notice theory of pleading, a statement of claim is adequate "if it gives sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it." *Sutton v. Duke*, 277 N.C. 94, 104 (1970) (cleaned up). "[T]he policy behind notice pleading is to resolve controversies on the merits, after an opportunity for discovery, instead of resolving them based on the technicalities of pleadings." *New Hanover Cnty. Bd. of Educ. v. Stein*, 380 N.C. 94, 106 (2022) (quoting *Ellison v. Ramos*, 130 N.C. App. 389, 395 (1998)); *see also Pyco Supply Co. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 442–43 (1988) ("Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the

---

property and economic rights cases. *See, e.g.*, *Kinsley v. Ace Speedway Racing, Ltd.*, 386 N.C. 418 (2024) (unanimously articulating the standard for bringing a claim under the Fruits of Their Labor Clause); *Singleton*, 386 N.C. 597. For this Court to have any credibility as an impartial arbiter of the law, this Court cannot determine that some rights—those which align with the personal political beliefs of those in the majority or those rights that they deem politically advantageous—are more justiciable than those rights which they disfavor. In creating a subclass of rights, the majority abdicates its most fundamental duties.

Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.").

In years of litigation, neither the State nor any of its representatives have ever offered the excuse that they were not on notice that plaintiffs alleged statewide constitutional deficiencies with school funding and educational support. Any assertion would be laughable, of course, in light of the history of this litigation.

## B. The Pleadings in this Case Establish Subject Matter Jurisdiction

Again, it seems the majority and dissents start from a different set of facts. From the beginning, plaintiffs' complaint alleged a statewide injury. The initial factual allegation in the first complaint in 1994 reads:

> [The State Board of Education and the State of North Carolina] have failed in numerous respects to satisfy their constitutional and statutory obligations regarding education. These failures stem from the State's system for funding its schools, which does not take sufficient account of the substantial disparities in wealth among school districts. The result of inadequate funding is an education system with inadequate and unequal educational opportunities.

Plaintiffs asserted that the state's education funding system *as a whole* was not general and uniform and did not provide equal opportunities for all children, even as they compared their individual district to others. *See Leandro I*, 346 N.C. at 342–43 (summarizing plaintiffs' pleadings, including that "they have a right to adequate educational opportunities which is being denied them by defendants [the State of North Carolina and the State Board of Education] under the current school funding

system"). They claimed that, because of the state's general system, the quality of educational opportunities varied substantially "according to where a child happens to live [within the state]." Plaintiffs sought a declaratory judgement that the state's public education system, including its funding, "violates the Constitution of North Carolina by failing to provide adequate educational opportunities, by failing to provide substantially equal educational opportunities, and by denying due process of law." While some counts in the initial complaint were ultimately dismissed, the framing of and notice provided by the pleadings were always statewide.

And logically, the case here had to be about statewide claims because of the theory of the case. Any *Leandro* claim (as opposed to a claim under *Deminski v. State Bd. of Educ.*, 377 N.C. 406 (2021)) must inherently be a statewide claim because North Carolina operates a uniform educational system. Even if plaintiffs alleged that students in a particular county were being deprived of the right to a sound basic education because of insufficiently funded schools, our educational system is funded, as constitutionally mandated, by a uniform, statewide funding delivery system. That requires at least some statewide perspective for liability purposes and most certainly a statewide approach for remedy. Put another way, the majority purposefully misses the forest for the individual trees. North Carolina's uniform public education system is an interconnected, interrelated forest.

## C. The Law of this Case Establishes Subject Matter Jurisdiction

The trial court's consistent findings confirm what the pleadings established: that definitionally, assessing the constitutional adequacy of a uniform and sound basic public education requires a statewide analysis. In its judgment and final Memorandum of Decision entered on 4 April 2002, the trial court summarized years of factfinding and research to explain that, in determining whether children in Hoke County were receiving a sound basic education, the court was required to compare Hoke County's performance with other counties' performance. Judgment, *Hoke Cnty. Bd. of Educ. v. State*, No. 95-CVS-1158, 2002 WL 34165636, at *2–3 (N.C. Super. Ct. Apr. 4, 2002). It determined there was a *statewide* lack of coordinated, effective educational strategy for at-risk children in North Carolina. *Id.* at *3. The judgment went on to find that there was clear and convincing evidence that thousands of children throughout the state, including but not limited to children in Hoke County, were not provided with the minimum resources necessary to obtain a sound basic education. *Id.* at *49–50. The court reiterated that *Leandro*'s guarantee of a sound basic education applies to each and every child in North Carolina and the responsibility to meet that constitutional guarantee, as well as the obligation to remedy any violation, belongs to the State of North Carolina. *Id.* at *48–50. And the trial court explicitly stated: "[T]he State of North Carolina is ORDERED to remedy the [c]onstitutional deficiency for those children who are not being provided the basic educational services set out [above], *whether they are in Hoke County, or another county within the State.*" *Id.* at *53 (emphasis added). The trial court, consistent

with the pleadings, treated this case as a statewide challenge requiring a statewide remedy.

### D. The Majority's Subject Matter Jurisdiction Analysis is Deficient and Inconsistent with Our Precedent

So not only does the majority's subject matter jurisdiction conclusion fundamentally rest on misinterpretations of the pleadings and prior rulings in this case, but it also offers no discernible contours for its future application. At the outset, the majority notes that it intends to resolve the question of whether the trial court lacked subject matter jurisdiction to enter its 17 April 2023 order and concludes that it did. Majority *supra* Introduction. Later in the opinion, the majority blithely asserts that "by no later than the Attorney General's filing of the State Board's motion for relief from the Hoke County judgment on 24 July 2017, the litigation had been so transformed that a proper invocation of the trial court's subject matter jurisdiction over a facial challenge to the current system was required." Majority *supra* Section II.B. But what is entirely missing is a coherent explanation about why the Attorney General's filing on that date is legally significant, apparently because the legally significant moment might have been even earlier.

The majority never explains why this Court affirmed the denial of the State's motion to dismiss for lack of subject matter jurisdiction in *Leandro I*—presumably correctly since this Court does not explicitly purport to overturn *Leandro I*. This is a significant omission in a subject matter jurisdiction analysis: how does that give notice or guidance to parties seeking to litigate these cases? The cynical answer may

be that the majority never intended to give notice or guidance, despite this Court's obligation to do so. *See State v. Lawrence*, 365 N.C. 506, 511 (2012) ("It is the institutional role of this Court to provide guidance and clarification when the law is unclear or applied inconsistently."); *Mole' v. City of Durham*, 384 N.C. 78, 101 (2023) (Earls, J., dissenting) (reasoning that if the Court issued an opinion on the merits instead of a per curiam decision, "the parties would receive an explanation of why their claim was successful or failed, and future litigants would have a foundation from which to bring or defend any subsequent claims").

A final note on subject matter jurisdiction: even when this Court has held that subject matter jurisdiction does not exist, the proper disposition has been dismissal without prejudice, permitting plaintiffs to refile if they remedy the jurisdictional defect, not dismissal with prejudice. As the Chief Justice has previously noted: "Because there is no subject matter jurisdiction over plaintiff's claims, dismissal of plaintiff's amended complaint without prejudice is proper. Therefore, I agree with the majority that *the proper disposition is dismissal without prejudice.*" *United Daughters of the Confederacy v. City of Winston-Salem*, 383 N.C. 612, 653 (2022) (Newby, C.J., concurring in the result only with Berger, J., and Barringer, J., joining) (emphasis added); *see also In re T.R.P.*, 360 N.C. 588, 597 (2006) ("[D]ismissal . . . [for

lack of subject matter jurisdiction] ha[d] no res judicata effect, and . . . any party . . . can file a new petition in this matter.").[9],[10]

And even more fundamentally, this Court held twenty-two years ago that the rights of students were being violated. *Leandro II*, 358 N.C. at 647–48 ("[A]n inordinate number of students in Hoke County are failing to obtain a sound basic education and . . . defendants have failed in their constitutional duty to provide such students with the opportunity to obtain a sound basic education. . . . [T]he State must act to correct those deficiencies that . . . contribut[ed] to the State's failure of providing a *Leandro*-comporting educational opportunity."). Despite the Court's clear mandate, the State never implemented any remedy, either statewide or in Hoke County. The majority conveniently omits this important fact from its analysis and dismisses the case without any hope for relief or remedy.

### III. The Majority Opinion Both Ignores a Host of Practical Realities and Creates New Problematic Practical Implications

### A. The Argument that Technological or Methodological Changes Divest this Court of Subject Matter Jurisdiction is Incorrect

---

[9] I credit Justice Dietz for attempting to craft a proposed approach to resolving this litigation. While I cannot say that I agree with the doctrinal approach to reaching this proposal, a commitment to addressing due process and fairness in remedy is always laudable. And while I do think this proposal has some appeal as a compromise solution or an off-ramp from the mess created by the majority in this case, I have yet to find a different doctrinal path to reach his proposal without sacrificing my understanding of the law to my willingness to embrace compromise in an outcome.

[10] The majority buries a stunning amount of incorrect or radically changed doctrine in footnote 26, offering a few of the "many reasons" it will not order remand for renewed litigation of the original as-applied claims. Major doctrinal departures should not be dealt with as afterthoughts. Suffice it to say that all of footnote 26 is problematic.

In reading the majority opinion, a reader would conclude that the adage "times have changed" directly contributes to the Court losing subject matter jurisdiction. There is not a doctrinally sound reason that the case can no longer be litigated. While education has undoubtedly changed during the long history of this case, our children's right to a sound basic education (and this state's failure to provide such an education) has not changed. The majority introduces a dangerous fallacy by suggesting that "times changing" and "technology advancing"—quite the norm these days—can somehow cause our Court to lose subject matter jurisdiction and vitiate our duty to enforce our Constitution.

The majority's insistence that this case is nonjusticiable because of the proliferation of technology like personal laptops since the 1990s, majority *supra* Section II.B, is out of touch and incorrect. While many of us who were schoolchildren in the 1990s may not yet have had cell phones in our pockets, let alone smartphones, we knew technological changes were coming, as did our teachers. And although it has been more recent, educators and schoolchildren similarly understand that artificial intelligence has the potential to dramatically alter educational settings and outcomes. I hope not, but maybe someday we will be educating our children with artificial intelligence bots instead of well-trained and supported teachers. But all of that has about as much to do with the constitutional promise of a sound basic education for every child, regardless of the wealth of their county, as does whether a new style of jeans will come to be ubiquitous. Even as technology changes the way

we educate our children, the State's obligation to provide a sound basic education—and the ability of parties to litigate claims when the State fails in that obligation—must remain constant.

Further, the majority's distracting reference to changing accountability standards incorrectly implies that the method in effect at the time of the complaint is the only relevant metric for assessing the constitutional adequacy of public education. The truth is that whether you score it using an "ABCs" metric or "123s" metric, failure is still failure. And a change in the nomenclature and structure of accountability standards does not change the reality that we have been failing our public schoolchildren for decades. The majority's "times have changed" commentary does not reflect any actual legal rigor in analysis or commitment to performing our constitutional job to enforce the constitutional rights of North Carolinians.

There is an important balance between respecting the original intent behind the establishment of constitutional rights and ensuring that our constitutional analysis is sufficiently flexible to meet modern issues, but today's decision fails to reckon with that balance in favor of outright dismissal. We must continue to assess the constitutional adequacy of public education by looking to funding, curriculum, and accountability. The development of new technologies and accountability standards are relevant to that analysis but certainly do not obviate this Court's need

to conduct any analysis whatsoever.[11]  *See, e.g., State v. Bishop*, 368 N.C. 869, 874 (2016) (analyzing the First Amendment given technological changes to the internet and "new media and forms of communication that progress might make available"); *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 180–81 (2018) (analyzing the Commerce Clause given technological changes to modern e-commerce); *Carpenter v. United States*, 585 U.S. 296, 309–10 (2018) (analyzing the Fourth Amendment given technological changes to cell phones).

And, for all the self-proclaimed originalists in the majority, the majority's treatment of technological changes is ironically in conflict with modern originalist doctrinal trends, where courts have applied past-looking analysis to constitutional rights regardless of technological changes, even those which have radically reshaped society beyond what the Founders could have expected.  *See, e.g., United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) ("Even when a law regulates arms-bearing for a permissible reason . . . it may not be compatible with the [Second Amendment] right if it does so to an extent beyond what was done at the founding."); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131–32 (2022) (describing the Second Amendment test for modern regulations by looking to whether and how the Founding generation addressed societal problems).  This inconsistency suggests this Court may

---

[11] For example, it would be reasonable to update our definition of a sound basic education to require computer competency in light of technological developments since we first articulated the right in *Leandro I*.  However, it is unreasonable to claim, as the majority does, that because computers are more prominent in schools than they were in the 1990s, we are entirely unable to reach the present claim.

be more focused on results-oriented jurisprudence than the clear evolution of doctrine. Societal changes and new technology make it more, not less, important that this Court thoughtfully reckon with modern developments to meet its obligation to safeguard our constitutional rights. *See Bickett v. Knight*, 169 N.C. 333, 347 (1915) ("The Constitution is intended to be permanent, and was adopted not only to meet conditions then existing, but for the future . . . .").

**B. Today's Decision Still Ignores the Basic Problem: Our State's 100 Counties Have Access to Dramatically Different Resources and *Leandro* Compliance Requires a Statewide Solution**

The majority claims that the questions originally in controversy are no longer at issue today because the state's educational system has undergone changes—as it naturally would over the decades. Although the "educational system" in place in 1994 does not exist under the same name, the State's failure to allocate funds and its reliance instead upon local governments to fill gaps in funding are still present today. The majority ignores the basic problem that started this litigation all those years ago. North Carolina's educational system then—and now—operated on both state and local levels, but, as the majority acknowledges, "local governments played a *supplemental financial role.*" *See* majority *supra* Section I.A.2.c (emphasis added); N.C.G.S. §§ 115C-472.22 to -472.24 (2025). That is still the case today. *See* N.C.G.S. § 115C-408 (2025) (giving funding authority to the State Board of Education and excepting for local funds as may be provided by local governments, including "the facilities requirements" to be met by county governments).

The General Assembly has chosen to enact many statutes delegating the burden of funding education,[12] but the State cannot delegate away its entire responsibility. *Silver v. Halifax Cnty. Bd. of Comm'rs*, 371 N.C. 855, 868 (2018) (stating that even when a county "hinders" the right to a sound basic education, "it is the State's constitutional burden to take corrective action").

Even though the majority places blame on the counties for school funding inadequacies, this Court and the General Assembly are not making it easier for the counties to raise the funds necessary to provide a sound basic education, even if the General Assembly had properly and entirely delegated that responsibility to the counties (and it has not).[13] Because counties and municipalities are statutory

---

[12] *See, e.g.*, N.C.G.S. § 115C-408(b) (2025) ("[T]he facilities requirements for a public education system will be met by county governments."); *id.* §§ 115C-521(b), -524(b) (2025) (requiring boards of commissioners to provide funds for the erection of "school buildings equipped with suitable school furniture and apparatus" and to ensure that these buildings are in "good repair" and "at all times in proper condition for use"); *id.* § 115C-522(c) (2025) (making it the combined duty of "tax-levying authorities" and local school boards "to provide suitable supplies for the school buildings . . . includ[ing] . . . proper window shades, blackboards, reference books, library equipment, maps, and equipment for teaching the sciences" as well as the combined duty of boards of education and boards of county commissioners to "provide every school with a good supply of water").

[13] The majority fails to acknowledge that this Court has limited counties' ability to raise revenue for schools. *See Lanvale Props., LLC v. County of Cabarrus*, 366 N.C. 142, 143 (2012) (holding the county lacked general or statutory authority to impose a school impact fee)*; see also* Adam Lovelady, *Schools and Development Regulations in North Carolina*, Coates' Canons, Univ. of N.C. Sch. of Gov't Blog (June 28, 2024), https://canons.sog.unc.edu/2024/06/schools-and-development-regulations-in-north-carolina/ ("When it comes to school impact fees, North Carolina courts have been clear—local governments do *not* have the statutory authority to impose school impact fees. This is different from many fast-growing states where school impact fees are common."). "Through a series of cases starting in the early 2000s and culminating with [*Lanvale*], North Carolina courts ruled against local governments attempting to charge school impact fees on new development." *Id.*

creations with only statutorily granted powers, they do not have inherent, unbounded authority to raise money for their schools and must conform to the legislature's grant of powers. *See id.* at 866–67 (stating that counties are creatures of the legislature and serve as instrumentalities of the state government, so exercise power as conferred by statute).

Some counties have more resources, and other counties have fewer resources, but the majority expects both to meet the burden of school funding without adequate support from the State, even under our uniform system of education. The majority creates a classic straw man logical fallacy, and its efforts to destroy that straw man by blaming the counties only serves as a weak attempt to distract from the real constitutional responsibilities borne by the State. The practical implications of this misplaced blame will create lasting harm.

## IV.   This Case Bears Directly on the Reputation and Integrity of this Court

The increasing partisanship associated with any discussion of educational rights in this state does not serve the children of North Carolina (nor does it do anything to engender respect for the Court's impartiality). The course of this litigation has only recently shifted so markedly toward partisan lines. *See* Robert F. Orr, *The Long and Winding Road: The Leandro Case Saga Continues*, 101 N.C. L. Rev. F. 222, 240–41 (2023) [hereinafter Orr, *Long and Winding Road*] ("[T]he supreme court has had a varied composition throughout the litigation: *Leandro I* (five Democrats and two Republicans); *Leandro II* (six Republicans and one Democrat);

and *Leandro IV* (four Democrats and three Republicans)." (footnotes omitted)).

But critiques of "how we got here" do not need to be partisan in language. The course of this litigation has taken too long and certainly falls short of any ideal standard I have for how litigation of this import should be resolved. I see no point in pretending otherwise, particularly when public schoolchildren have borne the consequence of this shortfall. There is more than enough responsibility to go around. Litigants who seek relief in a court, at both the liability and remedy stages, have an obligation to work relentlessly to move their cases along, and they are not without options if a court drags its feet.[14] With the benefit of hindsight, there were obviously ways in which the parties could have properly asserted pressure on the trial and appellate courts to move more quickly. *See* Mark Dorosin, Leandro v. State*: The Challenges of Litigating School Funding Equity in Hyper-Partisan Times*, 13 Touro J. of Race, Gender & Ethnicity 61, 65 (2024) (noting "repeated requests from the plaintiffs" to enter an order compelling the State to develop a specific plan to remedy the constitutional harm or to provide additional educational funding).

But the blame certainly does not fall squarely at the feet of plaintiffs. The Legislative Defendant-Intervenors' failure to appeal the 2011 denial of their motion

---

[14] *See, e.g.*, *Stevens v. Guzman*, 140 N.C. App. 780, 783 (2000) ("The failure of the trial court to enter an order . . . is to be addressed through a writ of mandamus filed with this Court."); *In re T.H.T.*, 362 N.C. 446, 455 (2008) ("A writ of mandamus ensures that the trial courts adhere to statutory time frames without the ensuing delay of a lengthy appeal."); *Oltmanns v. Oltmanns*, 241 N.C. App. 326, 330–31 (2015) ("If a trial court fails to enter a written order, a party may apply to this Court for a writ of mandamus to compel entry of an order.").

to intervene, despite the subsequent enactment of legislation guaranteeing their intervention, implicates significant laches issues. *See Marshall v. Hammock*, 195 N.C. 498, 500 (1928) ("Equity aids the vigilant, not those who sleep on their rights."). The legislature complained that it did not have notice of the statewide claims here, but it effectively sat on its rights from 2011 to 2021. *Id.* ("[R]easonable diligence is the best evidence of good faith and a just cause . . . ."). And the State Board of Education's belated Rule 60 motion for relief from judgment also contributed to the delay.

Most significantly, though, the buck stops with us, the judiciary, if the wheels of justice turn too slowly. First, the courts, particularly ours, should not have allowed this litigation to drag on for decades. While much of the judicial delay here was attributable to an otherwise laudable deference to the other branches of government, the majority construes that deferential delay as what ultimately defeats plaintiffs' ability to obtain any relief. That, at core, cannot be the right answer—deference and delay as a defense to liability and remedy?

Thus, for all the critiques of *Leandro IV* we saw in the 2022 dissents and see in judicial ink spilled here today, our courts have failed our children terribly. Not only do North Carolina courts have an "inherent power to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed," *In re Alamance Cnty. Ct. Facilities*, 329 N.C. 84, 100 (1991) (cleaned up), we bear the responsibility and shame when we fail to act in a timely fashion to protect

justice. Our trial courts have the power "to do what is reasonably necessary for the proper administration of justice," *id*., including the power to control a case to ensure fairness and prevent injustice. It has been said, without much controversy I think, that "[t]he litigation would have been far better served if a comprehensive order setting out the intent of [the decision to first try the case of a representative county] had been entered and consented to in writing by the parties." Orr, *Long and Winding Road* at 232.[15] When the trial court failed to move this case along by taking excessive amounts of time to take evidence and enter comprehensive and final orders, this Court should have exercised its supervisory authority as the Supreme Court of North Carolina to intervene. N.C. Const. art. IV, § 12, cl. 1 ("[T]he Court may issue any remedial writs necessary to give it general supervision and control over the proceedings of the other courts.").[16] Our trial courts were not solely accountable for this situation: we have an obligation to ensure that our lower courts are doing their jobs and that cases are being resolved on reasonable timelines. We allowed our discretion and deference to simmer without coming to a boil for so long that multiple generations of schoolchildren lost out on the start at life that our Constitution promised them.

---

[15] Justice Orr, a former justice of the Supreme Court of North Carolina, authored this Court's opinion in *Leandro II*.

[16] *See also* Raymond B. Mallard, *Inherent Power of the Courts of North Carolina*, 10 Wake Forest L. Rev. 1, 12–13 (1974) (explaining courts have the inherent powers that are "reasonably necessary for the administration of justice and the orderly and efficient exercise of the court's jurisdiction").

Further, with the benefit of hindsight, perhaps it is easy to criticize *Leandro IV*. The majority there could have provided more clarity in defending its reliance on the WestEd Comprehensive Remedial Plan. The *Leandro IV* majority might also have reckoned more directly with the dissent, rebutting its points more squarely so that today's majority could not repackage the *Leandro IV* dissent's grievances as subject matter jurisdiction.[17] But alas, some of the same members of this Court who decried the decision of a "bare majority" of the Court in *Leandro IV* force an even more fractured outcome here. *Hoke Cnty. Bd. of Educ. v. State* (*Leandro IV*), 382 N.C. 386, 481 (2022) (Berger, J., dissenting with Newby, C.J., and Barringer, J., joining). At least for now, we should not expect this majority to reject hubris or assume responsibility for building bridges.

**A. We Must Come to Some Shared Understanding of the Role of the Court**

Enough of how we got here, more than thirty years after the start of the litigation. What do we do about it beyond hope and pray that another branch of government takes its obligations seriously under the state Constitution? A helpful

---

[17] While I think that the subject matter jurisdiction arguments underpinning today's majority are wrong, I worry even more that now, decisions taken by our Court to resolve litigation with some finality will be undermined by never-ending and politically-motivated post-judgment challenges to subject matter jurisdiction. *Lockhart v. Bell*, 90 N.C. 499, 500 (1884) ("It is due to the parties litigant, and it is important in a more general and higher sense to the public in the administration of justice, that there shall be a decent and orderly end to litigation, and that the decisions of the courts shall be uniform and stable as well as correct."); *State v. Brunson*, 327 N.C. 244, 249 (1990) (reasoning that finality "promot[es] public confidence in and stability of the legal system"); *Weisel v. Cobb*, 122 N.C. 67, 70 (1898) ("A partial change in the personnel of the Court affords no reason for a departure from the rule [against rehearing cases], but rather emphasizes the necessity for its application . . . .").

step might be examining with some curiosity whether our decisions help or hinder the efforts of litigants to bring fully developed cases through our judicial system and resolve them with finality.

I am beyond troubled by the tone throughout the majority, particularly in the conclusion. There is no place in an opinion of the Supreme Court of North Carolina for scolding litigants for seeking to vindicate constitutional rights, particularly those of North Carolina's children who cannot speak out for themselves. It is also surpassingly ironic that the majority is critical of plaintiffs' efforts to effectively move this case forward, and yet it took over two years for this Court to issue this opinion, concluding in fewer than thirty pages of actual legal analysis. I cannot imagine a more surefire way to convince the legal community and the public that this Court is unable to act "without favor, denial, or delay" than to act with such dismissive disregard for the parents, students, and schools impacted by today's decision, then abstractly opine on what better things lawyers can do than seek relief in this Court for a constitutional deprivation. *See* majority *supra* Section III; N.C. Const. art. I, § 18.

Indeed, the majority makes clear that it lacks interest in entertaining not only future constitutional litigation under Article I, Section 15, and Article IX, but any litigation where this Court might be required to enforce the Constitution over the legislature's objections or resistance. That is not only devastating for the state of checks and balances; it disabuses even a lay reader of any hope that we can expect

an impartial judiciary that will consider the nuance of politically-charged cases, seek to build legal consensus, or provide meaningful clarity for practitioners.

The role of the Court is to protect North Carolinians' rights and liberties under our founding documents, and the role of state government is to make better the lives of the people who live in this state. But some of my colleagues disagree and have a dramatically different understanding of the role that our branch plays in governance and in the daily lives of North Carolinians.

Ultimately, though, I expect that meaningful change in the direction of our courts—in how we work to resolve legal disputes in a reasoned and neutral way and how we strengthen or earn a public reputation for impartiality—needs to come from the top. Consider this: in cases with major constitutional or institutional significance, the Chief Justice, if in the majority, will frequently take the pen on drafting a so-called "Chief Justice's Opinion." Orr, *Long and Winding Road* at 227. In my mind, that tradition not only derives from a respect for seniority, but a belief that the Chief Justice bears extra responsibility for defending the institutional reputation of the Court and because the Chief Justice (here and at the Supreme Court of the United States) should typically be particularly sensitive to ensuring that the high court is neutral and impartial.[18] Nothing about what the Court as a body does today seems

---

[18] In his 2024 Year End Report, Chief Justice Roberts noted that a pressing threat to "judicial independence is defiance of judgments lawfully entered by courts of competent jurisdiction" and that "judicial independence is undermined unless the other branches are firm in their responsibility to enforce the court's decrees." John G. Roberts Jr., *2024 End of Year Report on the Federal Judiciary* 7–8, https://www.supremecourt.gov/publicinfo/year-

to embrace that ethos.  To be sure, the Chief Justice of any high court does not alone bear the responsibility for defending the reputation and impartiality of the Court, but I do hope, for the sake of us all, that we are nearing the point in these contentious times where the tides change and leadership actively builds consensus and models the inclusion required to earn the trust of the people.

**B. Collegiality and Consistency on the Court Will Beget Better Law**

Unfortunately, today's opinion not only highlights the philosophical differences among the members of the Court, but the inappropriate scolding we see in the majority extends beyond the litigants appearing before the Court.  The majority targets one of its own members—a constitutional officer—in a concerning manner.  The majority is rife with not-even-remotely subtle suggestions that Justice Earls is acting inappropriately by sitting on this case.  Her name is explicitly stated seventeen times, and there are numerous other references to her involvement with the Penn Intervenors.  Justice Earls has addressed this matter fully in her dissent, so I mention this only to highlight one particularly troubling aspect of the majority's treatment of Justice Earls.  To be clear, I obviously do not think it is inappropriate for members of the judiciary to express opinions, when invited, on whether other members of the

---

end/2024year-endreport.pdf.  Quoting the late Justice Ruth Bader Ginsburg, he added that "an independent judiciary is 'essential to the rule of law in any land,' yet it 'is vulnerable to assault; it can be shattered if the society law exists to serve does not take care to assure its preservation.'"  *Id.* at 8  (quoting R. B. Ginsburg, Remarks on Judicial Independence, Conf. of Am. Judges Ass'n (2006)).  He urged the federal courts to "do their part to preserve the public's confidence in our institutions."  *Id.* at 9.

judiciary should or should not recuse themselves. *See* Order, *Hoke Cnty. Bd. of Educ. v. State*, 385 N.C. 866, 868 (Feb. 16, 2024) (No. 425A21-3) (Riggs, J., dissenting from the Court's order dismissing plaintiff's motion and suggestion of recusal of Justice Berger that was referred to the entire Court for its consideration).[19] As I said there, "Impartiality—maintained in fact as well as for appearances—is central to the functioning of our state's courts." *Id.* (citing *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 311 (1976)). This Court established two ways in which a justice may resolve a motion seeking that justice's recusal: he or she can decide it individually, or the justice can refer it to the rest of the Court. Recusal Procedure Order, 379 N.C. 693 (Dec. 23, 2021).

What is astonishing to me is that the majority, after dismissing a recusal motion directed at Justice Berger because he had earlier individually denied a recusal motion in this case, impliedly critiques Justice Earls for exercising that same right under this Court's procedures. *See id.* In 2022, Justice Berger decided that he did not need to recuse in this matter. However, after the partisan makeup of the Court changed, Justice Berger referred a later recusal motion to the entire Court. Referral Order, *Hoke Cnty. Bd. of Educ. v. State*, 385 N.C. 864, 865 (Feb. 5, 2024) (No. 425A21-

---

[19] The Code of Judicial Conduct provides that "a judge should disqualify himself . . . in a proceeding in which the judge's impartiality may reasonably be questioned, including but not limited to instances where . . . [he or his] spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person . . . [i]s a party to the proceeding, or an officer, director, or trustee of a party." N.C. Code of Jud. Conduct 3(C)(1). A parent is within the third degree of relationship to a judge.

3) (Berger, J.). And then this Court decided that because we were bound by Justice Berger's earlier unilateral decision, the subsequent recusal motion "amounts to an impermissible challenge to Justice Berger's denial of [plaintiffs'] first motion" and his first sole determination "shall be final." Order, *Hoke Cnty. Bd. of Educ. v. State*, 385 N.C. 866, 867 (Feb. 16, 2024) (quoting Recusal Procedure Order, *Hoke Cnty. Bd. of Educ.*, 379 N.C. at 693). Apparently, the majority would apply different rules to different members of this Court. Sadly, this brings to mind a famous quotation of the political philosopher Edmund Burke: "Hypocrisy can afford to be magnificent in its promises, for never intending to go beyond promise, it costs nothing." We will never be able to move past the tired tribalism of our politics if this Court persists in such double standards.

***************

I recognize the irony in offering this commentary in a dissent, but the public and the legal community alike are entitled to see where this majority has forsaken opportunities for compromise and collegiality. I understand that many will walk away from this Court's decision and dissents feeling hopeless, believing that the divides among those who serve them on the highest court are too great to ever be bridged, too great to ever develop the kind of legal doctrine that both protects North Carolinians' rights and will remain constant even when this Court changes political control. I refuse to believe that a better Court is out of reach. While we live in polarized times, and I do think today's decision represents an institutional failure,

the power to change this lies in the voices and votes of those who read this decision and want something different. While I disagree that some rights enshrined in the Constitution can only be vindicated at the ballot box,[20] I do agree that the ballot box is the only place where one important North Carolina issue can be resolved: whether the jurists who serve on the Supreme Court of North Carolina are willing to enforce the rights our Constitution grants its citizens and whether those jurists can put politics aside to work together for the good of the people of this state.

Today, this Court breaks a promise that constitutional drafters made to the people. The majority discards our constitutional commitment to the children of the state instead of acting to meet it. The majority distorts the facts and history of this case, hides behind technicalities rather than addressing the core issue affecting our children, and looks for a reason—any reason—to ignore the problem instead of fixing it. The majority's message to our children is clear: pull yourself up by your bootstraps, but there is nothing this Court will do if the political branches never met their obligation to put boots on your feet in the first place. But tides will change, voters will reach a breaking point, and hope springs eternal that democratic demand for a different species of Court will soon produce results.

Justice EARLS joins in this dissenting opinion.

---

[20] *See Richmond Cnty. Bd. of Educ. v. Cowell*, 254 N.C. App. 422, 429 (2017) ("We have pronounced our judgment. If the other branches of government still ignore it, the remedy lies not with the courts, but at the ballot box.").